UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

FRIENDS OF THE EAST HAMPTON AIRPORT, INC.,
ANALAR CORPORATION, ASSOCIATED AIRCRAFT
GROUP, INC., ELEVENTH STREET AVIATION LLC,
HELICOPTER ASSOCIATION INTERNATIONAL, INC.,
HELIFLITE SHARES LLC, LIBERTY HELICOPTERS,
INC., and SOUND AIRCRAFT SERVICES, INC.,

No. 15 Civ. ____

                                  Plaintiffs,

**COMPLAINT**

      -against-

THE TOWN OF EAST HAMPTON,

**Jury Trial Demanded**

                              Defendant.

------------------------------------------------------------------------x

Plaintiffs Friends of the East Hampton Airport, Inc., Analar Corporation, Associated Aircraft Group, Inc., Eleventh Street Aviation LLC, Helicopter Association International, Inc., HeliFlite Shares LLC, Liberty Helicopters, Inc., and Sound Aircraft Services, Inc. (collectively, "Plaintiffs"), by their undersigned attorneys, allege as follows:

**Introduction**

1.      Plaintiffs seek declaratory and injunctive relief against the Town of East Hampton (the "Town") to enjoin the Town from unlawfully restricting access to East Hampton Airport (the "Airport") in violation of federal law.  Specifically, Plaintiffs seek to enjoin the Town from putting into effect and enforcing the local laws adopted by the Town on April 16, 2015 (and other laws they may soon adopt), which severely restrict access to East Hampton Airport through the imposition of mandatory curfews and trip limits.  *See* Town of East Hampton Res. 2015-411, 2015-412, and 2015-413, *to be codified at* Town of East Hampton Code §§ 75-38, 75-39

1

(collectively, the "Restrictions").  The Restrictions are preempted under the Supremacy Clause of the U.S. Constitution because they violate and conflict with federal law and policy.  The Restrictions also violate the Commerce Clause of the U.S. Constitution because they unduly burden interstate commerce.

2.      East Hampton Airport is a public-use, federally funded airport that the Federal Aviation Administration ("FAA") has specifically designated as important to our national air transportation system.  Of the approximately 19,000 airports and landing facilities in the United States, the FAA has deemed fewer than 3,400 important to the nationwide system of air transportation – and East Hampton Airport is one of them.  Built in the 1930s with federal funds, and developed in the decades since with federal funds, East Hampton Airport connects the eastern end of Long Island to the rest of the nation and supports local and regional economies.  Throughout its 79-year history, the Airport has been open to commercial and recreational aircraft of all kinds.

3.      Although the Town owns and operates East Hampton Airport (as the Airport's local proprietor), the Town has no authority to promulgate airport restrictions that conflict with federal aviation law and policy.  Congress has preempted the field of aviation regulation to promote and protect a national air transportation system – recognizing that no national system would be possible if left to patchwork regulation by local governments and subject to local political winds.

4.      Under well-established federal law, local governments have no authority to use their police powers to regulate aircraft in flight or to impose airport noise or access restrictions.  Furthermore, local airport proprietors have no authority to impose noise or access restrictions unless such regulations (i) comply and conform with federal law and policy, and (ii) are

2

otherwise reasonable, non-arbitrary and non-discriminatory.  Simply put, "Congress has left room only for local action that advances and is consistent with federal policy; other, noncomplementary exercises of local prerogative are forbidden." *British Airways Bd. v. Port Auth. of N.Y.*, 558 F.2d 75, 84–85 (2d Cir. 1977).

5.      In adopting the Restrictions, the Town has knowingly and purposefully transgressed the bounds of its extremely limited authority.  The Town adopted the Restrictions in blatant violation of the Airport Noise and Capacity Act of 1990 ("ANCA"), 49 U.S.C. §§ 47521-47533, in which Congress established a national aviation noise policy that bars airport proprietors from imposing <u>any</u> noise or access restrictions on <u>any</u> aircraft classified by the FAA as "Stage 2" and "Stage 3" aircraft unless the proprietor has first complied with ANCA's requirements.[1]  Among other things, ANCA requires the airport proprietor to prepare and publish specific, extensive analyses at least 180 days before any proposed restriction on Stage 2 aircraft may take effect.  ANCA furthermore prohibits any restriction from being imposed on Stage 3 aircraft unless the proprietor has first obtained FAA approval or the consent of all affected aircraft operators.  Yet, here, the Town adopted the Restrictions – imposing severe access restrictions on both Stage 2 and Stage 3 aircraft – without remotely complying with ANCA's requirements.

6.      Further, the Town adopted the Restrictions in violation of the Airport and Airway Improvement Act of 1982 (the "AAIA"), 49 U.S.C. §§ 47101-47131.  Under the AAIA, in return

---

[1] The FAA has classified aircraft into "Stages" based on each aircraft's ability to operate beneath various noise thresholds specified by the FAA.  Generally speaking, Stage 2 aircraft emit less noise than Stage 1, and Stage 3 aircraft emit less noise than Stage 2.  In 2005, the FAA promulgated a new Stage 4 classification for the quietest aircraft currently in operation.  Stage 4 aircraft emit less noise than Stage 3 aircraft and receive the same ANCA protections as Stage 3 aircraft.

for federal airport funding, the Town gave binding assurances to the federal government that, at least until September 2021, it would: (i) keep the airport open and accessible to all types of aircraft and aeronautical activities, including commercial activities, on reasonable terms; (ii) maintain the Airport in a safe and well-serviced condition; and (iii) not impose anti-competitive restrictions.  The Restrictions violate these grant assurances because they are unreasonable and anti-competitive in nature, unfairly discriminate against certain aircraft, and will so deprive the Airport of revenue as to make it difficult or impossible for the Airport to be properly maintained.

7.      The Restrictions, without justification or regard for federal interests, severely limit flight operations by Stage 2, Stage 3, and Stage 4 aircraft.  Under the Restrictions, nearly all helicopters and many jets will be barred from using the Airport for 13 hours of every day, year-round, including when passenger demand is highest.  The Restrictions further bar those aircraft from accessing the Airport for more than one trip per week during the summer – effectively shutting down commercial charter service by helicopters during the busiest season.  The Restrictions are excessive and unprecedented in their severity for a public-use, federally obligated airport.  They will disrupt the national transportation system and interfere with federal policy for maintaining safe and efficient airports and navigable airspace.

8.      Moreover, in contravention of federal regulations and policy, the Restrictions purport to create new local standards and requirements for aircraft classification and the determination of aviation noise impact.

9.      Although the Town has attempted to justify its disregard of federal law by pointing to a 2005 settlement involving the FAA to which the Town was not even a party, that settlement does not – and could not – relieve the Town of its obligation to refrain from imposing restrictions that violate federal law.

4

10.    The Restrictions stand as an obstacle to the accomplishment and execution of established federal law and policy.  If allowed to take effect, the Restrictions will undermine Congress's will, unduly burden interstate commerce, and irreparably harm the Plaintiffs.

11.    Plaintiffs accordingly seek declaratory and injunctive relief confirming that the Town's Restrictions are invalid and unenforceable under the Supremacy Clause and the Commerce Clause.

## The Parties

12.    Plaintiff Friends of the East Hampton Airport, Inc. ("FOEHA") is a non-profit corporation organized and existing under the laws of the State of New York, and located in Suffolk County.  FOEHA represents the interests of those who seek to keep East Hampton Airport open to all types, kinds, and classes of aircraft activities and flying services.  FOEHA's members include, among others, operators and users of Stage 2, Stage 3, and Stage 4 aircraft. FOEHA's members will be irreparably harmed by the Restrictions.

13.    Plaintiff Analar Corporation ("Analar") is a New Jersey corporation located in Princeton, New Jersey.  Analar is an air carrier that is federally authorized to provide helicopter charter services.  Using Stage 2 helicopter aircraft, Analar flies passengers to and from points throughout the East Coast.  Analar uses East Hampton Airport extensively to transport passengers intrastate and interstate.  Analar will be irreparably harmed by the Restrictions.

14.    Plaintiff Associated Aircraft Group, Inc. ("AAG") is a Connecticut corporation located in Wappingers Falls, New York.  AAG is an air carrier that is federally authorized to (i) to provide helicopter charter services, and (ii) manage a fractional aircraft ownership program that involves selling partial ownership or leasehold interests of a helicopter to private persons who desire to operate their own helicopter using the safety support services provided by AAG as

the program manager.  As the fractional program manager, AAG serves the aircraft ownership

and operating interests of the private aircraft to whom it has sold the helicopter shares, including

customers that fly into and out of East Hampton Airport.  AAG's aircraft are Sikorsky

helicopters presently classified by the FAA as Stage 2 helicopters; those helicopters also meet,

but are not currently certified to, the FAA's newly enacted standards for Stage 3 helicopters.

AAG transports passengers to various locations throughout the East Coast, and uses East

Hampton Airport extensively to transport passengers both intrastate and interstate.  AAG will be

irreparably harmed by the Restrictions.

15.     Plaintiff Eleventh Street Aviation LLC ("Eleventh Street") is a Delaware limited

liability company located in Highland Heights, Ohio.  Eleventh Street is federally authorized to

operate aircraft for private use.  Eleventh Street operates a Stage 4, state-of-the-art Dassault

Falcon 7x jet airplane ("Falcon 7x"), which is based at East Hampton Airport.  Eleventh Street

also operates a Stage 2 helicopter.  Eleventh Street conducts extensive intrastate, interstate, and

international flight operations to and from East Hampton Airport.  Eleventh Street will be

irreparably harmed by the Restrictions.

16.     Plaintiff Helicopter Association International, Inc. ("HAI") is a Delaware

corporation located in Alexandria, Virginia.  HAI is a trade association that represents and serves

the interests of helicopter operators around the world.  Its members include one or more

providers of helicopter services at East Hampton Airport.  HAI's members will be irreparably

harmed by the Restrictions.

17.     Plaintiff HeliFlite Shares LLC ("HeliFlite") is a Delaware limited liability

company located in Newark, New Jersey.  HeliFlite is an air carrier that is federally authorized to

(i) to provide helicopter charter services, and (ii) manage a fractional aircraft ownership

program.  HeliFlite provides flight services to clients throughout the East Coast using Stage 2 helicopter aircraft.  HeliFlite uses East Hampton Airport extensively to transport passengers intrastate and interstate.  HeliFlite will be irreparably harmed by the Restrictions.

18.     Plaintiff Liberty Helicopters, Inc. ("Liberty") is a New York corporation located in Kearny, New Jersey.  Liberty is an air carrier that is federally authorized to provide helicopter charter services.  It provides flight services to customers throughout the East Coast using Stage 2 helicopter aircraft.  Liberty transports passengers from points within New York and New Jersey to East Hampton Airport.  Liberty will be irreparably harmed by the Restrictions.

19.     Plaintiff Sound Aircraft Services, Inc. ("Sound") is a New York corporation and fixed-base operator ("FBO") located at East Hampton Airport.  Sound leases airport property from the Town and is the main provider of fuel and other on-site services to the aircraft and passengers that use East Hampton Airport.  Sound will be irreparably harmed by the Restrictions.

20.     Defendant Town of East Hampton is a town on the east end of Long Island consisting of the village East Hampton, the hamlets of Montauk, Amagansett, Wainscott, and Springs, and part of the incorporated village of Sag Harbor.  The Town's legislative power is vested in a town board (the "Town Board") consisting of five members.

## Jurisdiction and Venue

21.     Plaintiffs' claims for declaratory and injunctive relief arise under the Supremacy and Commerce Clauses of the United States Constitution, the Declaratory Judgment Act, 28 U.S.C. § 2201, and this Court's inherent equitable powers.  This Court has jurisdiction under 28 U.S.C. § 1331.

22.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant Town of East Hampton is located in this District and the events giving rise to Plaintiffs' claims occurred in this District.

## Pertinent Law

23.     Congress has established the federal government's exclusive sovereignty over the airspace of the United States and preempted the field of aviation regulation in order to promote and protect a national air transportation system.

24.     Among Congress's stated goals in enacting federal aviation laws are to promote and encourage a competitive, privately owned United States air transport industry, and to ensure that consumers in all regions of the United States, including those in small communities, have access to air service.  *See* 49 U.S.C. § 40101.

25.     The FAA is responsible for implementing, enforcing, and overseeing the federal aviation laws enacted by Congress.  The FAA has promulgated extensive federal regulations implementing Congress's directives and establishing rules, standards, and federal policies governing the operation of airports and aircraft.

26.     Under federal law, local governments have no authority to regulate or control aircraft in flight, no authority to impose airport noise or access restriction using their police powers, and no authority to enact or enforce airport noise or access restrictions that violate or conflict with federal law and policy.

27.     Congress has expressly preempted local governments from enacting or enforcing "a law, regulation, or other provision having the force and effect of law related to price, route, or service of an air carrier . . . ."  49 U.S.C. § 41713(b)(1).  Congress has left no more than

extremely limited room for a local government that is "carrying out its proprietary powers and rights" as an airport proprietor.  *Id.* § 41713(b)(3).

28.     A local proprietor may promulgate airport regulations <u>only</u> to the extent that such regulations (i) conform with federal law and (ii) are otherwise reasonable, non-arbitrary and non-discriminatory.

29.     The FAA is vested with special expertise, knowledge and responsibility to determine whether airport restrictions are reasonable, non-arbitrary and non-discriminatory.  The FAA has stated that to be reasonable, a regulation restricting airport uses for noise control purposes must, among other things, reflect a balanced approach to addressing the identified problem that fairly considers both local and federal interests.

30.     Airport restrictions that violate federal law or inhibit the accomplishment of legitimate national goals are unreasonable *per se*.

31.     Particularly relevant here are the federal laws governing noise control and the federal funding of airports.

**A.      Noise Control – The Airport Noise and Capacity Act**

32.     Congress has legislated repeatedly in the area of aviation noise control, culminating in Congress's enactment in 1990 of the Airport Noise and Capacity Act ("ANCA"), 49 U.S.C. § 47521, *et seq*.  ANCA established a "national aviation noise policy" applicable to all U.S. airports.  49 U.S.C. § 47523.

33.     Prior to ANCA's enactment in 1990, various federal statutes and regulations addressing noise control had already established, among other things: (i) uniform federal standards and procedures for the measurement of aircraft noise; (ii) a single system – using the Day-Night Average Sound Level ("DNL") noise metric – for determining the exposure of

9

individuals to airport noise resulting from airport operations; (iii) federal policy guidelines regarding land use compatibility (including standards for evaluating when residential property near an airport may be considered adversely affected by flight operations); (iv) a program to make federal funding available for local noise abatement efforts; (v) a classification system for aircraft based on noise level – classifying aircraft into "Stages" 1, 2 and 3 (and later 4); and (vi) time-frames and procedures for phasing out certain aircraft based on noise level.[2]

34.     The FAA has classified aircraft into "Stages" based on their ability to operate beneath various noise thresholds specified by the FAA.  In general, Stage 1 aircraft emit the most noise; Stage 2 aircraft emit less noise than Stage 1; and Stage 3 aircraft emit less noise than Stage 2.  In 2005, the FAA promulgated a Stage 4 classification for certain airplanes.  Stage 4 is currently the quietest classification.  *See* 70 Fed. Reg. 38742, 38748 (July 5, 2005).  This classification system serves Congress's goal of alleviating community noise concerns through the use of new technology and noise abatement strategies, rather than through airport access restrictions.

35.     In 1990, Congress enacted ANCA, legislating a national aviation noise policy. ANCA applies to all airports in the United States.  *See* 49 U.S.C. § 47524(b)-(c); 14 C.F.R. §§ 161.3, 161.5.

36.     In enacting ANCA, Congress expressly found that "community noise concerns have led to uncoordinated and inconsistent restrictions on aviation that could impede the national

---

[2] *See* Act of July 21, 1968, Pub. L. No. 90-411, § 1, 82 Stat. 395 (codified as amended at 49 U.S.C. § 44715); Noise Control Act of 1972, Pub. L. 92-574, § 7(b), 86 Stat. 1234 (codified as amended at 42 U.S.C. §§ 4901–4918, 49 U.S.C. § 44715); Aviation Safety and Noise Abatement Act of 1979, Pub. L. No. 96–193, 94 Stat. 50 (codified as amended at 49 U.S.C. §§ 47501–47510); FAA Modernization and Reform Act of 2012, Pub. L. No. 112-95, 126 Stat. 11 (codified in scattered sections of 49 U.S.C.); *see also* 14 C.F.R. Pts. 36, 150, 161; 14 C.F.R. §§ 91.801-.883.

air transportation system," and that, while "local interest in aviation noise management shall be considered in determining the national interest," "a noise policy <u>must</u> be carried out at the national level." 49 U.S.C. § 47521(2)-(4) (emphasis added).

37.     ANCA expressly prohibits airport proprietors from imposing any noise or access restriction on Stage 2 or Stage 3 aircraft unless ANCA's requirements have been satisfied. At Congress's direction, the FAA has promulgated extensive regulations, published at 14 C.F.R. Part 161, establishing a consistent nationwide process for review of airport noise and access restrictions.

<u>**ANCA Requirements for Stage 2 Aircraft**</u>

38.     ANCA prohibits <u>any</u> access or noise restriction from being imposed on Stage 2 aircraft unless, at least 180 days before the effective date of the proposed restriction, the airport proprietor prepares, publishes and makes available for public comment:

(1)     An analysis of the anticipated or actual costs and benefits of the proposed noise or access restriction;

(2)     A description of alternative restrictions; <u>and</u>

(3)     A description of alternative measures considered that do not involve aircraft restrictions, and a comparison of the costs and benefits of such alternative measures to costs and benefits of the proposed noise or access restriction.

14 C.F.R. § 161.205(1)-(3), implementing 49 U.S.C. § 47524(b) (emphasis added).

39.     In addition, as part of these extensive analyses, the airport proprietor must prepare a noise study – commonly referred to as a "Part 161 noise study" – to determine, using federally prescribed methodologies and standards, noise levels at the airport and surrounding areas, and the exposure of individuals to noise resulting from airport operations. *See* 14 C.F.R. §§ 161.205(b); 161.9(a) (Part 161 noise study "must be" prepared in accordance with FAA

11

specifications, methods, criteria and computer models set forth under Appendix A of 14 C.F.R. Part 150).

40.     An airport proprietor that fails to comply with these requirements cannot lawfully impose any noise or access restriction on Stage 2 aircraft.

**ANCA Requirements for Stage 3 and Stage 4 Aircraft**

41.     ANCA's requirements regarding Stage 3 aircraft are even more stringent, prohibiting any restriction on Stage 3 aircraft unless the airport proprietor has first obtained either (i) FAA approval or (ii) the unanimous consent of all aircraft operators affected by the restriction.  49 U.S.C. § 47524(c)(1); 14 C.F.R. §§ 161.101, 161.301(c).

42.     Moreover, reflecting Congress's deep discouragement of any noise or access restriction on Stage 3 aircraft, ANCA prohibits the FAA from approving any application for a Stage 3 restriction unless "substantial evidence" demonstrates that the restriction: (i) is reasonable, non-arbitrary and nondiscriminatory; (ii) does not create an unreasonable burden on interstate or foreign commerce; (iii) is consistent with maintaining the safe and efficient use of navigable airspace; (iv) does not conflict with a law or regulation of the United States; (v) has received adequate opportunity for public comment; and (vi) does not create an unreasonable burden on the national aviation system.  49 U.S.C. § 47524(c)(2).  To comply with these statutory requirements, the FAA has promulgated numerous stringent regulations requiring airport proprietors to prepare extensive and detailed analyses, including a Part 161 noise study, addressing these statutory requirements.  *See* 14 C.F.R. §§ 161.305, 161.9(a).

43.     Stage 4 aircraft – the quietest designation for jet aircraft flying today – by definition operate beneath the noise thresholds specified for Stage 3 aircraft and thus are protected by the same ANCA requirements that apply to Stage 3 aircraft.

44.     An airport proprietor that fails to comply with ANCA's requirements cannot lawfully impose any noise or access restriction on Stage 3 or Stage 4 aircraft.

**B.     Federal Funding – The Airport and Airway Improvement Act of 1982**

45.     Since at least the 1930s, the federal government has encouraged the development of a national system of public-use airports through federal grants.

46.     The Airport and Airway Improvement Act of 1982 (the "AAIA"), as amended, 49 U.S.C. § 47101, *et seq.*, established the Airport Improvement Program ("AIP"), a federal grant program that encourages the nationwide development and improvement of airports through federal funding.

47.     As a condition of the receipt of AIP funding, airport proprietors are required to provide statutorily mandated, written assurances to the federal government – known as grant assurances – which become a binding obligation between the federal government and the airport proprietor, both statutorily and by contractual agreement.  *See* 49 U.S.C. § 47108(a).  Congress imposed these grant assurance requirements to insure the maintenance of conditions essential to an efficient national air transport system, including public access, safety and competition.  A grant agreement is not an ordinary contract, but part of a procedure mandated by Congress to assure federal funds are disbursed in accordance with Congress's will.

48.     The FAA has implemented the AAIA's grant assurance requirements by, among other things, maintaining and publishing an official list of the specific assurances with which recipients of AIP grant funding must comply.  A copy of the FAA's list of assurances, in its current form, is attached hereto as Exhibit A.

49.     One of those mandated grant assurances, Grant Assurance 22.a, assures public access on reasonable terms, specifically providing that:

> It [the airport proprietor] will make the airport available as an airport for public
> use on reasonable terms and without unjust discrimination to all types, kinds and
> classes of aeronautical activities, including commercial aeronautical activities
> offering services to the public at the airport.

Ex. A at 10, implementing 49 U.S.C. § 47107(a)(1).

50.     Another mandated grant assurance, Grant Assurance 19.a, assures that the

federally funded airport will be properly maintained, which requires adequate funding for an

effective maintenance program.  Grant Assurance 19.a specifically provides that:

> The airport and all facilities which are necessary to serve the aeronautical users of
> the airport, . . . shall be operated at all times in a safe and serviceable condition
> and in accordance with the minimum standards as may be required or prescribed
> by applicable Federal, state and local agencies for maintenance and operation.

Ex. A at 9-10, implementing 49 U.S.C. § 47107(a)(7).

51.     Another mandated grant assurance, Grant Assurance 23, assures that the federally

funded airport will not impose restrictions that are anti-competitive in nature, by effectively

granting exclusive rights to use of the airport to some aircraft operators at the expense of others.

Grant Assurance 23 specifically provides that:

> It [the airport proprietor] will permit no exclusive right for the use of the airport
> by any person providing, or intending to provide, aeronautical services to the
> public.

Ex. A at 12, implementing 49 U.S.C. § 47107(a)(4).

52.     The FAA has interpreted the AAIA as mandating that Grant Assurances 22.a and

19.a be complied with for the useful life of the federally funded improvements, which the FAA

has interpreted to be at least 20 years.  Grant Assurance 23 never expires.  *See* FAA Airport

Compliance Manual, FAA Order 5190.6B ¶¶ 4.3-4.4; Exhibit A at 1; *see also, e.g.*, 53 Fed. Reg.

3104-03, 1988 WL 276277 (Feb. 3, 1988) (publicizing grant assurance duration terms).

14

53.     The FAA is statutorily mandated to ensure that airport proprietors comply with their grant assurances, and to pursue enforcement action when it determines that violations of the grant assurances have occurred.  *See* 49 U.S.C. §§ 46101(a), 47107(g).

### Pertinent Facts

**A.     East Hampton Airport**

54.     East Hampton Airport was constructed in 1936 with federal funds from the Works Progress Administration.  The Airport opened in 1938 as one of the great public works projects of the New Deal era.

55.     Upon information and belief, many or all of the residential homes built in the immediate environs of East Hampton Airport post-date the Airport's construction.  Upon information and belief, the homes within a one-mile radius of the Airport were purchased subject to easements, restrictions, or covenants in which the homeowners were notified about possible airport noise and waived claims based on airport-related noise.  The Code of the Town of East Hampton requires that subdivisions located within a one-mile radius of the Airport grant airport noise easements to the Town.  *See* Town of East Hampton Code § 220-1.06(E).

56.     From its inception, and at all times during the last 79 years, East Hampton Airport has been open to the public and has served aviators and aircraft operators of all sorts, including commercial and recreational.  Chartered flight services (by jet, helicopter, and seaplane) have been continuously provided at the Airport for decades.  At various points in the Airport's history, commercial airlines have provided scheduled airline services to and from the Airport.

57.     East Hampton Airport is important to people and businesses on Long Island and elsewhere.  It is an engine for regional and local commerce.  The Airport connects the East End of Long Island to New York City and destinations up and down the East Coast, around the

United States, and internationally.  The Airport's operation has enabled the East End of Long

Island to be an accessible, highly desirable destination – particularly during the summer season.

Users of the Airport include many East Hampton and East End business owners and homeowners

for whom the Airport was an important feature in deciding where to locate their business or

purchase their home.  The Airport is also a base for flight instruction and training, and serves

medical, law enforcement, and search and rescue operations.

58.     The FAA has identified East Hampton Airport as "important to national air

transportation" and included East Hampton Airport in its 2015-2019 National Plan of Integrated

Airport Systems ("NPIAS"), a report the FAA provides to Congress.  *See* FAA Report to

Congress: National Plan of Integrated Airport Systems (NPIAS) 2015-2019, available at

http://www.faa.gov/airports/planning_capacity/npias/reports/.  Of the approximately 19,000

airports and other landing facilities nationwide, only approximately 3,330 are included in the

NPIAS report.  East Hampton Airport is one of them.

59.     The FAA has furthermore classified East Hampton Airport as a "regional" general

aviation airport, recognizing that the Airport supports interstate commerce.  *See* FAA, *General

Aviation Airports: A National Asset*, 12 (May 2012).[3]  The FAA classifies general aviation

airports as being either National (serving national and global markets), Regional (serving

regional and national markets), Local (serving local and regional markets), or Basic (low levels

of activity).

---

[3] This report is available at http://www.faa.gov/airports/planning_capacity/ga_study/media/
2012Asset Report.pdf; *see also id.* Appendix B, *available at* http://www.faa.gov/airports/
planning_capacity/ga_study/media/2012AssetReportAppB.pdf.

B.      **The Town's Grant Assurances to the Federal Government**

60.     From 1983 to 2001, the Town received numerous AIP grants for the development of East Hampton Airport, including grants for the construction and improvement of its terminal, runway, taxiways, lighting, and other major capital improvements.

61.     Most recently, the Town received AIP funding in 2001.  Specifically, on September 25, 2001, the Town accepted a federal grant in the amount of $1,410,000 for rehabilitating and repaving the airport terminal apron, the main parking area for aircraft.  In accepting that grant, the Town provided the AAIA-mandated grant assurances.  Grant Assurances 19.a, 22.a and 23 have not materially changed from when the Town signed its grant assurance agreement in 2001.

62.     The Town is obligated to comply with Grant Assurances 22.a and 19.a for at least 20 years from the date of its acceptance of federal funds – *i.e.*, at least until September 25, 2021. The Town is obligated to comply with Grant Assurance 23 in perpetuity.

C.      **The Restrictions Adopted on April 16, 2015**

63.     The Town adopted the Restrictions on April 16, 2015, for the stated basis of reducing noise.

64.     The Town publicly noticed the proposed Restrictions on February 10, 2015, just sixty-six days before adopting them.  The Restrictions are expected to take effect imminently, upon public filing by the New York Secretary of State.

65.     The Restrictions consist of three local laws (attached hereto as Exhibits B–D, including:

>        (1)     a mandatory curfew, prohibiting use of East Hampton Airport
>                between 11:00 p.m. and 7:00 a.m. (the "Mandatory Curfew") (*see*
>                Exhibit B);

(2)     an extended curfew for "Noisy Aircraft" banning flight from 8:00 p.m. to 9:00 a.m. ("the Extended Curfew") (*see* Exhibit C); and

(3)     a one-trip limit prohibiting "Noisy Aircraft" from flying more than one trip per week during the "season"[4] (the "One-Trip Limit") (*see* Exhibit D).

66.     The Restrictions define a "Noisy Aircraft" as "any airplane or rotorcraft for which there is a published Effective Perceived Noise in Decibels (EPNdB) approach (AP) level of 91.0 or greater."  Ex. C § 75-38(A)(4)(a).  The Town has published a list of the aircraft that are deemed "Noisy Aircraft" under this definition.  The Town's list of "Noisy Aircraft" includes nearly all helicopters and many jet aircraft that use East Hampton Airport, including Stage 2 helicopters and Stage 3 and Stage 4 jets.

67.     Violations of the Restrictions are deemed criminal offenses punishable by a sliding scale of mandatory financial fines for the first three violations (up to $10,000 per violation) and mandatory prohibition from the Airport for a period of up to two years for a fourth violation.  *See id*. § 75-39(B).  Punishment can also include "discretionary" additional fines of an amount not less than the Town's "actual costs incurred," *id.* § 75-39(D), and a mandatory fine of "not less than $2000" for any person or entity found to have violated the Restrictions within five years of a previous violation, *id.* § 75-39(D).

68.     The Restrictions further provide that the Town can seek court injunctions, restraining orders, and financial fines against any person or entity holding an ownership interest in the violating aircraft.  See *id.* § 75-39(E).

69.     The Town adopted the Restrictions without seeking or obtaining FAA approval.

---

[4] The One-Trip Limit, as adopted, does not define "season," although additional legislation was noticed by the Town on April 15, 2015, to define "season" as the "months of May, June, July, August and September."

70.     On April 7, 2015, one of the Town Board's members issued a press release stating that the Town estimates that the Restrictions will prohibit 75% of all helicopter operations and 23% of all aircraft operations at the Airport.

71.     In February 2015, prior to adopting the Restrictions, the Town stated publicly that it would have the Town Board's Budget & Finance Advisory Committee ("BFAC") analyze the proposed legislation to ensure that, if adopted, the Airport could remain financially sustainable and be able to meet its capital needs.  The BFAC never issued such an analysis.  Instead, the BFAC reported to the Town in March 2015 that it was unable to reach a consensus on whether and how severely the Restrictions would affect the financial sustainability of the Airport.  The Town nonetheless adopted the Restrictions.

> **D.     The Restrictions Violate and Conflict with Federal Law and Policy**

72.     The Restrictions violate and conflict with federal statutes, regulations and policy in myriad ways.

73.     The Town violated ANCA and its implementing regulations by imposing noise and access restrictions on Stage 2 aircraft without complying with ANCA's statutory requirements.  Among other things, the Town: (i) failed to provide 180 days' notice and opportunity to comment before the effective date of the Restrictions; (ii) failed to publish an analysis of the anticipated or actual costs and benefits of the proposed Restrictions before adopting them; (iii) failed to conduct a Part 161 noise study; (iv) failed to publish any meaningful description of alternative restrictions; and (v) failed to publish a comparison of the costs and benefits of alternative measures to the costs and benefits of the proposed Restrictions.

74.     Likewise, the Town violated ANCA and federal regulations by imposing restrictions on Stage 3 and Stage 4 aircraft without complying with ANCA's statutory

requirements.  Among other things, the Town: (i) failed to seek or obtain the FAA's approval of

the Restrictions; (ii) failed to seek or obtain the approval of Stage 3 and Stage 4 aircraft operators

affected by the Restrictions; (iii) failed to prepare a Part 161 noise study; and (iv) failed to

prepare all of the other extensive analyses required by law before any restriction can be imposed

on Stage 3 or Stage 4 aircraft.

75.     Not only did the Town fail to prepare a Part 161 noise study, as ANCA requires,

but the Town also unreasonably based the Restrictions on noise studies prepared in contravention

of federal regulations and policies for the determination of aviation noise impact on areas

surrounding an airport.  Federal law expressly prescribes a process using a single noise metric –

yearly DNL – that must be used for determining the exposure of individuals to airport noise

resulting from airport operations.  *See* 14 C.F.R. Pt. 150, A150.3.  Under that system, exposure

of residential areas to cumulative noise levels under DNL 65 dB is generally acceptable.  In East

Hampton's case, past studies commissioned by the Town in accordance with these federally

prescribed methods have identified <u>no area</u> outside the Airport boundaries with an exposure level

of DNL 65 dB or higher.  In other words, federally prescribed methods for noise impact

measurement have not yielded data to support the imposition of the Restrictions.  A technical

memorandum prepared by one of the Town's noise consultants in 2014 likewise concluded:

"There is no area off the Airport subject to DNL 65 noise levels or above."

76.     Because the Town's past studies (conducted in accordance with federal law) did

not support the conclusion that there was an airport noise problem in East Hampton, the Town

Board, in enacting the Restrictions, ignored those past studies and relied instead on a database of

self-selected noise complaints solicited from and called into a telephone hotline by certain

homeowners throughout the East End of Long Island.  Those so-called "noise studies" are deeply flawed, unscientific, unreliable and inadequate to justify the Restrictions.  Among other things:

(a)     The noise complaint data used by the Town came from the entire East End of Long Island – a large geographic area including households as far as 23 miles away from East Hampton Airport.  The complaint data were not tailored or narrowed in any manner to identify complaints relating specifically to noise generated by landings or takeoffs from East Hampton Airport.  The Town used noise complaint data regardless of proximity of the complaining households to East Hampton Airport.

(b)     All of the 23,954 noise complaints called in to the telephone hotline were generated by 633 households – which represent approximately 1.2% of the approximately 52,811 occupied housing units within the broad geographic area covered by the complaint database.  The remaining 99% of households in the area did not generate a single complaint.

(c)     Approximately 50% of the 23,954 complaints came from only 10 households, with one household submitting approximately 2,800 complaints in a 12-month period (averaging approximately 7.5 complaints every day for one year).

(d)     The complaint data were not verified to ensure reliability.

(e)     The noise complaint data included – and the Town made no attempt to eliminate – noise complaints relating to aircraft flying to or from airports other than East Hampton Airport.  The complaint data did not distinguish whether particular noise complaints related to flights to or from East Hampton Airport, or to or from different airports.

(f)     The noise complaint data included – and the Town made no effort to eliminate – complaining households that are subject to noise easements, covenants and restrictions and have thus waived their right to complain about airport-related noise.

(g)     The noise complaint data included – and the Town made no effort to eliminate – complaints from households outside of East Hampton and the immediate environs of the Airport, who are complaining not about aircraft noise from arrivals or departures from East Hampton Airport, but about fly-over noise from aircraft in flight, which are complying with federally prescribed flight routes.

77.     The One-Trip Limit and Extended Curfew further conflict with federal law and policy because those Restrictions are based on the Town-devised "Noisy Aircraft" standard, which is unreasonable, discriminatory and arbitrary for many reasons, including but not limited to the following:

(a)     The "Noisy Aircraft" standard creates a local aircraft classification system that interferes with the existing federal scheme for aircraft classification.  Federal regulations classify aircraft into "Stages" 1 through 4 based upon noise level and provides for phasing out noisier fleets over time.  *See, e.g.*, 49 U.S.C. §§ 47521(5), 47528.  This regulatory scheme serves Congress's goal of alleviating community noise concerns through the use of new aircraft technology and through noise abatement strategies that do not restrict airport access.  That the "Noisy Aircraft" standard conflicts with the federal scheme is best evidenced by the fact that even some Stage 4 aircraft – the quietest jets in the sky under the FAA's classification system – are deemed "Noisy Aircraft" under the Restrictions.  Plaintiff Eleventh Street operates a Stage 4 jet, the

Dassault Falcon 7x, that is among those aircraft deemed "Noisy Aircraft" and hence subjected to the Extended Curfew and One-Trip Limit.

(b)      The definition of "Noisy Aircraft" (*i.e.*, any aircraft for which there is a published EPNdB approach level of 91.0 or greater) is based on a type of data – FAA-certified EPNdB approach levels – that is not a valid indicator of noise that actually occurs in the normal operation of an aircraft, or of the ground-level impact of aircraft noise on a residential community.  The FAA uses EPNdB data for a discrete and different purpose: to certify the <u>maximum</u> noise output of aircraft, regardless of how the aircraft is flown under normal approach and departure scenarios, under a different set of federal regulations governing manufacturing requirements.  The Town has used EPNdB data to deem many aircraft "Noisy Aircraft," without making any effort to determine the noise impact of those aircraft in actual operation.

(c)      Many of the aircraft operators at East Hampton Airport, including Plaintiffs, follow the Airport's voluntary noise abatement procedures for landing and takeoff, which significantly reduce actual noise impact.  It is thus further unreasonable and arbitrary for the Restrictions to use 91.0 EPNdB (AP) as the threshold for designating "Noisy Aircraft" while no effort has been made to determine actual noise impact.

(d)      The Restrictions' use of 91.0 EPNdB (AP) to limit airport access is discriminatory because not all aircraft have published EPNdB certification levels.  Under the Restrictions, aircraft that do not have a published EPNdB certification level (such as sea planes) are not considered to be "Noisy Aircraft," regardless of their actual noise level.  Because helicopters and jet aircraft do have published EPNdB certification levels, they are targeted by the Restrictions.  Indeed, the Town appears to have selected 91.0

23

EPNdB (AP) as the threshold for "Noisy Aircraft" for the principal and discriminatory

purpose of barring as many helicopter operations as possible from the Airport.

78.     The Restrictions are further unreasonable because they interfere with federal law

and policies controlling the safe and efficient use of navigable airspace.  The Restrictions will

disrupt the national system of civil aviation, and cause operational difficulties at other local and

regional airports, including congestion, and potentially dangerous situations.

79.     All of the Restrictions pose potential operational safety risks and concerns at odds

with federal policy.  As the FAA recently explained, mandatory curfews implicate safety

concerns because they potentially "reach[] into the cockpits of individual aircraft and interact[]

with safety parameters affecting critical . . . decisions" by pilots; in particular, restrictions with

the prospect of an injunction or financial penalties impose factors "that could influence operators

and pilots to reduce safety margins in making operational decisions." FAA Determination

Pursuant to 14 Code of Federal Regulations Part 161 of LAWA Application Dated January 13,

2013 (supplemented May 14, 2014) (FAA Nov. 7, 2014), at 41-42, *available at*

http://www.faa.gov/airports/ environmental/airport_noise/part_161/media/Final-Determination-

LAX-Part%20161-Application-20141107.pdf.  In that case, the FAA rejected a proposed

mandatory curfew to restrict certain flights from 12 midnight to 6:30 a.m. as conflicting with

federal regulations and policy.  The FAA also has similarly rejected the imposition of mandatory

curfews as unreasonable on multiple other occasions, and has approved mandatory curfews only

for a few airports in limited and special circumstances, after extensive analysis of safety and

national concerns.

80.     The Restrictions are further unreasonable because they do not reflect a balanced

approach for addressing airport noise concerns.  The Town failed to take federal interests into

account and gave inadequate consideration to non-restrictive and less restrictive means to address any noise problem.  There is no evidence that the Restrictions are the only way to address the Town's noise concerns effectively.

81.     The Restrictions are further unreasonable because they interfere with federal control of in-flight aircraft, flight paths and routes.  Many of the noise complaints upon which the Restrictions are based were lodged by East End residents living far from East Hampton Airport, well outside earshot of landings and takeoffs at the Airport, who were complaining about fly-over noise by in-flight aircraft following federally prescribed flight paths.  For the Town to impose Restrictions based on such complaints interferes with federal control of national airspace.

82.     The Restrictions are further unreasonable because they create an unwarranted burden on interstate commerce.  If each locality in the nation was allowed to set different requirements and standards for aircraft operating within its limits, there would be substantial negative effect on commerce.  The need for nationwide uniformity is clear.

83.     The Restrictions are further unreasonable because they violate the Town's grant assurances under AAIA.  In adopting the Restrictions, the Town violated Grant Assurance 22.a, under which it agreed – at least until September 2021 – to make the airport publicly available on reasonable terms and without unjust discrimination to all types or aircraft and aeronautical activities.  Because the Restrictions are unreasonable and discriminatory, including for the reasons stated above, they violate Grant Assurance 22.a.

84.     The Restrictions also violate Grant Assurance 19.a., which obligates the Town – at least until September 2021 – to maintain the Airport in a safe and serviceable condition at all times.  All Airport maintenance and capital improvements are currently self-funded by Airport

revenues.  Even before the imposition of these Restrictions, the Town has in recent years failed

to maintain the Airport properly, causing cancellation of the instrument landing approach

systems at night because of uncut trees, an aircraft to strike a deer upon landing due to

inadequate fencing to keep wildlife off the runway, inadvertent intrusions by cars due to failure

to maintain working gates, closure of a runway for failure to maintain the pavement, and

deterioration of the two remaining runways and parking ramp resulting from lack of pavement

maintenance, among other problems.  Now, the Restrictions will greatly reduce the revenue that

East Hampton Airport generates from landing fees and fuel flowage fees, placing the Airport's

maintenance and economic viability further at risk.  The greatest share of Airport revenue occurs

during the summer season, when operations will be most affected under the Restrictions.

Further, the greatest share of revenue comes from charter jet and helicopter operators – whose

operations will be severely curtailed under the Restrictions.  Without the revenue from the

summer season and from jet and helicopter charter operators, the Town may not have the funds

to complete overdue Airport maintenance or capital improvements, leading to further

degradation of the Airport infrastructure.  Nevertheless, the Town adopted the Restrictions,

knowing the Restrictions will reduce Airport revenue, and despite the fact that the BFAC was

unable to reach consensus on how the Restrictions will affect the Airport's sustainability.  By

proceeding in this manner, without BFAC analysis, and without the economic cost-benefit

analysis mandated by ANCA, the Town has placed the safety and viability of the Airport in

jeopardy, in violation of Grant Assurance 19.a and ANCA.

85.     The One-Trip Limit and Extended Curfew also violate Grant Assurance 23.

Although drafted in purportedly neutral terms, the Restrictions actually target helicopter charter

operators, rendering such operators non-competitive and effectively granting exclusive rights to other types of charter aircraft that are not affected by the One-Trip Limit and Extended Curfew.

### E.   The Town's Attempt to Avoid Compliance with Federal Law by Relying on a 2005 Settlement Agreement to which the Town was Not a Party

86.     The Town appears to believe that it is entitled to disregard federal law because of a civil settlement agreement entered by the FAA in 2005, to which the Town was not even a party.  The Town is wrong.

87.     After the Town received its most recent AIP grant in 2001, an unincorporated association of individuals living near East Hampton Airport, who called themselves the "Committee to Stop Airport Expansion" (the "Committee"), initiated various legal actions in an attempt to stop the expansion of East Hampton Airport.

88.     One of those actions, *Committee to Stop Airport Expansion v. Department of Transportation*, Case No. 03 Civ. 2634 (E.D.N.Y. 2003) (the "Committee Action"), was filed in this District.  The Committee Action challenged the legality of the FAA's approval of East Hampton's 2001 airport layout plan.  The named plaintiffs in the Committee Action were the Committee and three Committee members; the named defendants included the FAA and its Administrator, and the U.S. Department of Transportation and its Secretary.

89.     Neither the Town nor East Hampton Airport was party to the Committee Action.

90.     In 2005, the parties in the Committee Action executed a settlement agreement ("the 2005 Settlement Agreement") that resolved the Committee Action and certain other litigation and proceedings the Committee had commenced in other fora.  Paragraph 7 of the 2005 Settlement Agreement stated that Grant Assurance 22.a and three other grant assurances (Grant Assurances 22.h, 29.a and 29.b) "will not be enforced [by the FAA] beyond December 31,

2014." The 2005 Settlement Agreement further provided that, aside from the four referenced Grant Assurances, "[a]ll other grant assurances with respect to any grant awarded to East Hampton Airport . . . shall be enforced in full." *Id.* The Agreement further provided that if the Town was awarded additional AIP grant funding after the Agreement's effective date (April 29, 2005), then all grant assurances would be enforced in connection with that new funding. *Id.*

91.     The Town was not a party to the 2005 Settlement Agreement and did not sign it. No representative of East Hampton Airport, authorized or otherwise, was a party to the Committee Action or the 2005 Settlement Agreement.

92.     The 2005 Settlement Agreement does not mention ANCA and contains no provisions relating to ANCA.

93.     The District Court did not retain jurisdiction over the Committee Action for the purpose of enforcing the 2005 Settlement Agreement, and the Committee Action was closed by the Court in 2005.

94.     As alleged in a separate action pending in this Court, the FAA exceeded its statutory authority, and violated it statutory obligations, when it agreed in the 2005 Settlement Agreement not to enforce certain grant assurances as to East Hampton Airport after December 31, 2014. *See Friends of the East Hampton Airport, Inc., et al. v. Federal Aviation Administration, et al.*, 15 Civ. 441 (DRH) (the "FAA Action"), filed on January 29, 2015.[5] Indeed, the FAA has unequivocally stated in proceedings relating to other airports that, because of its statutorily imposed duties, the FAA lacks authority to settle pending litigation by waiving either the FAA's prospective enforcement jurisdiction or an airport proprietor's grant assurances.

---

[5] In filing this Complaint, Plaintiffs designated the FAA Action as a related case. Many of the plaintiffs in the FAA Action are also Plaintiffs in this action.

*See, e.g.*, *Platinum Aviation and Platinum Jet Center BMI v. Bloomington-Normal Airport Authority, Illinois*, FAA 16-06-09, 2007 WL 4854321, at *4 (Nov. 28, 2007); *In the Matter of Compliance with Federal Obligations by the City of Santa Monica, California*, FAA 16-02-08, 2008 WL 6895776, at *26 (May 27, 2008) (Director's Determination).

95.     The FAA Action seeks declaratory and injunctive relief confirming that the FAA is statutorily required to ensure that the Town complies with all of its grant assurances until at least September 25, 2021, and that the FAA cannot be constrained by the 2005 Settlement Agreement from exercising its enforcement powers and Congressionally mandated responsibilities with respect to East Hampton Airport.

96.     The 2005 Settlement Agreement did not, and could not, release the Town or East Hampton Airport from their federal obligations under AAIA, ANCA, and other federal law.  The Town and East Hampton Airport were neither parties nor signatories to the 2005 Settlement Agreement.  Nor did the 2005 Settlement Agreement contain any provision releasing the Town or East Hampton Airport from its federal obligations under the AAIA, ANCA or any other federal law or regulation.

97.     The Town's duty to comply with its obligations under federal law exists independent of the FAA's obligation to enforce the law.

98.     The Town cannot rely on the 2005 Settlement Agreement as a basis for imposing Restrictions that violate federal law and policy.

**F.     The Restrictions Will Irreparably Harm Plaintiffs and Other Airport Users**

99.     The Restrictions will cause serious and irreparable harm to the Plaintiff helicopter operators – Analar, AAG, HeliFlite, and Liberty.  All of these Plaintiffs provide charter helicopter services to and from East Hampton Airport, and those flights account for a significant

portion of their annual operations and revenues.  Moreover, the vast majority of those flights occur from May through September.  Because their aircraft are now deemed "Noisy Aircraft" under the Restrictions, their access to East Hampton will be severely restricted, devastating their charter businesses.  The One-Trip Limit effectively closes East Hampton Airport to charter helicopter operators from May through September – the busiest season of the year.  The Extended and Mandatory Curfews will prohibit the Plaintiff helicopter operators from using the Airport for 13 hours of every day, year-round.  The Town has itself forecasted that the Restrictions will prohibit at least 75% of total helicopter operations at the Airport; the impact on charter helicopter operators will be even higher.  The Restrictions will thus impose serious financial harm on the Plaintiff helicopter operators' businesses and operations and cause them to take such measures as reducing the size of their fleet, laying off pilots and employees, and reorganizing or possibly terminating their business operations.

100.    The Restrictions will cause serious and irreparable harm to Plaintiff Eleventh Street, which conducts extensive private flight operations to and from East Hampton Airport using its state-of-the-art Stage 4 jet aircraft and helicopter.  The Restrictions will severely disrupt Eleventh Street's operations out of East Hampton Airport, where the Falcon 7x is based.  As an FAA-designated Stage 4 aircraft, the Falcon 7x is one of the quietest jet aircraft in operation.  It is often referred to by pilots as a "whisper jet."  Nevertheless, under the Restrictions' aircraft classification system, the Falcon 7x is a "Noisy Aircraft," and will thus be prohibited from takeoffs or landings between 8:00 p.m. and 9:00 a.m., year-round, and from making more than one trip per week from May through September.

101.    The Restrictions will cause serious and irreparable harm to Plaintiff Sound.  Sound is the fixed-base operator at East Hampton Airport that provides fuel and other services to

landing aircraft and passengers.  Sound's primary source of revenue is the sale of fuel to jets and helicopters in the summer months.  The dramatic reduction in flight operations to and from the Airport, and severe restrictions on Stage 2, Stage 3, and Stage 4 aircraft, will have devastating financial impacts on Sound's business.

102.     The Restrictions will cause serious and irreparable harm to the many people and businesses that depend upon the Airport's accessibility for their livelihood and enjoyment, including pilots, passengers and local businesses.  The Restrictions will interfere with people's ability to work, and to get to work and home.

### FIRST CLAIM FOR RELIEF

### THE RESTRICTIONS ARE PREEMPTED BY FEDERAL LAW AND VIOLATE THE SUPREMACY CLAUSE OF THE U.S. CONSTITUTION

103.     Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 102 of this Complaint.

104.     The Supremacy Clause of the U.S. Constitution provides that the "Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."  U.S. Const., art. VI.

105.     Under the Supremacy Clause, local laws that interfere with or are contrary to federal law are invalid and unenforceable.

106.     The Restrictions are contrary to and interfere with federal law, including but not limited to ANCA, the AAIA and their implementing regulations.

107.     The Restrictions are contrary to and interfere with federal policy and national aviation goals.

31

108.    The Restrictions relate to the "route[s]" and "service[s]" of the Plaintiffs are thus expressly preempted by 49 U.S.C. § 41713(b)(1).  The Restrictions are not within the extremely limited proprietor's exception, *id.* § 41713(b)(3), because the Restrictions are unreasonable, arbitrary, and discriminatory.

109.    All of the Restrictions are *per se* unreasonable and unlawful because the Town adopted them in violation of the Town's federal obligations under ANCA.

110.    All of the Restrictions are *per se* unreasonable and unlawful because the Town adopted them in violation of the Town's federal obligations under the AAIA.

111.    The Town cannot invoke the proprietor's exception because it purposefully acted in violation of federal law.  The Restrictions in any event exceeded a local proprietor's limited rights.

112.    All of the Restrictions are unreasonable, discriminatory and/or arbitrary.

113.    The Restrictions are preempted by federal law.

114.    The Restrictions violate the Supremacy Clause of the U.S. Constitution.

## SECOND CLAIM FOR RELIEF

### THE RESTRICTIONS VIOLATE THE COMMERCE CLAUSE OF THE U.S. CONSTITUTION

115.    Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 114 of this Complaint.

116.    The Commerce Clause of the U.S. Constitution provides that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., art. I, § 8, cl. 3.  The Commerce Clause limits the power of local governments to erect barriers against interstate trade.

117.    East Hampton is a travel destination for people all over the United States.

118.    As a regional general aviation airport, East Hampton Airport serves as a gateway to the East End of Long Island, bringing travelers from around the nation.

119.    Plaintiffs include companies engaged in the interstate transportation of passengers between East Hampton Airport and points inside and outside of New York State.

120.    The Restrictions render air travel between East Hampton and points outside New York unavailable, unfeasible and impractical.

121.    The Restrictions will cause neighboring airports in the East End of Long Island to become congested and exceed their capacity during the busiest season of the year, further hampering access to East Hampton by interstate air travel.

122.    The Restrictions, in their practical operation and/or in their purpose, discriminate against and exclude many types of interstate air travel to and from East Hampton, including interstate air travel that Plaintiffs have operated and seek to continue to operate.

123.    The Restrictions, in their practical operation and/or purpose, block the flow of interstate commerce.

124.    The Restrictions in their practical operation and/or purpose, interfere with the freedom of travel and movement of persons between states.

125.    The Restrictions violate the Commerce Clause of the U.S. Constitution.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court grant the following relief:

      (a)     A declaration that:

            1.     The Town's Restrictions are preempted by federal law and are therefore invalid and unenforceable; and

            2.     The Town's Restrictions violate the Commerce Clause of the U.S. Constitution and are therefore invalid and unenforceable;

      (b)     An injunction directing Defendants and their agents to act in accordance with the above declarations of law; and

      (c)     Such other and further relief as the Court may deem appropriate.

LANKLER SIFFERT & WOHL LLP

Dated: New York, New York
       April 21, 2015

By: _Lisa Zornberg_

Lisa Zornberg (lzornberg@lswlaw.com)
Matthew Coogan (mcoogan@lswlaw.com)
Jonathan Lamberti (jlamberti@lswlaw.com)
500 Fifth Avenue, 34th Floor
New York, NY 10110
(212) 921-8399

# EXHIBIT A

 **FAA
Airports**

# ASSURANCES

## Airport Sponsors

### A. General.

1. These assurances shall be complied with in the performance of grant agreements for airport development, airport planning, and noise compatibility program grants for airport sponsors.

2. These assurances are required to be submitted as part of the project application by sponsors requesting funds under the provisions of Title 49, U.S.C., subtitle VII, as amended.  As used herein, the term "public agency sponsor" means a public agency with control of a public-use airport; the term "private sponsor" means a private owner of a public-use airport; and the term "sponsor" includes both public agency sponsors and private sponsors.

3. Upon acceptance of this grant offer by the sponsor, these assurances are incorporated in and become part of this grant agreement.

### B. Duration and Applicability.

1. **Airport development or Noise Compatibility Program Projects Undertaken by a Public Agency Sponsor.**

   The terms, conditions and assurances of this grant agreement shall remain in full force and effect throughout the useful life of the facilities developed or equipment acquired for an airport development or noise compatibility program project, or throughout the useful life of the project items installed within a facility under a noise compatibility program project, but in any event not to exceed twenty (20) years from the date of acceptance of a grant offer of Federal funds for the project.  However, there shall be no limit on the duration of the assurances regarding Exclusive Rights and Airport Revenue so long as the airport is used as an airport.  There shall be no limit on the duration of the terms, conditions, and assurances with respect to real property acquired with federal funds.  Furthermore, the duration of the Civil Rights assurance shall be specified in the assurances.

2. **Airport Development or Noise Compatibility Projects Undertaken by a Private Sponsor.**

   The preceding paragraph 1 also applies to a private sponsor except that the useful life of project items installed within a facility or the useful life of the facilities developed or equipment acquired under an airport development or noise compatibility program project shall be no less than ten (10) years from the date of acceptance of Federal aid for the project.

3. **Airport Planning Undertaken by a Sponsor.**

Unless otherwise specified in this grant agreement, only Assurances 1, 2, 3, 5, 6, 13, 18, 25, 30, 32, 33, and 34 in Section C apply to planning projects.  The terms, conditions, and assurances of this grant agreement shall remain in full force and effect during the life of the project; there shall be no limit on the duration of the assurances regarding Airport Revenue so long as the airport is used as an airport.

**C.  Sponsor Certification.**

The sponsor hereby assures and certifies, with respect to this grant that:

1. **General Federal Requirements.**

It will comply with all applicable Federal laws, regulations, executive orders, policies, guidelines, and requirements as they relate to the application, acceptance and use of Federal funds for this project including but not limited to the following:

**Federal Legislation**

a. Title 49, U.S.C., subtitle VII, as amended.
b. Davis-Bacon Act - 40 U.S.C. 276(a), et seq.[1]
c. Federal Fair Labor Standards Act - 29 U.S.C. 201, et seq.
d. Hatch Act – 5 U.S.C. 1501, et seq.[2]
e. Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 Title 42 U.S.C. 4601, et seq.[1][2]
f. National Historic Preservation Act of 1966 - Section 106 - 16 U.S.C. 470(f).[1]
g. Archeological and Historic Preservation Act of 1974 - 16 U.S.C. 469 through 469c.[1]
h. Native Americans Grave Repatriation Act - 25 U.S.C. Section 3001, et seq.
i. Clean Air Act, P.L. 90-148, as amended.
j. Coastal Zone Management Act, P.L. 93-205, as amended.
k. Flood Disaster Protection Act of 1973 - Section 102(a) - 42 U.S.C. 4012a.[1]
l. Title 49, U.S.C., Section 303, (formerly known as Section 4(f))
m. Rehabilitation Act of 1973 - 29 U.S.C. 794.
n. Title VI  of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq., 78 stat. 252) (prohibits discrimination on the basis of race, color, national origin);
o. Americans with Disabilities Act of 1990, as amended, (42 U.S.C. § 12101 et seq.), prohibits discrimination on the basis of disability).
p. Age Discrimination Act of 1975 - 42 U.S.C. 6101, et seq.
q. American Indian Religious Freedom Act, P.L. 95-341, as amended.
r. Architectural Barriers Act of 1968 -42 U.S.C. 4151, et seq.[1]
s. Power plant and Industrial Fuel Use Act of 1978 - Section 403- 2 U.S.C. 8373.[1]
t. Contract Work Hours and Safety Standards Act - 40 U.S.C. 327, et seq.[1]
u. Copeland Anti-kickback Act - 18 U.S.C. 874.1
v. National Environmental Policy Act of 1969 - 42 U.S.C. 4321, et seq.[1]
w. Wild and Scenic Rivers Act, P.L. 90-542, as amended.
x. Single Audit Act of 1984 - 31 U.S.C. 7501, et seq.[2]
y. Drug-Free Workplace Act of 1988 - 41 U.S.C. 702 through 706.

z.  The Federal Funding Accountability and Transparency Act of 2006, as amended
    (Pub. L. 109-282, as amended by section 6202 of Pub. L. 110-252).

## Executive Orders

a.  Executive Order 11246 - Equal Employment Opportunity[1]
b.  Executive Order 11990 - Protection of Wetlands
c.  Executive Order 11998 – Flood Plain Management
d.  Executive Order 12372 - Intergovernmental Review of Federal Programs
e.  Executive Order 12699 - Seismic Safety of Federal and Federally Assisted New
    Building Construction[1]
f.  Executive Order 12898 - Environmental Justice

## Federal Regulations

a.  2 CFR Part 180 - OMB Guidelines to Agencies on Governmentwide Debarment
    and Suspension (Nonprocurement).
b.  2 CFR Part 200, Uniform Administrative Requirements, Cost Principles, and
    Audit Requirements for Federal Awards. [OMB Circular A-87 Cost Principles
    Applicable to Grants and Contracts with State and Local Governments, and OMB
    Circular A-133 - Audits of States, Local Governments, and Non-Profit
    Organizations].[4, 5, 6]
c.  2 CFR Part 1200 – Nonprocurement Suspension and Debarment
d.  14 CFR Part 13 - Investigative and Enforcement Procedures14 CFR Part 16 -
    Rules of Practice For Federally Assisted Airport Enforcement Proceedings.
e.  14 CFR Part 150 - Airport noise compatibility planning.
f.  28 CFR Part 35- Discrimination on the Basis of Disability in State and Local
    Government Services.
g.  28 CFR § 50.3 - U.S. Department of Justice Guidelines for Enforcement of Title
    VI of the Civil Rights Act of 1964.
h.  29 CFR Part 1 - Procedures for predetermination of wage rates.[1]
i.  29 CFR Part 3 - Contractors and subcontractors on public building or public work
    financed in whole or part by loans or grants from the United States.[1]
j.  29 CFR Part 5 - Labor standards provisions applicable to contracts covering
    federally financed and assisted construction (also labor standards provisions
    applicable to non-construction contracts subject to the Contract Work Hours and
    Safety Standards Act).[1]
k.  41 CFR Part 60 - Office of Federal Contract Compliance Programs, Equal
    Employment Opportunity, Department of Labor (Federal and federally assisted
    contracting requirements).[1]
l.  49 CFR Part 18 - Uniform administrative requirements for grants and cooperative
    agreements to state and local governments.[3]
m.  49 CFR Part 20 - New restrictions on lobbying.
n.  49 CFR Part 21 – Nondiscrimination in federally-assisted programs of the
    Department of Transportation - effectuation of Title VI of the Civil Rights Act of
    1964.
o.  49 CFR Part 23 - Participation by Disadvantage Business Enterprise in Airport
    Concessions.

p. 49 CFR Part 24 – Uniform Relocation Assistance and Real Property Acquisition for Federal and Federally Assisted Programs.[1][2]

q. 49 CFR Part 26 – Participation by Disadvantaged Business Enterprises in Department of Transportation Programs.

r. 49 CFR Part 27 – Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving or Benefiting from Federal Financial Assistance.[1]

s. 49 CFR Part 28 – Enforcement of Nondiscrimination on the Basis of Handicap in Programs or Activities conducted by the Department of Transportation.

t. 49 CFR Part 30 - Denial of public works contracts to suppliers of goods and services of countries that deny procurement market access to U.S. contractors.

u. 49 CFR Part 32 – Governmentwide Requirements for Drug-Free Workplace (Financial Assistance)

v. 49 CFR Part 37 – Transportation Services for Individuals with Disabilities (ADA).

w. 49 CFR Part 41 - Seismic safety of Federal and federally assisted or regulated new building construction.

## Specific Assurances

Specific assurances required to be included in grant agreements by any of the above laws, regulations or circulars are incorporated by reference in this grant agreement.

## Footnotes to Assurance C.1.

[1] These laws do not apply to airport planning sponsors.

[2] These laws do not apply to private sponsors.

[3] 49 CFR Part 18 and 2 CFR Part 200 contain requirements for State and Local Governments receiving Federal assistance. Any requirement levied upon State and Local Governments by this regulation and circular shall also be applicable to private sponsors receiving Federal assistance under Title 49, United States Code.

[4] On December 26, 2013 at 78 FR 78590, the Office of Management and Budget (OMB) issued  the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards in 2 CFR Part 200. 2 CFR Part 200 replaces and combines the former Uniform Administrative Requirements for Grants (OMB Circular A-102 and Circular A-110 or 2 CFR Part 215 or Circular) as well as the Cost Principles (Circulars A-21 or 2 CFR part 220; Circular A-87 or 2 CFR part 225; and A-122, 2 CFR part 230). Additionally it replaces Circular A-133 guidance on the Single Annual Audit. In accordance with 2 CFR section 200.110, the standards set forth in Part 200 which affect administration of Federal awards issued by Federal agencies become effective once implemented by Federal agencies or when any future amendment to this Part becomes final. Federal agencies, including the Department of Transportation, must implement the policies and procedures applicable to Federal awards by promulgating a regulation to be effective by December 26, 2014 unless different provisions are required by statute or approved by OMB.

[5]  Cost principles established in 2 CFR part 200 subpart E must be used as guidelines for determining the eligibility of specific types of expenses.

[6]  Audit requirements established in 2 CFR part 200 subpart F are the guidelines for audits.

2. **Responsibility and Authority of the Sponsor.**

   a.  Public Agency Sponsor:

   It has legal authority to apply for this grant, and to finance and carry out the proposed project; that a resolution, motion or similar action has been duly adopted or passed as an official act of the applicant's governing body authorizing the filing of the application, including all understandings and assurances contained therein, and directing and authorizing the person identified as the official representative of the applicant to act in connection with the application and to provide such additional information as may be required.

   b.  Private Sponsor:

   It has legal authority to apply for this grant and to finance and carry out the proposed project and comply with all terms, conditions, and assurances of this grant agreement. It shall designate an official representative and shall in writing direct and authorize that person to file this application, including all understandings and assurances contained therein; to act in connection with this application; and to provide such additional information as may be required.

3. **Sponsor Fund Availability.**

   It has sufficient funds available for that portion of the project costs which are not to be paid by the United States. It has sufficient funds available to assure operation and maintenance of items funded under this grant agreement which it will own or control.

4. **Good Title.**

   a.  It, a public agency or the Federal government, holds good title, satisfactory to the Secretary, to the landing area of the airport or site thereof, or will give assurance satisfactory to the Secretary that good title will be acquired.

   b.  For noise compatibility program projects to be carried out on the property of the sponsor, it holds good title satisfactory to the Secretary to that portion of the property upon which Federal funds will be expended or will give assurance to the Secretary that good title will be obtained.

5. **Preserving Rights and Powers.**

   a.  It will not take or permit any action which would operate to deprive it of any of the rights and powers necessary to perform any or all of the terms, conditions, and assurances in this grant agreement without the written approval of the Secretary, and will act promptly to acquire, extinguish or modify any outstanding rights or claims of right of others which would interfere with such performance by the sponsor. This shall be done in a manner acceptable to the Secretary.

b.  It will not sell, lease, encumber, or otherwise transfer or dispose of any part of its title or other interests in the property shown on Exhibit A to this application or, for a noise compatibility program project, that portion of the property upon which Federal funds have been expended, for the duration of the terms, conditions, and assurances in this grant agreement without approval by the Secretary. If the transferee is found by the Secretary to be eligible under Title 49, United States Code, to assume the obligations of this grant agreement and to have the power, authority, and financial resources to carry out all such obligations, the sponsor shall insert in the contract or document transferring or disposing of the sponsor's interest, and make binding upon the transferee all of the terms, conditions, and assurances contained in this grant agreement.

c.  For all noise compatibility program projects which are to be carried out by another unit of local government or are on property owned by a unit of local government other than the sponsor, it will enter into an agreement with that government. Except as otherwise specified by the Secretary, that agreement shall obligate that government to the same terms, conditions, and assurances that would be applicable to it if it applied directly to the FAA for a grant to undertake the noise compatibility program project. That agreement and changes thereto must be satisfactory to the Secretary. It will take steps to enforce this agreement against the local government if there is substantial non-compliance with the terms of the agreement.

d.  For noise compatibility program projects to be carried out on privately owned property, it will enter into an agreement with the owner of that property which includes provisions specified by the Secretary. It will take steps to enforce this agreement against the property owner whenever there is substantial non-compliance with the terms of the agreement.

e.  If the sponsor is a private sponsor, it will take steps satisfactory to the Secretary to ensure that the airport will continue to function as a public-use airport in accordance with these assurances for the duration of these assurances.

f.  If an arrangement is made for management and operation of the airport by any agency or person other than the sponsor or an employee of the sponsor, the sponsor will reserve sufficient rights and authority to insure that the airport will be operated and maintained in accordance Title 49, United States Code, the regulations and the terms, conditions and assurances in this grant agreement and shall insure that such arrangement also requires compliance therewith.

g.  Sponsors of commercial service airports will not permit or enter into any arrangement that results in permission for the owner or tenant of a property used as a residence, or zoned for residential use, to taxi an aircraft between that property and any location on airport.  Sponsors of general aviation airports entering into any arrangement that results in permission for the owner of residential real property adjacent to or near the airport must comply with the requirements of Sec. 136 of Public Law 112-95 and the sponsor assurances.

6. **Consistency with Local Plans.**

The project is reasonably consistent with plans (existing at the time of submission of this application) of public agencies that are authorized by the State in which the project is located to plan for the development of the area surrounding the airport.

7. **Consideration of Local Interest.**

It has given fair consideration to the interest of communities in or near where the project may be located.

8. **Consultation with Users.**

In making a decision to undertake any airport development project under Title 49, United States Code, it has undertaken reasonable consultations with affected parties using the airport at which project is proposed.

9. **Public Hearings.**

In projects involving the location of an airport, an airport runway, or a major runway extension, it has afforded the opportunity for public hearings for the purpose of considering the economic, social, and environmental effects of the airport or runway location and its consistency with goals and objectives of such planning as has been carried out by the community and it shall, when requested by the Secretary, submit a copy of the transcript of such hearings to the Secretary. Further, for such projects, it has on its management board either voting representation from the communities where the project is located or has advised the communities that they have the right to petition the Secretary concerning a proposed project.

10. **Metropolitan Planning Organization.**

In projects involving the location of an airport, an airport runway, or a major runway extension at a medium or large hub airport, the sponsor has made available to and has provided upon request to the metropolitan planning organization in the area in which the airport is located, if any, a copy of the proposed amendment to the airport layout plan to depict the project and a copy of any airport master plan in which the project is described or depicted.

11. **Pavement Preventive Maintenance.**

With respect to a project approved after January 1, 1995, for the replacement or reconstruction of pavement at the airport, it assures or certifies that it has implemented an effective airport pavement maintenance-management program and it assures that it will use such program for the useful life of any pavement constructed, reconstructed or repaired with Federal financial assistance at the airport. It will provide such reports on pavement condition and pavement management programs as the Secretary determines may be useful.

12. **Terminal Development Prerequisites.**

For projects which include terminal development at a public use airport, as defined in Title 49, it has, on the date of submittal of the project grant application, all the safety equipment required for certification of such airport under section 44706 of Title 49, United States Code, and all the security equipment required by rule or regulation, and

has provided for access to the passenger enplaning and deplaning area of such airport to passengers enplaning and deplaning from aircraft other than air carrier aircraft.

13. **Accounting System, Audit, and Record Keeping Requirements.**

   a. It shall keep all project accounts and records which fully disclose the amount and disposition by the recipient of the proceeds of this grant, the total cost of the project in connection with which this grant is given or used, and the amount or nature of that portion of the cost of the project supplied by other sources, and such other financial records pertinent to the project. The accounts and records shall be kept in accordance with an accounting system that will facilitate an effective audit in accordance with the Single Audit Act of 1984.

   b. It shall make available to the Secretary and the Comptroller General of the United States, or any of their duly authorized representatives, for the purpose of audit and examination, any books, documents, papers, and records of the recipient that are pertinent to this grant. The Secretary may require that an appropriate audit be conducted by a recipient. In any case in which an independent audit is made of the accounts of a sponsor relating to the disposition of the proceeds of a grant or relating to the project in connection with which this grant was given or used, it shall file a certified copy of such audit with the Comptroller General of the United States not later than six (6) months following the close of the fiscal year for which the audit was made.

14. **Minimum Wage Rates.**

   It shall include, in all contracts in excess of $2,000 for work on any projects funded under this grant agreement which involve labor, provisions establishing minimum rates of wages, to be predetermined by the Secretary of Labor, in accordance with the Davis-Bacon Act, as amended (40 U.S.C. 276a-276a-5), which contractors shall pay to skilled and unskilled labor, and such minimum rates shall be stated in the invitation for bids and shall be included in proposals or bids for the work.

15. **Veteran's Preference.**

   It shall include in all contracts for work on any project funded under this grant agreement which involve labor, such provisions as are necessary to insure that, in the employment of labor (except in executive, administrative, and supervisory positions), preference shall be given to Vietnam era veterans, Persian Gulf veterans, Afghanistan-Iraq war veterans, disabled veterans, and small business concerns owned and controlled by disabled veterans as defined in Section 47112 of Title 49, United States Code.  However, this preference shall apply only where the individuals are available and qualified to perform the work to which the employment relates.

16. **Conformity to Plans and Specifications.**

   It will execute the project subject to plans, specifications, and schedules approved by the Secretary. Such plans, specifications, and schedules shall be submitted to the Secretary prior to commencement of site preparation, construction, or other performance under this grant agreement, and, upon approval of the Secretary, shall be incorporated into this grant agreement. Any modification to the approved plans,

specifications, and schedules shall also be subject to approval of the Secretary, and incorporated into this grant agreement.

17. **Construction Inspection and Approval.**

It will provide and maintain competent technical supervision at the construction site throughout the project to assure that the work conforms to the plans, specifications, and schedules approved by the Secretary for the project. It shall subject the construction work on any project contained in an approved project application to inspection and approval by the Secretary and such work shall be in accordance with regulations and procedures prescribed by the Secretary. Such regulations and procedures shall require such cost and progress reporting by the sponsor or sponsors of such project as the Secretary shall deem necessary.

18. **Planning Projects.**

In carrying out planning projects:

a. It will execute the project in accordance with the approved program narrative contained in the project application or with the modifications similarly approved.

b. It will furnish the Secretary with such periodic reports as required pertaining to the planning project and planning work activities.

c. It will include in all published material prepared in connection with the planning project a notice that the material was prepared under a grant provided by the United States.

d. It will make such material available for examination by the public, and agrees that no material prepared with funds under this project shall be subject to copyright in the United States or any other country.

e. It will give the Secretary unrestricted authority to publish, disclose, distribute, and otherwise use any of the material prepared in connection with this grant.

f. It will grant the Secretary the right to disapprove the sponsor's employment of specific consultants and their subcontractors to do all or any part of this project as well as the right to disapprove the proposed scope and cost of professional services.

g. It will grant the Secretary the right to disapprove the use of the sponsor's employees to do all or any part of the project.

h. It understands and agrees that the Secretary's approval of this project grant or the Secretary's approval of any planning material developed as part of this grant does not constitute or imply any assurance or commitment on the part of the Secretary to approve any pending or future application for a Federal airport grant.

19. **Operation and Maintenance.**

a. The airport and all facilities which are necessary to serve the aeronautical users of the airport, other than facilities owned or controlled by the United States, shall be operated at all times in a safe and serviceable condition and in accordance with the minimum standards as may be required or prescribed by applicable Federal,

state and local agencies for maintenance and operation. It will not cause or permit any activity or action thereon which would interfere with its use for airport purposes. It will suitably operate and maintain the airport and all facilities thereon or connected therewith, with due regard to climatic and flood conditions. Any proposal to temporarily close the airport for non-aeronautical purposes must first be approved by the Secretary. In furtherance of this assurance, the sponsor will have in effect arrangements for-

1) Operating the airport's aeronautical facilities whenever required;

2) Promptly marking and lighting hazards resulting from airport conditions, including temporary conditions; and

3) Promptly notifying airmen of any condition affecting aeronautical use of the airport. Nothing contained herein shall be construed to require that the airport be operated for aeronautical use during temporary periods when snow, flood or other climatic conditions interfere with such operation and maintenance. Further, nothing herein shall be construed as requiring the maintenance, repair, restoration, or replacement of any structure or facility which is substantially damaged or destroyed due to an act of God or other condition or circumstance beyond the control of the sponsor.

b. It will suitably operate and maintain noise compatibility program items that it owns or controls upon which Federal funds have been expended.

20. **Hazard Removal and Mitigation.**

It will take appropriate action to assure that such terminal airspace as is required to protect instrument and visual operations to the airport (including established minimum flight altitudes) will be adequately cleared and protected by removing, lowering, relocating, marking, or lighting or otherwise mitigating existing airport hazards and by preventing the establishment or creation of future airport hazards.

21. **Compatible Land Use.**

It will take appropriate action, to the extent reasonable, including the adoption of zoning laws, to restrict the use of land adjacent to or in the immediate vicinity of the airport to activities and purposes compatible with normal airport operations, including landing and takeoff of aircraft. In addition, if the project is for noise compatibility program implementation, it will not cause or permit any change in land use, within its jurisdiction, that will reduce its compatibility, with respect to the airport, of the noise compatibility program measures upon which Federal funds have been expended.

22. **Economic Nondiscrimination.**

a. It will make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport.

b. In any agreement, contract, lease, or other arrangement under which a right or privilege at the airport is granted to any person, firm, or corporation to conduct or

to engage in any aeronautical activity for furnishing services to the public at the airport, the sponsor will insert and enforce provisions requiring the contractor to-

1) furnish said services on a reasonable, and not unjustly discriminatory, basis to all users thereof, and

2) charge reasonable, and not unjustly discriminatory, prices for each unit or service, provided that the contractor may be allowed to make reasonable and nondiscriminatory discounts, rebates, or other similar types of price reductions to volume purchasers.

c. Each fixed-based operator at the airport shall be subject to the same rates, fees, rentals, and other charges as are uniformly applicable to all other fixed-based operators making the same or similar uses of such airport and utilizing the same or similar facilities.

d. Each air carrier using such airport shall have the right to service itself or to use any fixed-based operator that is authorized or permitted by the airport to serve any air carrier at such airport.

e. Each air carrier using such airport (whether as a tenant, non-tenant, or subtenant of another air carrier tenant) shall be subject to such nondiscriminatory and substantially comparable rules, regulations, conditions, rates, fees, rentals, and other charges with respect to facilities directly and substantially related to providing air transportation as are applicable to all such air carriers which make similar use of such airport and utilize similar facilities, subject to reasonable classifications such as tenants or non-tenants and signatory carriers and non-signatory carriers. Classification or status as tenant or signatory shall not be unreasonably withheld by any airport provided an air carrier assumes obligations substantially similar to those already imposed on air carriers in such classification or status.

f. It will not exercise or grant any right or privilege which operates to prevent any person, firm, or corporation operating aircraft on the airport from performing any services on its own aircraft with its own employees [including, but not limited to maintenance, repair, and fueling] that it may choose to perform.

g. In the event the sponsor itself exercises any of the rights and privileges referred to in this assurance, the services involved will be provided on the same conditions as would apply to the furnishing of such services by commercial aeronautical service providers authorized by the sponsor under these provisions.

h. The sponsor may establish such reasonable, and not unjustly discriminatory, conditions to be met by all users of the airport as may be necessary for the safe and efficient operation of the airport.

i. The sponsor may prohibit or limit any given type, kind or class of aeronautical use of the airport if such action is necessary for the safe operation of the airport or necessary to serve the civil aviation needs of the public.

23. **Exclusive Rights.**

It will permit no exclusive right for the use of the airport by any person providing, or intending to provide, aeronautical services to the public. For purposes of this paragraph, the providing of the services at an airport by a single fixed-based operator shall not be construed as an exclusive right if both of the following apply:

a.  It would be unreasonably costly, burdensome, or impractical for more than one fixed-based operator to provide such services, and

b.  If allowing more than one fixed-based operator to provide such services would require the reduction of space leased pursuant to an existing agreement between such single fixed-based operator and such airport. It further agrees that it will not, either directly or indirectly, grant or permit any person, firm, or corporation, the exclusive right at the airport to conduct any aeronautical activities, including, but not limited to charter flights, pilot training, aircraft rental and sightseeing, aerial photography, crop dusting, aerial advertising and surveying, air carrier operations, aircraft sales and services, sale of aviation petroleum products whether or not conducted in conjunction with other aeronautical activity, repair and maintenance of aircraft, sale of aircraft parts, and any other activities which because of their direct relationship to the operation of aircraft can be regarded as an aeronautical activity, and that it will terminate any exclusive right to conduct an aeronautical activity now existing at such an airport before the grant of any assistance under Title 49, United States Code.

24. **Fee and Rental Structure.**

It will maintain a fee and rental structure for the facilities and services at the airport which will make the airport as self-sustaining as possible under the circumstances existing at the particular airport, taking into account such factors as the volume of traffic and economy of collection. No part of the Federal share of an airport development, airport planning or noise compatibility project for which a grant is made under Title 49, United States Code, the Airport and Airway Improvement Act of 1982, the Federal Airport Act or the Airport and Airway Development Act of 1970 shall be included in the rate basis in establishing fees, rates, and charges for users of that airport.

25. **Airport Revenues.**

a.  All revenues generated by the airport and any local taxes on aviation fuel established after December 30, 1987, will be expended by it for the capital or operating costs of the airport; the local airport system; or other local facilities which are owned or operated by the owner or operator of the airport and which are directly and substantially related to the actual air transportation of passengers or property; or for noise mitigation purposes on or off the airport. The following exceptions apply to this paragraph:

1)  If covenants or assurances in debt obligations issued before September 3, 1982, by the owner or operator of the airport, or provisions enacted before September 3, 1982, in governing statutes controlling the owner or operator's financing, provide for the use of the revenues from any of the airport owner or

operator's facilities, including the airport, to support not only the airport but also the airport owner or operator's general debt obligations or other facilities, then this limitation on the use of all revenues generated by the airport (and, in the case of a public airport, local taxes on aviation fuel) shall not apply.

2) If the Secretary approves the sale of a privately owned airport to a public sponsor and provides funding for any portion of the public sponsor's acquisition of land, this limitation on the use of all revenues generated by the sale shall not apply to certain proceeds from the sale.  This is conditioned on repayment to the Secretary by the private owner of an amount equal to the remaining unamortized portion (amortized over a 20-year period) of any airport improvement grant made to the private owner for any purpose other than land acquisition on or after October 1, 1996, plus an amount equal to the federal share of the current fair market value of any land acquired with an airport improvement grant made to that airport on or after October 1, 1996.

3) Certain revenue derived from or generated by mineral extraction, production, lease, or other means at a general aviation airport (as defined at Section 47102 of title 49 United States Code), if the FAA determines the airport sponsor meets the requirements set forth in Sec. 813 of Public Law 112-95.

b. As part of the annual audit required under the Single Audit Act of 1984, the sponsor will direct that the audit will review, and the resulting audit report will provide an opinion concerning, the use of airport revenue and taxes in paragraph (a), and indicating whether funds paid or transferred to the owner or operator are paid or transferred in a manner consistent with Title 49, United States Code and any other applicable provision of law, including any regulation promulgated by the Secretary or Administrator.

c. Any civil penalties or other sanctions will be imposed for violation of this assurance in accordance with the provisions of Section 47107 of Title 49, United States Code.

## 26. Reports and Inspections.

It will:

a. submit to the Secretary such annual or special financial and operations reports as the Secretary may reasonably request and make such reports available to the public; make available to the public at reasonable times and places a report of the airport budget in a format prescribed by the Secretary;

b. for airport development projects, make the airport and all airport records and documents affecting the airport, including deeds, leases, operation and use agreements, regulations and other instruments, available for inspection by any duly authorized agent of the Secretary upon reasonable request;

c. for noise compatibility program projects, make records and documents relating to the project and continued compliance with the terms, conditions, and assurances of this grant agreement including deeds, leases, agreements, regulations, and other instruments, available for inspection by any duly authorized agent of the Secretary upon reasonable request; and

d. in a format and time prescribed by the Secretary, provide to the Secretary and make available to the public following each of its fiscal years, an annual report listing in detail:

1) all amounts paid by the airport to any other unit of government and the purposes for which each such payment was made; and

2) all services and property provided by the airport to other units of government and the amount of compensation received for provision of each such service and property.

## 27. Use by Government Aircraft.

It will make available all of the facilities of the airport developed with Federal financial assistance and all those usable for landing and takeoff of aircraft to the United States for use by Government aircraft in common with other aircraft at all times without charge, except, if the use by Government aircraft is substantial, charge may be made for a reasonable share, proportional to such use, for the cost of operating and maintaining the facilities used. Unless otherwise determined by the Secretary, or otherwise agreed to by the sponsor and the using agency, substantial use of an airport by Government aircraft will be considered to exist when operations of such aircraft are in excess of those which, in the opinion of the Secretary, would unduly interfere with use of the landing areas by other authorized aircraft, or during any calendar month that –

a. Five (5) or more Government aircraft are regularly based at the airport or on land adjacent thereto; or

b. The total number of movements (counting each landing as a movement) of Government aircraft is 300 or more, or the gross accumulative weight of Government aircraft using the airport (the total movement of Government aircraft multiplied by gross weights of such aircraft) is in excess of five million pounds.

## 28. Land for Federal Facilities.

It will furnish without cost to the Federal Government for use in connection with any air traffic control or air navigation activities, or weather-reporting and communication activities related to air traffic control, any areas of land or water, or estate therein, or rights in buildings of the sponsor as the Secretary considers necessary or desirable for construction, operation, and maintenance at Federal expense of space or facilities for such purposes. Such areas or any portion thereof will be made available as provided herein within four months after receipt of a written request from the Secretary.

## 29. Airport Layout Plan.

a. It will keep up to date at all times an airport layout plan of the airport showing

1) boundaries of the airport and all proposed additions thereto, together with the boundaries of all offsite areas owned or controlled by the sponsor for airport purposes and proposed additions thereto;

2) the location and nature of all existing and proposed airport facilities and structures (such as runways, taxiways, aprons, terminal buildings, hangars and

roads), including all proposed extensions and reductions of existing airport facilities;

3) the location of all existing and proposed nonaviation areas and of all existing improvements thereon; and

4) all proposed and existing access points used to taxi aircraft across the airport's property boundary. Such airport layout plans and each amendment, revision, or modification thereof, shall be subject to the approval of the Secretary which approval shall be evidenced by the signature of a duly authorized representative of the Secretary on the face of the airport layout plan. The sponsor will not make or permit any changes or alterations in the airport or any of its facilities which are not in conformity with the airport layout plan as approved by the Secretary and which might, in the opinion of the Secretary, adversely affect the safety, utility or efficiency of the airport.

b. If a change or alteration in the airport or the facilities is made which the Secretary determines adversely affects the safety, utility, or efficiency of any federally owned, leased, or funded property on or off the airport and which is not in conformity with the airport layout plan as approved by the Secretary, the owner or operator will, if requested, by the Secretary (1) eliminate such adverse effect in a manner approved by the Secretary; or (2) bear all costs of relocating such property (or replacement thereof) to a site acceptable to the Secretary and all costs of restoring such property (or replacement thereof) to the level of safety, utility, efficiency, and cost of operation existing before the unapproved change in the airport or its facilities except in the case of a relocation or replacement of an existing airport facility due to a change in the Secretary's design standards beyond the control of the airport sponsor.

30. **Civil Rights.**

It will promptly take any measures necessary to ensure that no person in the United States shall, on the grounds of race, creed, color, national origin, sex, age, or disability be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination in any activity conducted with, or benefiting from, funds received from this grant.

a. Using the definitions of activity, facility and program as found and defined in §§ 21.23 (b) and 21.23 (e) of 49 CFR § 21, the sponsor will facilitate all programs, operate all facilities, or conduct all programs in compliance with all non-discrimination requirements imposed by, or pursuant to these assurances.

b. Applicability

1) Programs and Activities. If the sponsor has received a grant (or other federal assistance) for any of the sponsor's program or activities, these requirements extend to all of the sponsor's programs and activities.

2) Facilities. Where it receives a grant or other federal financial assistance to construct, expand, renovate, remodel, alter or acquire a facility, or part of a facility, the assurance extends to the entire facility and facilities operated in connection therewith.

3) Real Property.  Where the sponsor receives a grant or other Federal financial assistance in the form of, or for the acquisition of real property or an interest in real property, the assurance will extend to rights to space on, over, or under such property.

c.  Duration.

The sponsor agrees that it is obligated to this assurance for the period during which Federal financial assistance is extended to the program, except where the Federal financial assistance is to provide, or is in the form of, personal property, or real property, or interest therein, or structures or improvements thereon, in which case the assurance obligates the sponsor, or any transferee for the longer of the following periods:

1) So long as the airport is used as an airport, or for another purpose involving the provision of similar services or benefits; or

2) So long as the sponsor retains ownership or possession of the property.

d.  Required Solicitation Language. It will include the following notification in all solicitations for bids, Requests For Proposals for work, or material under this grant agreement and in all proposals for agreements, including airport concessions, regardless of funding source:

"The **(Name of Sponsor)**, in accordance with the provisions of Title VI of the Civil Rights Act of 1964 (78 Stat. 252, 42 U.S.C. §§ 2000d to 2000d-4) and the Regulations, hereby notifies all bidders that it will affirmatively ensure that any contract entered into pursuant to this advertisement, disadvantaged business enterprises and airport concession disadvantaged business enterprises will be afforded full and fair opportunity to submit bids in response to this invitation and will not be discriminated against on the grounds of race, color, or national origin in consideration for an award."

e.  Required Contract Provisions.

1) It will insert the non-discrimination contract clauses requiring compliance with the acts and regulations relative to non-discrimination in Federally-assisted programs of the DOT, and incorporating the acts and regulations into the contracts by reference in every contract or agreement subject to the non-discrimination in Federally-assisted programs of the DOT acts and regulations.

2) It will include a list of the pertinent non-discrimination authorities in every contract that is subject to the non-discrimination acts and regulations.

3) It will insert non-discrimination contract clauses as a covenant running with the land, in any deed from the United States effecting or recording a transfer of real property, structures, use, or improvements thereon or interest therein to a sponsor.

4) It will insert non-discrimination contract clauses prohibiting discrimination on the basis of race, color, national origin, creed, sex, age, or handicap as a

covenant running with the land, in any future deeds, leases, license, permits, or similar instruments entered into by the sponsor with other parties:

   a)  For the subsequent transfer of real property acquired or improved under the applicable activity, project, or program; and

   b)  For the construction or use of, or access to, space on, over, or under real property acquired or improved under the applicable activity, project, or program.

f.  It will provide for such methods of administration for the program as are found by the Secretary to give reasonable guarantee that it, other recipients, sub-recipients, sub-grantees, contractors, subcontractors, consultants, transferees, successors in interest, and other participants of Federal financial assistance under such program will comply with all requirements imposed or pursuant to the acts, the regulations, and this assurance.

g.  It agrees that the United States has a right to seek judicial enforcement with regard to any matter arising under the acts, the regulations, and this assurance.

**31. Disposal of Land.**

a.  For land purchased under a grant for airport noise compatibility purposes, including land serving as a noise buffer, it will dispose of the land, when the land is no longer needed for such purposes, at fair market value, at the earliest practicable time. That portion of the proceeds of such disposition which is proportionate to the United States' share of acquisition of such land will be, at the discretion of the Secretary, (1) reinvested in another project at the airport, or (2) transferred to another eligible airport as prescribed by the Secretary.  The Secretary shall give preference to the following, in descending order, (1) reinvestment in an approved noise compatibility project, (2) reinvestment in an approved project that is eligible for grant funding under Section 47117(e) of title 49 United States Code, (3) reinvestment in an approved airport development project that is eligible for grant funding under Sections 47114, 47115, or 47117 of title 49 United States Code, (4) transferred to an eligible sponsor of another public airport to be reinvested in an approved noise compatibility project at that airport, and (5) paid to the Secretary for deposit in the Airport and Airway Trust Fund.  If land acquired under a grant for noise compatibility purposes is leased at fair market value and consistent with noise buffering purposes, the lease will not be considered a disposal of the land.  Revenues derived from such a lease may be used for an approved airport development project that would otherwise be eligible for grant funding or any permitted use of airport revenue.

b.  For land purchased under a grant for airport development purposes (other than noise compatibility), it will, when the land is no longer needed for airport purposes, dispose of such land at fair market value or make available to the Secretary an amount equal to the United States' proportionate share of the fair market value of the land.  That portion of the proceeds of such disposition which is proportionate to the United States' share of the cost of acquisition of such land will, (1) upon application to the Secretary, be reinvested or transferred to another

eligible airport as prescribed by the Secretary.  The Secretary shall give preference to the following, in descending order: (1) reinvestment in an approved noise compatibility project, (2) reinvestment in an approved project that is eligible for grant funding under Section 47117(e) of title 49 United States Code, (3) reinvestment in an approved airport development project that is eligible for grant funding under Sections 47114, 47115, or 47117 of title 49 United States Code, (4) transferred to an eligible sponsor of another public airport to be reinvested in an approved noise compatibility project at that airport, and (5) paid to the Secretary for deposit in the Airport and Airway Trust Fund.

c.  Land shall be considered to be needed for airport purposes under this assurance if (1) it may be needed for aeronautical purposes (including runway protection zones) or serve as noise buffer land, and (2) the revenue from interim uses of such land contributes to the financial self-sufficiency of the airport. Further, land purchased with a grant received by an airport operator or owner before December 31, 1987, will be considered to be needed for airport purposes if the Secretary or Federal agency making such grant before December 31, 1987, was notified by the operator or owner of the uses of such land, did not object to such use, and the land continues to be used for that purpose, such use having commenced no later than December 15, 1989.

d.  Disposition of such land under (a) (b) or (c) will be subject to the retention or reservation of any interest or right therein necessary to ensure that such land will only be used for purposes which are compatible with noise levels associated with operation of the airport.

32. **Engineering and Design Services.**

It will award each contract, or sub-contract for program management, construction management, planning studies, feasibility studies, architectural services, preliminary engineering, design, engineering, surveying, mapping or related services with respect to the project in the same manner as a contract for architectural and engineering services is negotiated under Title IX of the Federal Property and Administrative Services Act of 1949 or an equivalent qualifications-based requirement prescribed for or by the sponsor of the airport.

33. **Foreign Market Restrictions.**

It will not allow funds provided under this grant to be used to fund any project which uses any product or service of a foreign country during the period in which such foreign country is listed by the United States Trade Representative as denying fair and equitable market opportunities for products and suppliers of the United States in procurement and construction.

34. **Policies, Standards, and Specifications.**

It will carry out the project in accordance with policies, standards, and specifications approved by the Secretary including but not limited to the advisory circulars listed in the Current FAA Advisory Circulars for AIP projects, dated _____ (the latest approved version as of this grant offer) and included in this grant, and in accordance

with applicable state policies, standards, and specifications approved by the Secretary.

35. **Relocation and Real Property Acquisition.**

    a. It will be guided in acquiring real property, to the greatest extent practicable under State law, by the land acquisition policies in Subpart B of 49 CFR Part 24 and will pay or reimburse property owners for necessary expenses as specified in Subpart B.

    b. It will provide a relocation assistance program offering the services described in Subpart C and fair and reasonable relocation payments and assistance to displaced persons as required in Subpart D and E of 49 CFR Part 24.

    c. It will make available within a reasonable period of time prior to displacement, comparable replacement dwellings to displaced persons in accordance with Subpart E of 49 CFR Part 24.

36. **Access By Intercity Buses.**

The airport owner or operator will permit, to the maximum extent practicable, intercity buses or other modes of transportation to have access to the airport; however, it has no obligation to fund special facilities for intercity buses or for other modes of transportation.

37. **Disadvantaged Business Enterprises.**

The sponsor shall not discriminate on the basis of race, color, national origin or sex in the award and performance of any DOT-assisted contract covered by 49 CFR Part 26, or in the award and performance of any concession activity contract covered by 49 CFR Part 23.  In addition, the sponsor shall not discriminate on the basis of race, color, national origin or sex  in the administration of its DBE and ACDBE programs or the requirements of 49 CFR Parts 23 and 26.  The sponsor shall take all necessary and reasonable steps under 49 CFR Parts 23 and 26 to ensure nondiscrimination in the award and administration of DOT-assisted contracts, and/or concession contracts.  The sponsor's DBE and ACDBE programs, as required by 49 CFR Parts 26 and 23, and as approved by DOT, are incorporated by reference in this agreement.  Implementation of these programs is a legal obligation and failure to carry out its terms shall be treated as a violation of this agreement.  Upon notification to the sponsor of its failure to carry out its approved program, the Department may impose sanctions as provided for under Parts 26 and 23 and may, in appropriate cases, refer the matter for enforcement under 18 U.S.C. 1001 and/or the Program Fraud Civil Remedies Act of 1936 (31 U.S.C. 3801).

38. **Hangar Construction.**

If the airport owner or operator and a person who owns an aircraft agree that a hangar is to be constructed at the airport for the aircraft at the aircraft owner's expense, the airport owner or operator will grant to the aircraft owner for the hangar a long term lease that is subject to such terms and conditions on the hangar as the airport owner or operator may impose.

39. **Competitive Access.**

   a.  If the airport owner or operator of a medium or large hub airport (as defined in section 47102 of title 49, U.S.C.) has been unable to accommodate one or more requests by an air carrier for access to gates or other facilities at that airport in order to allow the air carrier to provide service to the airport or to expand service at the airport, the airport owner or operator shall transmit a report to the Secretary that-

   1)  Describes the requests;

   2)  Provides an explanation as to why the requests could not be accommodated; and

   3)  Provides a time frame within which, if any, the airport will be able to accommodate the requests.

   b.  Such report shall be due on either February 1 or August 1 of each year if the airport has been unable to accommodate the request(s) in the six month period prior to the applicable due date.

# EXHIBIT B

4.A.11



**East Hampton Town Board**
159 Pantigo Road
East Hampton, NY  11937

**ADOPTED**

**RESOLUTION 2015-411**

Meeting: 04/16/15 06:30 PM
Department: Town Attorney
Category: Local Law
Prepared By: Elizabeth Vail
Initiator: Elizabeth Vail
Sponsors: Councilwoman Kathee Burke-Gonzalez
DOC ID: 15229 A

# Adopt Local Law- Amending Chapter 75 (Airport) of the Town Code Regulating Nighttime Operation of Aircraft at East Hampton Airport

WHEREAS, the Town of East Hampton is an established resort community that is renowned for its peaceful, quiet beaches and outdoor areas; and

WHEREAS, the economy of the Town of East Hampton is tied intrinsically to the use and enjoyment of its natural and scenic environment, including its world-renowned ocean beaches, wetlands, shorelines, harbors, bays, woodlands, and historic hamlets; and

WHEREAS, residents and visitors are attracted to the Town and the East End of Long Island to enjoy the area's unique scenic beauty, its outdoor spaces, and the peaceful and restful atmosphere they provide; and

WHEREAS, peace, quiet, repose, outdoor recreation, sea, air, and a beautiful and unique natural environment are the essential characteristics that make East Hampton and the East End, as a whole, such an attractive and desirable area; and

WHEREAS, the Town and its residents have invested heavily in preserving the rural, quiet pace of life by preserving land and adopting land use policies that are designed to protect the unique quality of life in East Hampton; and

WHEREAS, in the busy season of May - September, residents and visitors spend a significant portion of time outdoors engaged in recreational activities, entertaining, dining with family and friends, and otherwise enjoying the peaceful, restful atmosphere of the area; and

WHEREAS, the unique quality of life in the Town and entire East End means that residents are particularly susceptible to disturbances to their pastoral lifestyle, especially when those disturbances interfere with the qualities which make this Town a highly desirable place to live and visit; and

WHEREAS, the area surrounding the East Hampton Airport is notably quiet because of the lack of industrial noises, relatively low population density and rural roadway network, which, taken together, accentuates the perception of noise, both in terms of peak levels and also in terms of the duration of the noise events themselves; and

WHEREAS, in the past three decades, noise from aircraft overflights has disrupted outdoor activities and diminished the quality of life in the Town and the entire of the East End; and

WHEREAS, the aircraft noise problem has increased dramatically in recent years, as overall operations increased by 23 percent from 2013 to 2014 and helicopter operations alone increased by 47 percent from 2013 to 2014; and

WHEREAS, noise from loud aircraft and helicopters is particularly disruptive because it interrupts conversations and other ordinary activities and makes it very difficult to enjoy

Packet Pg. 142

outdoor activities; and

WHEREAS, the sheer frequency of overflights also poses a significant problem because there are extended periods of repeated loud noise events that make it very difficult to enjoy outdoor activities and that destroy the peaceful quiet of this rural area; and

WHEREAS, aircraft noise has been a major source of controversy and community strife for many years, with increasingly strong demands by the public that the Town take action to reduce the disruptive and harmful effects of aircraft noise; and

WHEREAS, the controversy has resulted in a number of lawsuits, and additional threatened lawsuits, aimed at compelling the Town or the federal government to take action to address the problem of aircraft noise; and

WHEREAS, in its capacity as proprietor of the East Hampton Airport, the Town Board has a responsibility to protect residents from the adverse effects of aircraft noise; and

WHEREAS, aircraft noise is not merely annoying and disturbing but threatens the economic vitality of the Town and its brand as a place where people can escape the noise and stresses of urban life in favor of tranquility and rural quiet; and

WHEREAS, that threat could result in lower rates of visitation, reduction in property values, and, more generally, a loss in the attractiveness of the Town; and

WHEREAS, in addition to formal noise complaints, residents and visitors have expressed their anger and frustration about aircraft noise at numerous public meetings, Town Board meetings, in letters to local papers, and in communications with Town officials; and

WHEREAS, the problem of aircraft noise was a major topic of discussion and debate in the recent Town election; and

WHEREAS, the Town has received numerous communications from residents and officials of neighboring and nearby jurisdictions demanding that the Town take action to reduce the effect of noise from aircraft flying to and from East Hampton Airport; and

WHEREAS, the Town of Southampton, the Town Shelter Island, the Town of Southold, the Village of North Haven, the Village of East Hampton, and the Village of Sag Harbor all have adopted resolutions requesting that the Town Board of the Town of East Hampton adopt a comprehensive aircraft noise limitation policy; and

WHEREAS these other towns and villages, and all residents and visitors to the East End, depend upon the Town to address the aircraft noise problem since the Town operates the East Hampton Airport, which is the destination of many of the noisy aircraft flights; and
WHEREAS, for over two decades, the Town has diligently identified and promoted voluntary measures, including helicopter noise abatement procedures and a nighttime curfew, in order to secure relief from the disturbance of aircraft noise; and

WHEREAS, Town officials have met repeatedly with the New York Congressional delegation, to discuss this issue in the hope of finding a federal legislative solution to the problem of aircraft noise; and

Resolution 2015-411                                    Meeting of April 16, 2015

WHEREAS, Town officials have met repeatedly with the Federal Aviation Administration (FAA) officials at the local, regional and headquarters level and with the FAA's Air Traffic Organization, to discuss proposed measures and use restrictions, including the use of voluntary measures; and

WHEREAS, the Town worked with the New York Congressional delegation and all levels of the FAA in the implementation of a mandatory North Shore Helicopter Route, which was initially implemented in August 2012 and recently extended through August 2016; and

WHEREAS, the Town has repeatedly tried, unsuccessfully, to convince the FAA to adopt a mandatory helicopter route along the south shore of Long Island or to adopt mandatory transition routes for helicopters transitioning from the mandatory routes to the East Hampton Airport; and

WHEREAS, the Town has spent the last several summer seasons studying various voluntary measures or measures in cooperation with the FAA to address the noise problem but the level of resident concern has actually increased over that time; and

WHEREAS, the Town's past several years of efforts to address the problem of aircraft noise through voluntary measures promoted by the Town combined with mandatory flight tracks for helicopters imposed by FAA have provided some limited relief in certain neighborhoods, but those measures alone have not reduced to an acceptable level the overall intensity of community disturbance from noise associated with aircraft flying to and from East Hampton Airport; and

WHEREAS, the Town's ability to address the problem of aircraft noise has been constrained legally by obligations under certain of its federal grants that the FAA has stated will no longer be enforced after December 31, 2014; and

WHEREAS, the Town first announced its intent to pursue use restrictions on operations at East Hampton Airport to address the problem of aircraft noise by the adoption of Resolution 2012-832 on August 2, 2012; and

WHEREAS, Town officials and staff have met repeatedly with airport stakeholders, including Eastern Region Helicopter Council, Friends of the East Hampton Airport, the National Business Aviation Association, the Aircraft Owners and Pilots Association, the National Air Transportation Association, and other informal local groups of users and service providers to discuss their respective concerns; and

WHEREAS, the Town held a special public meeting on August 27, 2014, provide the public an opportunity to comment on the problem of aircraft noise and to share views on potential solutions and the meeting was attended by almost 400 people, including 22 elected officials, all of whom expressed support for finding a solution to the noise problem; and

WHEREAS, the Town announced its commitment to finding a solution to disturbance resulting from noise associated with Airport operations; announced its intent to adopt lawful measures to ensure the peace, quiet, tranquility and health of communities affected by Airport noise;   resolved to consider the most serious disturbances,  the causes of the disturbances, and reasonable and practical solutions tailored to address the source of those disturbances before making a decision; and announced its intent to identify and adopt

Resolution 2015-411                                    Meeting of April 16, 2015

regulations to address noise and disturbance from Operations at East Hampton Airport before the 2015 season by the adoption of Resolution 2014-1180 on September 18, 2014; and

WHEREAS, FAA's traditional Day/Night Average Sound Level (DNL) noise metric has proved, after considerable study, not to be a useful tool for measuring the impact of noise from operations at East Hampton Airport because it averages noise data over 24 hours, and does not capture the demonstrated community annoyance and disruption from individual aircraft noise events (especially noise events associated with helicopters); and

WHEREAS, beginning in 2014, the Town commissioned a series of comprehensive analyses of the noise and related complaints, including the following:

- Henry Young of Young Environmental Sciences and Les Blomberg of Noise Pollution Clearinghouse: (1) analyzed 2013 operational data collected by the AirScene system, (2) converted that data for use in the Integrated Noise Model (INM), (3) used the INM to develop Day-Night Average Sound Level (DNL) noise contours for 2013 operations (for total annual operations, annual helicopter operations, busiest day total operations, and busiest day helicopter operations),  (4) used the INM to calculate the maximum sound level (Lmax) for each modeled flight in 2013 at each

  property parcel in a 10-mile radius from the airport, (5) applied the Town Code noise

  standards to determine the number of "exceedances" (i.e., the number of times each parcel experienced a noise impact above the Town's limits) by aircraft type and type of operation; and

- Peter Wadsworth analyzed 2014 complaint data collected by the PlaneNoise system; and

- Ted Baldwin of Harris Miller Miller & Hanson Inc. (HMMH) led HMMH analyses of November 1, 2013 - October 31, 2014 data, including: (1) analysis of PlaneNoise complaint data to identify temporal and geographic complaint patterns for different aircraft types (e.g., jet, turboprop, piston prop, seaplane, and helicopter), (2) analysis of Vector operations data to identify patterns of activity by day of year, day of week, hour of day (for each day of the week and for the average annual day), and season; (3) correlated PlaneNoise complaint data and Vector operations data to identify patterns; (4) used the independent and correlated data analyses to develop a refined problem definition and promising alternatives for addressing that definition; (5) analyzed the effect of those alternatives in terms of the historical operations that each would have affected and of the associated noise complaints; and (6) identified and reviewed technical studies in the literature that have attempted to identify the most effective noise metric for understanding response to helicopter noise, whether the metric should include a special "adjustment" for helicopters, and otherwise

provide useful information on the best means of assessing helicopter noise and predicting human response; and

WHEREAS, the Town also commissioned several advisory groups to assist in identifying the noise problem with specificity and identifying meaningful, practical and carefully tailored measures that the Town could adopt which would help reduce or eliminate the noise problem; and

WHEREAS, these advisory groups have held many, many public meetings, discussions and debates about how best to address the Town's noise problem; and

WHEREAS, the Town held meetings on October 30, 2014; December 2, 2014; and February 4, 2015; to review the findings of each phase of the recent noise analyses; and

WHEREAS, the Town Board announced four proposed use restrictions for East Hampton Airport on February 10, 2015; and

WHEREAS, the Town Board held public hearings on March 12, 2015, to consider the following four local laws amending Chapter 75 (Airport) of the Town Code: (1) a local law to regulate nighttime operation of aircraft; (2) a local law to regulate nighttime and early morning operation of noisy aircraft; (3) a local law to regulate the operation of helicopters; and (4) a local law to regulate the operation of noisy aircraft; and

WHEREAS, the Town has been soliciting public comment through encouraging comments at Town Board meetings, and emailed comments through a dedicated email address; and

WHEREAS, the Town Board has reviewed all of those comments plus written comments and comments appearing in several local newspapers over the course of the last year; and

WHEREAS, there is no single or simple measure which is certain to solve the Town's noise problem; and

WHEREAS, the Town is committed to testing measures for their practical, real-world effectiveness but needs to have at least one summer season to collect adequate data on real world effects; and

WHEREAS, the Town is committed to collecting data during the summer 2015 season and to assessing all noise control measures in October 2015 for their effectiveness; and

WHEREAS, the Town will modify any restrictions to improve their effectiveness based upon the results of these restrictions during the summer 2015 season; and

WHEREAS, the Town encourages residents, visitors, airport stakeholders, users and all other interested parties to provide the Town with input on the effectiveness of particular measures in addressing, mitigating or eliminating the noise problem; and

WHEREAS, after considering the history of noise disturbance caused by operations at the Airport, reviewing the data provided by the Town's consultants and the comments of the public, and after holding public hearings, the Town Board believes that the enactment of a local law to implement a nighttime curfew at the East Hampton Airport is in the best

interests of the Town of East Hampton for the following reasons:

- Disturbance by all types of aircraft is most significant in the evening, nighttime, and early morning hours; and

- Professional studies confirm that nighttime aircraft noise is highly disturbing, that it can disrupt normal sleep patterns, and that it has a particularly serious adverse effect on people's lives; and

- The Town's voluntary curfew has not proven to be sufficiently effective at reducing nighttime noise from aircraft and nighttime operations still generate a significant number of complaints; and

WHEREAS, the proposed local law is an Unlisted Action pursuant to the New York State Environmental Quality Review Act (SEQRA) and Chapter 128 of the Town Code; and

WHEREAS, the Town Board has prepared and considered an Environmental Assessment Form which evaluates the potential environmental impacts of the proposed amendment; and

WHEREAS, the Board has determined that the adoption of this Local Law will not have a significant negative impact upon the environment; and now, therefore be it

**NOW, THEREFORE, BE IT RESOLVED**, that a negative declaration is hereby made pursuant to the State Environmental Quality Review Act (SEQRA); and

RESOLVED, that said local law is hereby adopted to read as follows:

LOCAL LAW NO.  ___  OF 2015
INTRODUCTORY NO.  ___   OF 2015

A Local Law providing for the amendment of Chapter 75 ("AIRPORT") of the East Hampton Town Code to read as follows:

BE IT ENACTED by the Town Board of the Town of East Hampton as follows:

**SECTION 1.  Legislative Intent**

In the past three decades, the residents of the Town of East Hampton have experienced a significant increase in noisy aircraft traffic at the East Hampton Airport. By its extensive complaints to the Town Board and to other governmental entities, the public has made clear, and this Town Board recognizes, the negative impact that this aircraft noise has made to the health and welfare of its citizenry, to wildlife and their habitat, as well as to the peace, quiet, and repose of the region. Aircraft noise has substantially diminished the quiet enjoyment of homes and properties and compromised the pleasures of the woodlands, beaches, fields, and preserved lands that define our community and sense of place.

East Hampton is an established resort community whose entire economy is intrinsically tied to the use and enjoyment of its natural and scenic environment, including its world renowned ocean beaches, wetlands, shorelines, harbors, bays, woodlands, and historic

Resolution 2015-411                                         Meeting of April 16, 2015

hamlets. Visitors and residents alike enjoy East Hampton's unique scenic beauty and the Town has made significant efforts to preserve the natural environs of the Town, spending a total of $229,431,502 of Community Preservation Funds to preserve approximately 1,924 acres since 1998.

The Town's Comprehensive Plan has outlined the vital connection between preserving the natural scenic beauty and enjoyment of its community and the Town's economy, stating in its vision statement the goal to

> "[t]ake forceful measures to protect and restore the environment, particularly groundwater. Reduce the impacts of human habitation on groundwater, surface water, wetlands, dunes biodiversity, ecosystems, scenic resources, air quality, the night sky, noise and energy consumption."

The 2007 Airport Master Plan Report that then became the basis for the adopted 2010 Airport Master Plan states, at II-73:

> "The East Hampton Airport is owned, maintained and operated for the benefit of the Town and its residents. The airport continues to be classified as a General Aviation Airport under federal criteria. Its primary role is the accommodation of light aircraft traffic. Aircraft operating at greater weights will be accommodated on condition [sic] without unjust discrimination. The airport is also managed with the objective of providing emergency access and facilitation of all other public and community responsibilities. The size and operation of the airport takes into consideration the needs of East Hampton and Southampton residents for protection from excessive noise disturbance and adverse environmental impacts."

> "Control of noise and adverse environmental impacts at the airport is consistent with current Town goals for improved quality of life and land and water conservation. These goals recognize that protecting the environment is essential for improving the Town's seasonal and year round economy. These controls are achieved through reasonable, non arbitrary and non discriminatory management practices. These may limit the maximum size of aircraft to be accommodated, regulate excessive peak demand during the summer season and otherwise adjust use patterns such as for helicopter access to minimize community disturbances."

In an effort to address the impacts of aircraft noise, the Town Board undertook an extensive analysis of the citizenry's complaints, and of the aircraft traffic itself, by the Town's aviation consultants and noise engineers, the results of which have only confirmed the seriousness of the community's noise disturbance. Of 24,000 airport noise complaints logged last year, the latest noise analysis discloses that they are overwhelmingly attributable to helicopters and jets, the noisiest types. Noise complaints at East Hampton Airport far exceed the level of complaints at major airports around the country. This is surely due, not least, to the

Resolution 2015-411                                   Meeting of April 16, 2015

incongruity of jet and helicopter noise in what is otherwise a very quiet, exurban and rural environment.

Specifically, noise from aircraft operating at the East Hampton Airport disturbs many residents of the East End of Long Island. Disturbance by all types of aircraft is most significant in the evening, nighttime, and early morning hours.  Myriad professional studies from airports throughout the world have confirmed what the residents of East Hampton know from personal experience: nighttime aircraft noise is more disturbing, more annoying, can disrupt normal sleep patterns, and, generally, has a particularly seriously adverse effect on people's lives.

In its capacity as proprietor of the East Hampton Airport, the Town Board has a public policy responsibility to protect residents from the adverse effects of aircraft noise. It has developed a set of restrictions on the use of East Hampton Airport that are reasonable, non-arbitrary, and non-discriminatory. These restrictions address the problems of aircraft noise that are unique to the Town and neighboring communities while preserving for the community the benefits of aviation.

The Town Board recognizes the value of the East Hampton Airport to the community and does not want to impose any greater restriction than is necessary to achieve the Town's objectives.

To that end, the Town Board recognizes the importance of addressing nighttime noise problems, during sleeping hours when there is a heightened expectation of quiet, by imposing a curfew for nighttime hours. The legislation is intended to restrict aircraft operations during the most sensitive times of the day.

By enacting this legislation, the Town Board seeks to achieve immediate, substantial nighttime noise relief for residents and visitors, maintain the intended and traditional use of the East Hampton Airport by recreational aircraft, and continue sufficient air traffic to maintain a financially self-sustaining Airport.

The Town Board is committed to balancing the need to address the impact of the aircraft noise on the Town's environment with the equally important need to maintain an economically viable and safe airport for East Hampton.

The proposed legislation expressly excludes from its application aircraft operated by any federal, state or local government, any emergency services, evacuation services, public or private, and any operation by an aircraft in an emergency.  The airport will remain open to such operations at all times without restriction or charge.

These restrictions are adopted on an interim basis. The effects of the legislation on the operations at the Airport for the period May 1 to October 31, 2015 shall be evaluated to determine whether the restrictions should be made permanent or modified. The Town Board will seek public comment throughout the Season and immediately following the Season to determine the success and/or failure of the use restrictions and whether they function the way they were intended or need to be adjusted.

## SECTION 2.  Amendment

The Code of the Town of East Hampton is hereby amended by adding the following new

Resolution 2015-411                                    Meeting of April 16, 2015

section to Chapter 75 (Airport).

**§ 75-38 AIRPORT USE RESTRICTIONS:**

A.     **Definitions**.

        (1) - (2) - *Reserved*

        (3)     "Individual Aircraft" shall mean an aircraft, of whatever type, with a distinct registration number ("N number" if such registration is issued by the United States Government).

        (4) - (5) - *Reserved*

        (6)     "Use of the Airport" shall mean either one arrival (landing) at, or one departure (takeoff) from, the Airport, shall not include any repositioning of any aircraft on the Airport or any aborted takeoff or landing, but shall include touch-and-go operations that result in use of an Airport runway.

B.     **Nighttime Operations**.  Use of the Airport is prohibited between the hours of 11:00 pm and 7:00 am (local time).

C.     [*Reserved*]

D.     [*Reserved*]

E.     **Exemptions**.  The restrictions of this section 75-38 shall not apply to any aircraft operational emergency, any medical emergency operation, whether by public or private aircraft, or to any operation by a government-owned aircraft, including, without limitation, police, emergency services, and military operations.  In the case of an aircraft emergency or medical emergency operation, the operator shall submit a sworn statement to the Airport Manager within 24 hours of such operation attesting to the nature of the emergency and reason for the operation.

**§ 75-39 PENALTIES:**

A.     Section 75-34 shall not apply to violations of Section 75-38 and this Section 75-39 shall apply for all violations of Section 75-38.  For the purpose of conferring jurisdiction upon courts and judicial officers in general, violations of Section 75-38 shall be deemed misdemeanors, and, for such purpose only, all provisions of law relating to misdemeanors shall apply to such violations.

B.     Any Use of the Airport by an Individual Aircraft in violation of Section 75-38 shall be punishable by a fine assessed against any person, organization, corporation, group or other entity which holds an ownership interest in such aircraft, as follows:

        (1)     For the first violation by an Individual Aircraft, a fine of not more than

$1,000.

(2)     For the second violation by an Individual Aircraft, a fine of not more than $4,000.

(3)     For the third violation by an Individual Aircraft, a fine of not more than $10,000.

(4)     For the fourth violation by an Individual Aircraft, a prohibition on any Use of the Airport by the Individual Aircraft involved in such violation for a period of not more than two years.

C.     Each Use of the Airport by an Individual Aircraft in violation of Section 75-38 shall constitute a separate offense.

D.     In addition, any entity convicted hereunder of not complying with the requirements of Section 75-38 may be subject to a fine of not less than the amount of the actual costs incurred and owed to the Town and not more than an amount equal to twice said actual costs.  Should any person, organization, corporation, group or other entity be found in violation of the provisions of Section 75-38 within five years of a previous violation of this chapter, the minimum additional fine shall be not less than $2000.

E.     In addition to the above penalties, the Town may also maintain an action or proceeding in the name of the Town in a court of competent jurisdiction to compel compliance with or to restrain by injunction the violation Section 75-38 by any person, organization, corporation, group or other entity which holds an ownership interest in the Individual Aircraft.

(1) If a finding is made by a court of competent jurisdiction that the defendants or any of them has caused, permitted or allowed a violation of Section 75-38, a penalty to be jointly and severally included in the judgment may be awarded at the discretion of the court in an amount not to exceed $10,000.00 for each violation that the defendants or any one of them individually caused, permitted or allowed the violation.

## SECTION 3.  Authority

The Town Board is authorized to establish and promulgate rules and regulations regarding use of the East Hampton Airport pursuant to Municipal Home Rule Law §10(1)(ii)(a)(11) and (12) and Town Law §130 and pursuant to its powers as the proprietor of East Hampton Airport under federal statutory and case law and regulations of the Federal Aviation Administration.

## SECTION 4. Severability

If any section or subdivision, paragraph, clause or phrase of this law shall be adjudged

Resolution 2015-411                                          Meeting of April 16, 2015

invalid, unenforceable, or unconstitutional by any order or judgment of a court of competent jurisdiction, or pursuant to any order of any administrative agency having jurisdiction, whether such judgment or order is temporary or permanent, such judgment or order shall not affect the validity of this law as a whole or any part thereof other than the part or provision so adjudged to be invalid or unconstitutional.

## SECTION 5. Effective Date

This local law shall take effect upon filing with the Secretary of State.

Dated: April 16, 2015

BY ORDER OF THE TOWN BOARD
TOWN OF EAST HAMPTON
CAROLE BRENNAN, TOWN CLERK

| | |
|---|---|
| **RESULT:** | **ADOPTED [UNANIMOUS]** |
| **MOVER:** | Kathee Burke-Gonzalez, Councilwoman |
| **SECONDER:** | Peter Van Scoyoc, Councilman |
| **AYES:** | Burke-Gonzalez, Van Scoyoc, Overby, Overton, Cantwell |

# EXHIBIT C

4.A.12



**East Hampton Town Board**
159 Pantigo Road
East Hampton, NY  11937

Meeting: 04/16/15 06:30 PM
Department: Town Attorney
Category: Local Law
Prepared By: Elizabeth Vail

**ADOPTED**

**RESOLUTION 2015-412**

Initiator: Elizabeth Vail
Sponsors: Councilwoman Kathee Burke-Gonzalez
DOC ID: 15230 A

# Adopt Local Law- Amending Chapter 75 (Airport) of the Town Code Regulating Evening, Nighttime and Early Morning Operation of Noisy Aircraft at East Hampton Airport

WHEREAS, the Town of East Hampton is an established resort community that is renowned for its peaceful, quiet beaches and outdoor areas; and

WHEREAS, the economy of the Town of East Hampton is tied intrinsically to the use and enjoyment of its natural and scenic environment, including its world-renowned ocean beaches, wetlands, shorelines, harbors, bays, woodlands, and historic hamlets; and

WHEREAS, residents and visitors are attracted to the Town and the East End of Long Island to enjoy the area's unique scenic beauty, its outdoor spaces, and the peaceful and restful atmosphere they provide; and

WHEREAS, peace, quiet, repose, outdoor recreation, sea, air, and a beautiful and unique natural environment are the essential characteristics that make East Hampton and the East End, as a whole, such an attractive and desirable area; and

WHEREAS, the Town and its residents have invested heavily in preserving the rural, quiet pace of life by preserving land and adopting land use policies that are designed to protect the unique quality of life in East Hampton; and

WHEREAS, in the busy season of May - September, residents and visitors spend a significant portion of time outdoors engaged in recreational activities, entertaining, dining with family and friends, and otherwise enjoying the peaceful, restful atmosphere of the area; and

WHEREAS, the unique quality of life in the Town and entire East End means that residents are particularly susceptible to disturbances to their pastoral lifestyle, especially when those disturbances interfere with the qualities which make this Town a highly desirable place to live and visit; and

WHEREAS, the area surrounding the East Hampton Airport is notably quiet because of the lack of industrial noises, relatively low population density and rural roadway network, which, taken together, accentuates the perception of noise, both in terms of peak levels and also in terms of the duration of the noise events themselves; and

WHEREAS, in the past three decades, noise from aircraft overflights has disrupted outdoor activities and diminished the quality of life in the Town and the entire of the East End; and

WHEREAS, the aircraft noise problem has increased dramatically in recent years, as overall operations increased by 23 percent from 2013 to 2014 and helicopter operations alone increased by 47 percent from 2013 to 2014; and

WHEREAS, noise from loud aircraft and helicopters is particularly disruptive because it interrupts conversations and other ordinary activities and makes it very difficult to enjoy

Resolution 2015-412                                        Meeting of April 16, 2015

outdoor activities; and

WHEREAS, the sheer frequency of overflights also poses a significant problem because there are extended periods of repeated loud noise events that make it very difficult to enjoy outdoor activities and that destroy the peaceful quiet of this rural area; and

WHEREAS, aircraft noise has been a major source of controversy and community strife for many years, with increasingly strong demands by the public that the Town take action to reduce the disruptive and harmful effects of aircraft noise; and

WHEREAS, the controversy has resulted in a number of lawsuits, and additional threatened lawsuits, aimed at compelling the Town or the federal government to take action to address the problem of aircraft noise; and

WHEREAS, in its capacity as proprietor of the East Hampton Airport, the Town Board has a responsibility to protect residents from the adverse effects of aircraft noise; and

WHEREAS, aircraft noise is not merely annoying and disturbing but threatens the economic vitality of the Town and its brand as a place where people can escape the noise and stresses of urban life in favor of tranquility and rural quiet; and

WHEREAS, that threat could result in lower rates of visitation, reduction in property values, and, more generally, a loss in the attractiveness of the Town; and

WHEREAS, in addition to formal noise complaints, residents and visitors have expressed their anger and frustration about aircraft noise at numerous public meetings, Town Board meetings, in letters to local papers, and in communications with Town officials; and

WHEREAS, the problem of aircraft noise was a major topic of discussion and debate in the recent Town election; and

WHEREAS, the Town has received numerous communications from residents and officials of neighboring and nearby jurisdictions demanding that the Town take action to reduce the effect of noise from aircraft flying to and from East Hampton Airport; and

WHEREAS, the Town of Southampton, the Town Shelter Island, the Town of Southold, the Village of North Haven, the Village of East Hampton, and the Village of Sag Harbor all have adopted resolutions requesting that the Town Board of the Town of East Hampton adopt a comprehensive aircraft noise limitation policy; and

WHEREAS these other towns and villages, and all residents and visitors to the East End, depend upon the Town to address the aircraft noise problem since the Town operates the East Hampton Airport, which is the destination of many of the noisy aircraft flights; and
WHEREAS, for over two decades, the Town has diligently identified and promoted voluntary measures, including helicopter noise abatement procedures and a nighttime curfew, in order to secure relief from the disturbance of aircraft noise; and

WHEREAS, Town officials have met repeatedly with the New York Congressional delegation, to discuss this issue in the hope of finding a federal legislative solution to the problem of aircraft noise; and

Resolution 2015-412                                        Meeting of April 16, 2015

WHEREAS, Town officials have met repeatedly with the Federal Aviation Administration (FAA) officials at the local, regional and headquarters level and with the FAA's Air Traffic Organization, to discuss proposed measures and use restrictions, including the use of voluntary measures; and

WHEREAS, the Town worked with the New York Congressional delegation and all levels of the FAA in the implementation of a mandatory North Shore Helicopter Route, which was initially implemented in August 2012 and recently extended through August 2016; and

WHEREAS, the Town has repeatedly tried, unsuccessfully, to convince the FAA to adopt a mandatory helicopter route along the south shore of Long Island or to adopt mandatory transition routes for helicopters transitioning from the mandatory routes to the East Hampton Airport; and

WHEREAS, the Town has spent the last several summer seasons studying various voluntary measures or measures in cooperation with the FAA to address the noise problem but the level of resident concern has actually increased over that time; and

WHEREAS, the Town's past several years of efforts to address the problem of aircraft noise through voluntary measures promoted by the Town combined with mandatory flight tracks for helicopters imposed by FAA have provided some limited relief in certain neighborhoods, but those measures alone have not reduced to an acceptable level the overall intensity of community disturbance from noise associated with aircraft flying to and from East Hampton Airport; and

WHEREAS, the Town's ability to address the problem of aircraft noise has been constrained legally by obligations under certain of its federal grants that the FAA has stated will no longer be enforced after December 31, 2014; and

WHEREAS, the Town first announced its intent to pursue use restrictions on operations at East Hampton Airport to address the problem of aircraft noise by the adoption of Resolution 2012-832 on August 2, 2012; and

WHEREAS, Town officials and staff have met repeatedly with airport stakeholders, including Eastern Region Helicopter Council, Friends of the East Hampton Airport, the National Business Aviation Association, the Aircraft Owners and Pilots Association, the National Air Transportation Association, and other informal local groups of users and service providers to discuss their respective concerns; and

WHEREAS, the Town held a special public meeting on August 27, 2014, provide the public an opportunity to comment on the problem of aircraft noise and to share views on potential solutions and the meeting was attended by almost 400 people, including 22 elected officials, all of whom expressed support for finding a solution to the noise problem; and

WHEREAS, the Town announced its commitment to finding a solution to disturbance resulting from noise associated with Airport operations; announced its intent to adopt lawful measures to ensure the peace, quiet, tranquility and health of communities affected by Airport noise;  resolved to consider the most serious disturbances, the causes of the disturbances, and reasonable and practical solutions tailored to address the source of those disturbances before making a decision; and announced its intent to identify and adopt

regulations to address noise and disturbance from Operations at East Hampton Airport before the 2015 season by the adoption of Resolution 2014-1180 on September 18, 2014; and

WHEREAS, FAA's traditional Day/Night Average Sound Level (DNL) noise metric has proved, after considerable study, not to be a useful tool for measuring the impact of noise from operations at East Hampton Airport because it averages noise data over 24 hours, and does not capture the demonstrated community annoyance and disruption from individual aircraft noise events (especially noise events associated with helicopters); and

WHEREAS, beginning in 2014, the Town commissioned a series of comprehensive analyses of the noise and related complaints, including the following:

- Henry Young of Young Environmental Sciences and Les Blomberg of Noise Pollution Clearinghouse: (1) analyzed 2013 operational data collected by the AirScene system, (2) converted that data for use in the Integrated Noise Model (INM), (3) used the INM to develop Day-Night Average Sound Level (DNL) noise contours for 2013 operations (for total annual operations, annual helicopter operations, busiest day total operations, and busiest day helicopter operations),  (4) used the INM to calculate the maximum sound level (Lmax) for each modeled flight in 2013 at each

  property parcel in a 10-mile radius from the airport, (5) applied the Town Code noise

  standards to determine the number of "exceedances" (i.e., the number of times each parcel experienced a noise impact above the Town's limits) by aircraft type and type of operation; and

- Peter Wadsworth analyzed 2014 complaint data collected by the PlaneNoise system; and

- Ted Baldwin of Harris Miller Miller & Hanson Inc. (HMMH) led HMMH analyses of November 1, 2013 - October 31, 2014 data, including: (1) analysis of PlaneNoise complaint data to identify temporal and geographic complaint patterns for different aircraft types (e.g., jet, turboprop, piston prop, seaplane, and helicopter), (2) analysis of Vector operations data to identify patterns of activity by day of year, day of week, hour of day (for each day of the week and for the average annual day), and season; (3) correlated PlaneNoise complaint data and Vector operations data to identify patterns; (4) used the independent and correlated data analyses to develop a refined problem definition and promising alternatives for addressing that definition; (5) analyzed the effect of those alternatives in terms of the historical operations that each would have affected and of the associated noise complaints; and (6) identified and reviewed technical studies in the literature that have attempted to identify the most effective noise metric for understanding response to helicopter noise, whether the metric should include a special "adjustment" for helicopters, and otherwise

provide useful information on the best means of assessing helicopter noise and predicting human response; and

WHEREAS, the Town also commissioned several advisory groups to assist in identifying the noise problem with specificity and identifying meaningful, practical and carefully tailored measures that the Town could adopt which would help reduce or eliminate the noise problem; and

WHEREAS, these advisory groups have held many, many public meetings, discussions and debates about how best to address the Town's noise problem; and

WHEREAS, the Town held meetings on October 30, 2014; December 2, 2014; and February 4, 2015; to review the findings of each phase of the recent noise analyses; and

WHEREAS, the Town Board announced four proposed use restrictions for East Hampton Airport on February 10, 2015; and

WHEREAS, the Town Board held public hearings on March 12, 2015, to consider the following four local laws amending Chapter 75 (Airport) of the Town Code: (1) a local law to regulate nighttime operation of aircraft; (2) a local law to regulate nighttime and early morning operation of noisy aircraft; (3) a local law to regulate the operation of helicopters; and (4) a local law to regulate the operation of noisy aircraft; and

WHEREAS, the Town has been soliciting public comment through encouraging comments at Town Board meetings, and emailed comments through a dedicated email address; and

WHEREAS, the Town Board has reviewed all of those comments plus written comments and comments appearing in several local newspapers over the course of the last year; and

WHEREAS, there is no single or simple measure which is certain to solve the Town's noise problem; and

WHEREAS, the Town is committed to testing measures for their practical, real-world effectiveness but needs to have at least one summer season to collect adequate data on real world effects; and

WHEREAS, the Town is committed to collecting data during the summer 2015 season and to assessing all noise control measures in October 2015 for their effectiveness; and

WHEREAS, the Town will modify any restrictions to improve their effectiveness based upon the results of these restrictions during the summer 2015 season; and

WHEREAS, the Town encourages residents, visitors, airport stakeholders, users and all other interested parties to provide the Town with input on the effectiveness of particular measures in addressing, mitigating or eliminating the noise problem; and

WHEREAS, after considering the history of noise disturbance caused by operations at the Airport, reviewing the data provided by the Town's consultants and the comments of the public, and after holding public hearings, the Town Board believes that the enactment of a local law to regulate evening, nighttime and early morning operation of noisy aircraft at the

Resolution 2015-412                                         Meeting of April 16, 2015

East Hampton Airport is in the best interests of the Town of East Hampton for the following reasons:

- Of the 24,000 airport noise complaints logged last year, the latest noise analysis discloses that they are overwhelmingly attributable to helicopters and jets, the noisiest types of aircraft; and

- Disturbance by all types of aircraft is most significant in the evening, nighttime, and early morning hours; and

- During those hours, noisy aircraft are the most annoying; and

- While all aircraft operations during the nighttime hours are disturbing, noisy aircraft can be especially intrusive during the "shoulder" times of the evening and early morning hours, which are times of the day when residents and visitors typically engage in outdoor activities and are therefore are highly sensitive to disruption by loud aircraft; and

WHEREAS, the proposed local law is an Unlisted Action pursuant to the New York State Environmental Quality Review Act (SEQRA) and Chapter 128 of the Town Code; and

WHEREAS, the Town Board has prepared and considered an Environmental Assessment Form which evaluates the potential environmental impacts of the proposed amendment; and

WHEREAS, the Board has determined that the adoption of this Local Law will not have a significant negative impact upon the environment; and now, therefore be it

**NOW, THEREFORE, BE IT RESOLVED,** that a negative declaration is hereby made pursuant to the State Environmental Quality Review Act (SEQRA); and

RESOLVED, that said local law is hereby adopted to read as follows:

LOCAL LAW NO.   ___  OF 2015
INTRODUCTORY NO.   ___   OF 2015

A Local Law providing for the amendment of Chapter 75 ("AIRPORT") of the East Hampton Town Code to read as follows:

BE IT ENACTED by the Town Board of the Town of East Hampton as follows:

## SECTION 1. Legislative Intent

In the past three decades, the residents of the Town of East Hampton have experienced a

Resolution 2015-412                                              Meeting of April 16, 2015

significant increase in noisy aircraft traffic at the East Hampton Airport, chiefly helicopters, jets, and seaplanes. By its extensive complaints to the Town Board and to other governmental entities, the public has made clear, and this Town Board recognizes, the negative impact that this aircraft noise has made to the health and welfare of its citizenry, to wildlife and their habitat, as well as to the peace, quiet, and repose of the region. Aircraft noise has substantially diminished the quiet enjoyment of homes and properties and compromised the pleasures of the woodlands, beaches, fields, and preserved lands that define our community and sense of place.

East Hampton is an established resort community whose entire economy is intrinsically tied to the use and enjoyment of its natural and scenic environment, including its world renowned ocean beaches, wetlands, shorelines, harbors, bays, woodlands, and historic hamlets. Visitors and residents alike enjoy East Hampton's unique scenic beauty and the Town has made significant efforts to preserve the natural environs of the Town, spending a total of $229,431,502 of Community Preservation Funds to preserve approximately 1,924 acres since 1998.

The Town's Comprehensive Plan has outlined the vital connection between preserving the natural scenic beauty and enjoyment of its community and the Town's economy, stating in its vision statement the goal to

> "[t]ake forceful measures to protect and restore the environment, particularly groundwater. Reduce the impacts of human habitation on groundwater, surface water, wetlands, dunes biodiversity, ecosystems, scenic resources, air quality, the night sky, noise and energy consumption."

The 2007 Airport Master Plan Report that then became the basis for the adopted 2010 Airport Master Plan states, at II-73:

> "The East Hampton Airport is owned, maintained and operated for the benefit of the Town and its residents. The airport continues to be classified as a General Aviation Airport under federal criteria. Its primary role is the accommodation of light aircraft traffic. Aircraft operating at greater weights will be accommodated on condition [sic] without unjust discrimination. The airport is also managed with the objective of providing emergency access and facilitation of all other public and community responsibilities. The size and operation of the airport takes into consideration the needs of East Hampton and Southampton residents for protection from excessive noise disturbance and adverse environmental impacts."

> "Control of noise and adverse environmental impacts at the airport is consistent with current Town goals for improved quality of life and land and water conservation. These goals recognize that protecting the environment is essential for improving the Town's seasonal and year round economy. These controls are achieved through reasonable, non arbitrary and non discriminatory management practices. These may limit the

Resolution 2015-412                                    Meeting of April 16, 2015

> maximum size of aircraft to be accommodated, regulate
> excessive peak demand during the summer season and
> otherwise adjust use patterns such as for helicopter access to
> minimize community disturbances."

In an effort to address the impacts of aircraft noise, the Town Board undertook an extensive analysis of the citizenry's complaints, and of the aircraft traffic itself, by the Town's aviation consultants and noise engineers, the results of which have only confirmed the seriousness of the community's noise disturbance.  Of 24,000 airport noise complaints logged last year, the latest noise analysis discloses that they are overwhelmingly attributable to helicopters and jets, the noisiest types. Noise complaints at East Hampton Airport far exceed the level of complaints at major airports around the country. This is surely due, not least, to the incongruity of jet and helicopter noise in what is otherwise a very quiet, exurban and rural environment.

Specifically, noise from aircraft operating at the East Hampton Airport disturbs many residents of the East End of Long Island. Disturbance by all types of aircraft is most significant in the evening, nighttime, and early morning hours. During those hours, noisy aircraft are the most disturbing.  While all aircraft operations during the nighttime hours are disturbing, noisy aircraft can be especially intrusive during the 'shoulder' times of the evening and early morning hours, when people are doing daily activities around their homes, and there is a need to address the particular impacts of these noisy aircraft during these times of the day.

In its capacity as proprietor of the East Hampton Airport, the Town Board has a public policy responsibility to protect residents from the adverse effects of aircraft noise. It has developed a set of restrictions on the use of East Hampton Airport that are reasonable, non-arbitrary, and non-discriminatory. These restrictions address the problems of aircraft noise that are unique to the Town and neighboring communities while preserving for the community the benefits of aviation.

The Town Board recognizes the value of the East Hampton Airport to the community and does not want to impose any greater restriction than is necessary to achieve the Town's objectives.

To that end, the Town Board recognizes the importance of addressing the impacts of noisy aircraft operations during non-working hours of evenings and early mornings when there is a heightened expectation of quiet, by imposing shorter operating hours for these noisy types of aircraft. The legislation is intended to recognize that noisier aircraft need to be subject to greater restrictions because of the seriousness of their noise contribution to the community disturbance - that is, each aircraft's individual noise generation and the frequency and timing of its airport landings and takeoffs.

By enacting this legislation, the Town Board seeks to achieve immediate, substantial evening and morning noise relief for residents and visitors, maintain the intended and traditional use of the East Hampton Airport by recreational aircraft, and continue sufficient air traffic to maintain a financially self-sustaining Airport.

The Town Board is committed to balancing the need to address the impact of the aircraft noise on the Town's environment with the equally important need to maintain an

economically viable and safe airport for East Hampton.

The proposed legislation expressly excludes from its application aircraft operated by any federal, state or local government, any emergency services, evacuation services, public or private, and any operation by an aircraft in an emergency.  The airport will remain open to such operations at all times without restriction or charge.

These restrictions are adopted on an interim basis. The effects of the legislation on the operations at the Airport for the period May 1 to October 31, 2015 shall be evaluated to determine whether the restrictions should be made permanent or modified. The Town Board will seek public comment throughout the Season and immediately following the Season to determine the success and/or failure of the use restrictions and whether they function the way they were intended or need to be adjusted.

## SECTION 2.  Amendment

The Code of the Town of East Hampton is hereby amended by adding the following new section to Chapter 75 (Airport).

## § 75-38 AIRPORT USE RESTRICTIONS:

A.     **Definitions**.

(1) - (2) - *Reserved*

(3)     "Individual Aircraft" shall mean an aircraft, of whatever type, with a distinct registration number ("N number" if such registration is issued by the United States Government).

(4)     "Noisy Aircraft" shall mean any airplane or rotorcraft type classified as a Noisy Aircraft type pursuant to this Section.

(a)     The Airport Director is directed to maintain on the Town website a current list of aircraft based upon the noise characteristics published by the Federal Aviation Administration, or (if data is not available from that agency), the European Aviation Safety Agency.  Noisy Aircraft shall be defined as any airplane or rotorcraft for which there is a published Effective Perceived Noise in Decibels (EPNdB) approach (AP) level of 91.0 or greater

(b)     In lieu of being subject to the definition of "Noisy Aircraft" pursuant to subsection (a) on the basis of the Town's list of types of Noisy Aircraft, the owner of an Individual Aircraft may elect to have the noise classification of such Individual Aircraft determined by the sound levels on the basis of the EPNdB level that is published in the airplane or rotorcraft flight manual for such Individual Aircraft pursuant to 14 C.F.R. 36.1581(a). To obtain a noise classification of an Individual Aircraft, the owner of such aircraft shall provide the Airport Director with a true copy of the relevant pages from such manual

showing the noise level data. In the event of a conflict between the Town's list of classifications of Noisy Aircraft types and classification based on the data set forth in the Individual Aircraft airplane or rotorcraft flight manual, the data in the Individual Aircraft airplane or rotorcraft flight manual shall prevail. Once the owner of an Individual Aircraft has provided the Airport Director with such data from the Individual Aircraft airplane or rotorcraft flight manual, and the Airport Director has determined the authenticity thereof, the Airport Director shall keep such data on file so that the owner need not resubmit the data for each Use of the Airport, and compliance by such Individual Aircraft with this Section shall be determined based on such data.

(5)     (*Reserved*)

(6)     "Use of the Airport" shall mean either one arrival (landing) at, or one departure (takeoff) from, the Airport, shall not include any repositioning of any aircraft on the Airport or any aborted takeoff or landing, but shall include touch-and-go operations that result in use of an Airport runway.

B.     [*Reserved*]

C.     **Noisy Aircraft Operations**.  Use of the Airport by Noisy Aircraft is prohibited as follows:

(1)     Between the hours of 8:00 pm and 9:00 am (local time).

D.     [*Reserved*]

E.     **Exemptions**.  The restrictions of this section 75-38 shall not apply to any aircraft operational emergency, any medical emergency operation, whether by public or private aircraft, or to any operation by a government-owned aircraft, including, without limitation, police, emergency services, and military operations.  In the case of an aircraft emergency or medical emergency operation, the operator shall submit a sworn statement to the Airport Manager within 24 hours of such operation attesting to the nature of the emergency and reason for the operation.

## § 75-39 PENALTIES:

A.     Section 75-34 shall not apply to violations of Section 75-38 and this Section 75-39 shall apply for all violations of Section 75-38.  For the purpose of conferring jurisdiction upon courts and judicial officers in general, violations of Section 75-38 shall be deemed misdemeanors, and, for such purpose only, all provisions of law relating to misdemeanors shall apply to such violations.

B.     Any Use of the Airport by an Individual Aircraft in violation of Section 75-38 shall be punishable by a fine assessed against any person, organization, corporation, group or other entity which holds an ownership interest in such aircraft, as follows:

(1)      For the first violation by an Individual Aircraft, a fine of not more than $1,000.

(2)      For the second violation by an Individual Aircraft, a fine of not more than $4,000.

(3)      For the third violation by an Individual Aircraft, a fine of not more than $10,000.

(4)      For the fourth violation by an Individual Aircraft, a prohibition on any Use of the Airport by the Individual Aircraft involved in such violation for a period of not more than two years.

C.      Each Use of the Airport by an Individual Aircraft in violation of Section 75-38 shall constitute a separate offense.

D.      In addition, any entity convicted hereunder of not complying with the requirements of Section 75-38 may be subject to a fine of not less than the amount of the actual costs incurred and owed to the Town and not more than an amount equal to twice said actual costs. Should any person, organization, corporation, group or other entity be found in violation of the provisions of Section 75-38 within five years of a previous violation of this chapter, the minimum additional fine shall be not less than $2000.

E.      In addition to the above penalties, the Town may also maintain an action or proceeding in the name of the Town in a court of competent jurisdiction to compel compliance with or to restrain by injunction the violation Section 75-38 by any person, organization, corporation, group or other entity which holds an ownership interest  in the Individual Aircraft.

(1) If a finding is made by a court of competent jurisdiction that the defendants or any of them has caused, permitted or allowed a violation of Section 75-38, a penalty to be jointly and severally included in the judgment may be awarded at the discretion of the court in an amount not to exceed $10,000.00 for each violation that the defendants or any one of them individually caused, permitted or allowed the violation.

## SECTION 3.  Authority

The Town Board is authorized to establish and promulgate rules and regulations regarding use of the East Hampton Airport pursuant to Municipal Home Rule Law §10(1)(ii)(a)(11) and (12) and Town Law §130 and pursuant to its powers as the proprietor of East Hampton Airport under federal statutory and case law and regulations of the Federal Aviation Administration.

## SECTION 4. Severability

Resolution 2015-412                                    Meeting of April 16, 2015

If any section or subdivision, paragraph, clause or phrase of this law shall be adjudged invalid, unenforceable, or unconstitutional by any order or judgment of a court of competent jurisdiction, or pursuant to any order of any administrative agency having jurisdiction, whether such judgment or order is temporary or permanent, such judgment or order shall not affect the validity of this law as a whole or any part thereof other than the part or provision so adjudged to be invalid or unconstitutional.

**SECTION 5. Effective Date**

This local law shall take effect upon filing with the Secretary of State.


Dated: April 16, 2015

                                        BY ORDER OF THE TOWN BOARD
                                        TOWN OF EAST HAMPTON
                                        CAROLE BRENNAN, TOWN CLERK


| | |
|---|---|
| **RESULT:** | **ADOPTED [UNANIMOUS]** |
| **MOVER:** | Kathee Burke-Gonzalez, Councilwoman |
| **SECONDER:** | Peter Van Scoyoc, Councilman |
| **AYES:** | Burke-Gonzalez, Van Scoyoc, Overby, Overton, Cantwell |

**EXHIBIT D**



**East Hampton Town Board**
159 Pantigo Road
East Hampton, NY  11937

**ADOPTED**

**RESOLUTION 2015-413**

Meeting: 04/16/15 06:30 PM
Department: Town Attorney
Category: Local Law
Prepared By: Elizabeth Vail
Initiator: Elizabeth Vail
Sponsors: Councilwoman Kathee Burke-Gonzalez
DOC ID: 15231 A

# Adopt Local Law-  Amending Chapter 75 (Airport) of the Town Code Regulating Operation of Noisy Aircraft at East Hampton Airport

WHEREAS, the Town of East Hampton is an established resort community that is renowned for its peaceful, quiet beaches and outdoor areas; and

WHEREAS, the economy of the Town of East Hampton is tied intrinsically to the use and enjoyment of its natural and scenic environment, including its world-renowned ocean beaches, wetlands, shorelines, harbors, bays, woodlands, and historic hamlets; and

WHEREAS, residents and visitors are attracted to the Town and the East End of Long Island to enjoy the area's unique scenic beauty, its outdoor spaces, and the peaceful and restful atmosphere they provide; and

WHEREAS, peace, quiet, repose, outdoor recreation, sea, air, and a beautiful and unique natural environment are the essential characteristics that make East Hampton and the East End, as a whole, such an attractive and desirable area; and

WHEREAS, the Town and its residents have invested heavily in preserving the rural, quiet pace of life by preserving land and adopting land use policies that are designed to protect the unique quality of life in East Hampton; and

WHEREAS, in the busy season of May - September, residents and visitors spend a significant portion of time outdoors engaged in recreational activities, entertaining, dining with family and friends, and otherwise enjoying the peaceful, restful atmosphere of the area; and

WHEREAS, the unique quality of life in the Town and entire East End means that residents are particularly susceptible to disturbances to their pastoral lifestyle, especially when those disturbances interfere with the qualities which make this Town a highly desirable place to live and visit; and

WHEREAS, the area surrounding the East Hampton Airport is notably quiet because of the lack of industrial noises, relatively low population density and rural roadway network, which, taken together, accentuates the perception of noise, both in terms of peak levels and also in terms of the duration of the noise events themselves; and

WHEREAS, in the past three decades, noise from aircraft overflights has disrupted outdoor activities and diminished the quality of life in the Town and the entire of the East End; and

WHEREAS, the aircraft noise problem has increased dramatically in recent years, as overall operations increased by 23 percent from 2013 to 2014 and helicopter operations alone increased by 47 percent from 2013 to 2014; and

WHEREAS, noise from loud aircraft and helicopters is particularly disruptive because it interrupts conversations and other ordinary activities and makes it very difficult to enjoy

outdoor activities; and

WHEREAS, the sheer frequency of overflights also poses a significant problem because there are extended periods of repeated loud noise events that make it very difficult to enjoy outdoor activities and that destroy the peaceful quiet of this rural area; and

WHEREAS, aircraft noise has been a major source of controversy and community strife for many years, with increasingly strong demands by the public that the Town take action to reduce the disruptive and harmful effects of aircraft noise; and

WHEREAS, the controversy has resulted in a number of lawsuits, and additional threatened lawsuits, aimed at compelling the Town or the federal government to take action to address the problem of aircraft noise; and

WHEREAS, in its capacity as proprietor of the East Hampton Airport, the Town Board has a responsibility to protect residents from the adverse effects of aircraft noise; and

WHEREAS, aircraft noise is not merely annoying and disturbing but threatens the economic vitality of the Town and its brand as a place where people can escape the noise and stresses of urban life in favor of tranquility and rural quiet; and

WHEREAS, that threat could result in lower rates of visitation, reduction in property values, and, more generally, a loss in the attractiveness of the Town; and

WHEREAS, in addition to formal noise complaints, residents and visitors have expressed their anger and frustration about aircraft noise at numerous public meetings, Town Board meetings, in letters to local papers, and in communications with Town officials; and

WHEREAS, the problem of aircraft noise was a major topic of discussion and debate in the recent Town election; and

WHEREAS, the Town has received numerous communications from residents and officials of neighboring and nearby jurisdictions demanding that the Town take action to reduce the effect of noise from aircraft flying to and from East Hampton Airport; and

WHEREAS, the Town of Southampton, the Town Shelter Island, the Town of Southold, the Village of North Haven, the Village of East Hampton, and the Village of Sag Harbor all have adopted resolutions requesting that the Town Board of the Town of East Hampton adopt a comprehensive aircraft noise limitation policy; and

WHEREAS these other towns and villages, and all residents and visitors to the East End, depend upon the Town to address the aircraft noise problem since the Town operates the East Hampton Airport, which is the destination of many of the noisy aircraft flights; and
WHEREAS, for over two decades, the Town has diligently identified and promoted voluntary measures, including helicopter noise abatement procedures and a nighttime curfew, in order to secure relief from the disturbance of aircraft noise; and

WHEREAS, Town officials have met repeatedly with the New York Congressional delegation, to discuss this issue in the hope of finding a federal legislative solution to the problem of aircraft noise; and

Resolution 2015-413                                        Meeting of April 16, 2015

WHEREAS, Town officials have met repeatedly with the Federal Aviation Administration (FAA) officials at the local, regional and headquarters level and with the FAA's Air Traffic Organization, to discuss proposed measures and use restrictions, including the use of voluntary measures; and

WHEREAS, the Town worked with the New York Congressional delegation and all levels of the FAA in the implementation of a mandatory North Shore Helicopter Route, which was initially implemented in August 2012 and recently extended through August 2016; and

WHEREAS, the Town has repeatedly tried, unsuccessfully, to convince the FAA to adopt a mandatory helicopter route along the south shore of Long Island or to adopt mandatory transition routes for helicopters transitioning from the mandatory routes to the East Hampton Airport; and

WHEREAS, the Town has spent the last several summer seasons studying various voluntary measures or measures in cooperation with the FAA to address the noise problem but the level of resident concern has actually increased over that time; and

WHEREAS, the Town's past several years of efforts to address the problem of aircraft noise through voluntary measures promoted by the Town combined with mandatory flight tracks for helicopters imposed by FAA have provided some limited relief in certain neighborhoods, but those measures alone have not reduced to an acceptable level the overall intensity of community disturbance from noise associated with aircraft flying to and from East Hampton Airport; and

WHEREAS, the Town's ability to address the problem of aircraft noise has been constrained legally by obligations under certain of its federal grants that the FAA has stated will no longer be enforced after December 31, 2014; and

WHEREAS, the Town first announced its intent to pursue use restrictions on operations at East Hampton Airport to address the problem of aircraft noise by the adoption of Resolution 2012-832 on August 2, 2012; and

WHEREAS, Town officials and staff have met repeatedly with airport stakeholders, including Eastern Region Helicopter Council, Friends of the East Hampton Airport, the National Business Aviation Association, the Aircraft Owners and Pilots Association, the National Air Transportation Association, and other informal local groups of users and service providers to discuss their respective concerns; and

WHEREAS, the Town held a special public meeting on August 27, 2014, provide the public an opportunity to comment on the problem of aircraft noise and to share views on potential solutions and the meeting was attended by almost 400 people, including 22 elected officials, all of whom expressed support for finding a solution to the noise problem; and

WHEREAS, the Town announced its commitment to finding a solution to disturbance resulting from noise associated with Airport operations; announced its intent to adopt lawful measures to ensure the peace, quiet, tranquility and health of communities affected by Airport noise;   resolved to consider the most serious disturbances, the causes of the disturbances, and reasonable and practical solutions tailored to address the source of those disturbances before making a decision; and announced its intent to identify and adopt

regulations to address noise and disturbance from Operations at East Hampton Airport before the 2015 season by the adoption of Resolution 2014-1180 on September 18, 2014; and

WHEREAS, FAA's traditional Day/Night Average Sound Level (DNL) noise metric has proved, after considerable study, not to be a useful tool for measuring the impact of noise from operations at East Hampton Airport because it averages noise data over 24 hours, and does not capture the demonstrated community annoyance and disruption from individual aircraft noise events (especially noise events associated with helicopters); and

WHEREAS, beginning in 2014, the Town commissioned a series of comprehensive analyses of the noise and related complaints, including the following:

- Henry Young of Young Environmental Sciences and Les Blomberg of Noise Pollution Clearinghouse: (1) analyzed 2013 operational data collected by the AirScene system, (2) converted that data for use in the Integrated Noise Model (INM), (3) used the INM to develop Day-Night Average Sound Level (DNL) noise contours for 2013 operations (for total annual operations, annual helicopter operations, busiest day total operations, and busiest day helicopter operations),  (4) used the INM to calculate the maximum sound level (Lmax) for each modeled flight in 2013 at each

  property parcel in a 10-mile radius from the airport, (5) applied the Town Code noise

  standards to determine the number of "exceedances" (i.e., the number of times each parcel experienced a noise impact above the Town's limits) by aircraft type and type of operation; and

- Peter Wadsworth analyzed 2014 complaint data collected by the PlaneNoise system; and

- Ted Baldwin of Harris Miller Miller & Hanson Inc. (HMMH) led HMMH analyses of November 1, 2013 - October 31, 2014 data, including: (1) analysis of PlaneNoise complaint data to identify temporal and geographic complaint patterns for different aircraft types (e.g., jet, turboprop, piston prop, seaplane, and helicopter), (2) analysis of Vector operations data to identify patterns of activity by day of year, day of week, hour of day (for each day of the week and for the average annual day), and season; (3) correlated PlaneNoise complaint data and Vector operations data to identify patterns; (4) used the independent and correlated data analyses to develop a refined problem definition and promising alternatives for addressing that definition; (5) analyzed the effect of those alternatives in terms of the historical operations that each would have affected and of the associated noise complaints; and (6) identified and reviewed technical studies in the literature that have attempted to identify the most effective noise metric for understanding response to helicopter noise, whether the metric should include a special "adjustment" for helicopters, and otherwise

Resolution 2015-413                                                        Meeting of April 16, 2015

provide useful information on the best means of assessing helicopter noise and predicting human response; and

WHEREAS, the Town also commissioned several advisory groups to assist in identifying the noise problem with specificity and identifying meaningful, practical and carefully tailored measures that the Town could adopt which would help reduce or eliminate the noise problem; and

WHEREAS, these advisory groups have held many, many public meetings, discussions and debates about how best to address the Town's noise problem; and

WHEREAS, the Town held meetings on October 30, 2014; December 2, 2014; and February 4, 2015; to review the findings of each phase of the recent noise analyses; and

WHEREAS, the Town Board announced four proposed use restrictions for East Hampton Airport on February 10, 2015; and

WHEREAS, the Town Board held public hearings on March 12, 2015, to consider the following four local laws amending Chapter 75 (Airport) of the Town Code: (1) a local law to regulate nighttime operation of aircraft; (2) a local law to regulate nighttime and early morning operation of noisy aircraft; (3) a local law to regulate the operation of helicopters; and (4) a local law to regulate the operation of noisy aircraft; and

WHEREAS, the Town has been soliciting public comment through encouraging comments at Town Board meetings, and emailed comments through a dedicated email address; and

WHEREAS, the Town Board has reviewed all of those comments plus written comments and comments appearing in several local newspapers over the course of the last year; and

WHEREAS, there is no single or simple measure which is certain to solve the Town's noise problem; and

WHEREAS, the Town is committed to testing measures for their practical, real-world effectiveness but needs to have at least one summer season to collect adequate data on real world effects; and

WHEREAS, the Town is committed to collecting data during the summer 2015 season and to assessing all noise control measures in October 2015 for their effectiveness; and

WHEREAS, the Town will modify any restrictions to improve their effectiveness based upon the results of these restrictions during the summer 2015 season; and

WHEREAS, the Town encourages residents, visitors, airport stakeholders, users and all other interested parties to provide the Town with input on the effectiveness of particular measures in addressing, mitigating or eliminating the noise problem; and

WHEREAS, after considering the history of noise disturbance caused by operations at the Airport, reviewing the data provided by the Town's consultants and the comments of the public, and after holding public hearings, the Town Board believes that the enactment of a local law to limit the number of operations of noisy aircraft at the East Hampton Airport is in

Resolution 2015-413                                          Meeting of April 16, 2015

the best interests of the Town of East Hampton for the following reasons:

- Noise from the noisiest aircraft operating at the East Hampton Airport is particularly disruptive of the peace and tranquility in and around the Town because their high noise levels contrast with the general peace and quiet of the East End to a much greater degree than quieter aircraft; and

- The relatively high volume of operations by the noisiest aircraft has caused widespread community disturbance due to the particularly disruptive effect of those aircraft; and

- The proposed restriction would affect 3,443, or 13.4 percent of the total operations but would address roughly 37.6 of the reported complaints; and

- Limiting the noisiest aircraft is the most important during the summer season when residents and visitors have a heightened expectation that they can enjoy the outdoor environment in peace; and

WHEREAS, the proposed local law is an Unlisted Action pursuant to the New York State Environmental Quality Review Act (SEQRA) and Chapter 128 of the Town Code; and

WHEREAS, the Town Board has prepared and considered an Environmental Assessment Form which evaluates the potential environmental impacts of the proposed amendment; and

WHEREAS, the Board has determined that the adoption of this Local Law will not have a significant negative impact upon the environment;


**NOW, THEREFORE, BE IT RESOLVED**, that a negative declaration is hereby made pursuant to the State Environmental Quality Review Act (SEQRA); and

RESOLVED, that said local law is hereby adopted to read as follows:

LOCAL LAW NO.   ___   OF 2015
INTRODUCTORY NO.   ___   OF 2015

A Local Law providing for the amendment of Chapter 75 ("AIRPORT") of the East Hampton Town Code to read as follows:

BE IT ENACTED by the Town Board of the Town of East Hampton as follows:

**SECTION 1.  Legislative Intent.**

In the past three decades, the residents of the Town of East Hampton have experienced a significant increase in noisy aircraft traffic at the East Hampton Airport, chiefly helicopters, jets, and seaplanes. By its extensive complaints to the Town Board and to other governmental entities, the public has made clear, and this Town Board recognizes, the negative impact that this aircraft noise has made to the health and welfare of its citizenry, to wildlife and their habitat, as well as to the peace, quiet, and repose of the region. Aircraft noise has substantially diminished the quiet enjoyment of homes and properties and

Resolution 2015-413                                    Meeting of April 16, 2015

compromised the pleasures of the woodlands, beaches, fields, and preserved lands that define our community and sense of place.

East Hampton is an established resort community whose entire economy is intrinsically tied to the use and enjoyment of its natural and scenic environment, including its world renowned ocean beaches, wetlands, shorelines, harbors, bays, woodlands, and historic hamlets. Visitors and residents alike enjoy East Hampton's unique scenic beauty and the Town has made significant efforts to preserve the natural environs of the Town, spending a total of $229,431,502 of Community Preservation Funds to preserve approximately 1,924 acres since 1998.

The Town's Comprehensive Plan has outlined the vital connection between preserving the natural scenic beauty and enjoyment of its community and  the Town's economy, stating in its vision statement the goal to

> "[t]ake forceful measures to protect and restore the environment, particularly groundwater. Reduce the impacts of human habitation on groundwater, surface water, wetlands, dunes biodiversity, ecosystems, scenic resources, air quality, the night sky, noise and energy consumption."

The 2007 Airport Master Plan Report that then became the basis for the adopted 2010 Airport Master Plan states, at II-73:

> "The East Hampton Airport is owned, maintained and operated for the benefit of the Town and its residents. The airport continues to be classified as a General Aviation Airport under federal criteria. Its primary role is the accommodation of light aircraft traffic. Aircraft operating at greater weights will be accommodated on condition [sic] without unjust discrimination. The airport is also managed with the objective of providing emergency access and facilitation of all other public and community responsibilities. The size and operation of the airport takes into consideration the needs of East Hampton and Southampton residents for protection from excessive noise disturbance and adverse environmental impacts."

> "Control of noise and adverse environmental impacts at the airport is consistent with current Town goals for improved quality of life and land and water conservation. These goals recognize that protecting the environment is essential for improving the Town's seasonal and year round economy. These controls are achieved through reasonable, non arbitrary and non discriminatory management practices. These may limit the maximum size of aircraft to be accommodated, regulate excessive peak demand during the summer season and otherwise adjust use patterns such as for helicopter access to minimize community disturbances."

In an effort to address the impacts of aircraft noise, the Town Board undertook an extensive

analysis of the citizenry's complaints, and of the aircraft traffic itself, by the Town's aviation consultants and noise engineers, the results of which have only confirmed the seriousness of the community's noise disturbance. Of 24,000 airport noise complaints logged last year, the latest noise analysis discloses that they are overwhelmingly attributable to helicopters and jets, the noisiest types. Noise complaints at East Hampton Airport far exceed the level of complaints at major airports around the country. This is surely due, not least, to the incongruity of jet and helicopter noise in what is otherwise a very quiet, exurban and rural environment.

Specifically, noise from aircraft operating at the East Hampton Airport disturbs many residents of the East End of Long Island. Disturbance by the noisiest aircraft is most significant when aircraft operations are most frequent.  The Town examined how best to limit the constant onslaught of air traffic and has determined that an overall limit on operations by the noisiest aircraft is essential to the quality of life to which residents and visitors are entitled.

In its capacity as proprietor of the East Hampton Airport, the Town Board has a public policy responsibility to protect residents from the adverse effects of aircraft noise. It has developed a set of restrictions on the use of East Hampton Airport that are reasonable, non-arbitrary, and non-discriminatory. These restrictions address the problems of aircraft noise that are unique to the Town and neighboring communities while preserving for the community the benefits of aviation.

As the U.S. Court of Appeals for the Second Circuit recognized in the *National Helicopter* case -- that residents have a justified, heightened expectation of quiet during non-working hours, evenings, nights, and weekends -- both year-round and seasonal residents of East Hampton and the East End have a justified, heightened expectation of quiet, yet suffer greater exposure to disturbance from aircraft noise, during the very periods when the East End is sought as a destination for repose and relief from urban ills. That is the reason why the huge influx of seasonal residents and visitors come to East Hampton. It is the reason why year-round residents struggle to stay in East Hampton despite the difficulty of earning a living in a limited economy on the end of a long, narrow peninsula on the tip of a long island. Peace, quiet, repose, outdoor recreation, sea, air, a beautiful and unique natural environment, these are the primary social and economic goods that East Hampton and the East End as a whole have to offer.

The Town Board recognizes the value of the East Hampton Airport to the community and does not want to impose any greater restriction than is necessary to achieve the Town's objectives.

To that end, the Town Board recognizes that limiting the volume and frequency of airport use by noisy aircraft types during the summer season is essential to restoring the peace and quiet that East Hampton residents and visitors have come to expect in this community. The legislation is intended to restrict aircraft according to the seriousness of their noise contribution to the community disturbance - that is, each aircraft's individual noise generation and the frequency and timing of its airport landings and takeoffs.  The proposed restrictions are seasonally based, imposing greater limits during the period May 1 to September 30 each year when residents and visitors have a heightened expectation that they can enjoy our magnificent outdoor environment in peace.

By enacting this legislation, the Town Board seeks to achieve immediate, substantial noise relief for residents and visitors during the summertime, provide an incentive for airport users with noisy types of aircraft to transition to quieter types of aircraft, maintain the intended and traditional use of the East Hampton Airport by recreational aircraft, and continue sufficient air traffic to maintain a financially self-sustaining Airport.

The Town Board is committed to balancing the need to address the impact of the aircraft noise on the Town's environment with the equally important need to maintain an economically viable and safe airport for East Hampton.

The proposed legislation expressly excludes from its application aircraft operated by any federal, state or local government, any emergency services, evacuation services, public or private, and any operation by an aircraft in an emergency.  The airport will remain open to such operations at all times without restriction or charge.

These restrictions are adopted on an interim basis. The effects of the legislation on the operations at the Airport for the period May 1 to October 31, 2015 shall be evaluated to determine whether the restrictions should be made permanent or modified. The Town Board will seek public comment throughout the Season and immediately following the Season to determine the success and/or failure of the use restrictions and whether they function the way they were intended or need to be adjusted.

**SECTION 2. Amendment**

Section 75-38, Airport Use Restrictions, of the Code of the Town of East Hampton is hereby amended by adding the following provisions:

CHAPTER 75, AIRPORT.

**§ 75-38 AIRPORT USE RESTRICTIONS:**

A.      **Definitions**.

(1)      "Calendar Week" shall mean the period beginning at 12:00:00 am on Sunday and ending at 11:59:59 pm on the following Saturday.

(2) - *Reserved*

(3)      "Individual Aircraft" shall mean an aircraft, of whatever type, with a distinct registration number ("N number" if such registration is issued by the United States Government).

(4)      "Noisy Aircraft" shall mean any airplane or rotorcraft type classified as a Noisy Aircraft type pursuant to this Section.

(a)      The Airport Director is directed to maintain on the Town website a current list of aircraft based upon the noise characteristics published by the Federal Aviation Administration, or (if data is not available from that agency), the European Aviation Safety Agency.  Noisy Aircraft shall be defined as any

airplane or rotorcraft for which there is a published Effective Perceived Noise in Decibels (EPNdB) approach (AP) level of 91.0 or greater

(b)      In lieu of being subject to the definition of "Noisy Aircraft" pursuant to subsection (a) on the basis of the Town's list of types of Noisy Aircraft, the owner of an Individual Aircraft may elect to have the noise classification of such Individual Aircraft determined by the sound levels on the basis of the EPNdB level that is published in the airplane or rotorcraft flight manual for such Individual Aircraft pursuant to 14 C.F.R. 36.1581(a). To obtain a noise classification of an Individual Aircraft, the owner of such airc     raft shall provide the Airport Director with a true copy of the relevant pages from such manual showing the noise level data. In the event of a conflict between the Town's list of classifications of Noisy Aircraft types and classification based on the data set forth in the Individual Aircraft airplane or rotorcraft flight manual, the data in the Individual Aircraft airplane or rotorcraft flight manual shall prevail. Once the owner of an Individual Aircraft has provided the Airport Director with such data from the Individual Aircraft airplane or rotorcraft flight manual, and the Airport Director has determined the authenticity thereof, the Airport Director shall keep such data on file so that the owner need not resubmit the data for each Use of the Airport, and compliance by such Individual Aircraft with this Section shall be determined based on such data.

(6)      "Use of the Airport" shall mean either one arrival (landing) at, or one departure (takeoff) from, the Airport, shall not include any repositioning of any aircraft on the Airport or any aborted takeoff or landing, but shall include touch-and-go operations that result in use of an Airport runway.

B.      [*Reserved*]

C.      **Noisy Aircraft Operations**.  Use of the Airport by Noisy Aircraft is prohibited as follows:

(1)      *[Reserved]*

(2)      More than two Uses of the Airport by an Individual Aircraft during a Calendar Week, or portion of a Calendar Week, that falls within the Season.

D.      [*Reserved*]

E.      **Exemptions**.  The restrictions of this section 75-38 shall not apply to any aircraft operational emergency, any medical emergency operation, whether by public or private aircraft, or to any operation by a government-owned aircraft, including, without limitation, police, emergency services, and military operations.  In the case of an aircraft emergency or medical emergency operation, the operator shall submit a sworn statement to the Airport Manager within 24 hours of such operation attesting to the nature of the emergency and

reason for the operation.


### § 75-39 PENALTIES:

A.      Section 75-34 shall not apply to violations of Section 75-38 and this Section 75-39 shall apply for all violations of Section 75-38.  For the purpose of conferring jurisdiction upon courts and judicial officers in general, violations of Section 75-38 shall be deemed misdemeanors, and, for such purpose only, all provisions of law relating to misdemeanors shall apply to such violations.

B.      Any Use of the Airport by an Individual Aircraft in violation of Section 75-38 shall be punishable by a fine assessed against any person, organization, corporation, group or other entity which holds an ownership interest in such aircraft, as follows: (1)        For the first violation by an Individual Aircraft, a fine of not more than $1,000.

        (2)     For the second violation by an Individual Aircraft, a fine of not more than $4,000.

        (3)     For the third violation by an Individual Aircraft, a fine of not more than $10,000.

        (4)     For the fourth violation by an Individual Aircraft, a prohibition on any Use of the Airport by the Individual Aircraft involved in such violation for a period of not more than two years.

C.      Each Use of the Airport by an Individual Aircraft in violation of Section 75-38 shall constitute a separate offense.

D.      In addition, any entity convicted hereunder of not complying with the requirements of Section 75-38 may be subject to a fine of not less than the amount of the actual costs incurred and owed to the Town and not more than an amount equal to twice said actual costs. Should any person, organization, corporation, group or other entity be found in violation of the provisions of Section 75-38 within five years of a previous violation of this chapter, the minimum additional fine shall be not less than $2000.

E.      In addition to the above penalties, the Town may also maintain an action or proceeding in the name of the Town in a court of competent jurisdiction to compel compliance with or to restrain by injunction the violation Section 75-38 any person, organization, corporation, group or other entity which holds an ownership interest  in the Individual Aircraft.

        (1) If a finding is made by a court of competent jurisdiction that the defendants or any of them has caused, permitted or allowed a violation of Section 75-38, a penalty to be jointly and severally included in the judgment may be awarded at the

Resolution 2015-413                                        Meeting of April 16, 2015

discretion of the court in an amount not to exceed $10,000.00 for each violation that the defendants or any one of them individually caused, permitted or allowed the violation.

**SECTION 3.  Authority**

The Town Board is authorized to establish and promulgate rules and regulations regarding use of the East Hampton Airport pursuant to Municipal Home Rule Law §10(1)(ii)(a)(11) and (12) and Town Law §130 and pursuant to its powers as the proprietor of East Hampton Airport under federal statutory and case law and regulations of the Federal Aviation Administration.

**SECTION 4. Severability.**

If any section or subdivision, paragraph, clause or phrase of this law shall be adjudged invalid, unenforceable, or unconstitutional by any order or judgment of a court of competent jurisdiction, or pursuant to any order of any administrative agency having jurisdiction, whether such judgment or order is temporary or permanent, such judgment or order shall not affect the validity of this law as a whole or any part thereof other than the part or provision so adjudged to be invalid or unconstitutional.

**SECTION 5. Effective Date.**

This local law shall take effect upon filing with the Secretary of State.


Dated: April 16, 2015

                                    BY ORDER OF THE TOWN BOARD
                                    TOWN OF EAST HAMPTON
                                    CAROLE BRENNAN, TOWN CLERK


| RESULT: | ADOPTED [4 TO 1] |
| --- | --- |
| MOVER: | Kathee Burke-Gonzalez, Councilwoman |
| SECONDER: | Peter Van Scoyoc, Councilman |
| AYES: | Kathee Burke-Gonzalez, Peter Van Scoyoc, Sylvia Overby, Larry Cantwell |
| NAYS: | Fred Overton |