UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

FRIENDS OF THE EAST HAMPTON AIRPORT, INC.,
ANALAR CORPORATION, ASSOCIATED AIRCRAFT
GROUP, INC., ELEVENTH STREET AVIATION LLC,
HELICOPTER ASSOCIATION INTERNATIONAL, INC.,
HELIFLITE SHARES LLC, LIBERTY HELICOPTERS,        No. 15 Civ. 2246 (SJF) (ARL)
INC., SOUND AIRCRAFT SERVICES, INC., and
NATIONAL BUSINESS AVIATION ASSOCIATION, INC.,

                                        Plaintiffs,

                    -against-

THE TOWN OF EAST HAMPTON,

                                        Defendant.

-------------------------------------------------------------------------x


**PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER**

LANKLER SIFFERT & WOHL LLP
Lisa Zornberg
Matthew G. Coogan
Jonathan Lamberti
500 Fifth Avenue, 34th Floor
New York, NY 10110
(212) 921-8399

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

TABLE OF ABBREVIATIONS ..................................................................... ii

Table of Authorities.......................................................................................... v

Preliminary Statement....................................................................................... 1

    A.    Plaintiffs Will Be Irreparably Harmed by the Restrictions ..................................... 3

    B.    The Restrictions are Preempted by ANCA .......................................................... 7

        1.    The Bishop Sentence did not "announce" the FAA's "interpretation of ANCA," and is not entitled to judicial deference. ................................ 10

        2.    The contention that ANCA applies only to airports wishing to remain eligible for federal funding is refuted by ANCA's unambiguous terms and Congress's intent.................................. 12

        3.    Whether the Town relied on the Bishop Sentence is irrelevant. Because the Restrictions are expressly preempted by ANCA, they violate the Supremacy Clause. ................................................... 15

    C.  The Restrictions are Preempted by the AAIA .......................................................... 19

    D.  The Restrictions Are Unreasonable, Arbitrary, and Discriminatory .......................... 21

CONCLUSION................................................................................................ 26

i

# TABLE OF ABBREVIATIONS

## *Parties*

| | |
|---|---|
| AAG | Associated Aircraft Group, Inc. |
| Analar | Analar Corporation |
| Eleventh Street | Eleventh Street Aviation LLC |
| FOEHA | Friends of the East Hampton Airport, Inc. |
| HAI | Helicopter Association International, Inc. |
| HeliFlite | HeliFlite Shares LLC |
| Liberty | Liberty Helicopters, Inc. |
| NBAA | National Business Aviation Administration |
| Sound | Sound Aircraft Services, Inc. |
| The Town | The Town of East Hampton |

## *Terms*

| | |
|---|---|
| 2005 Settlement Agreement | Settlement in *Committee to Stop Airport Expansion v. Department of Transportation*, 03 Civ. 2634 (E.D.N.Y.) |
| AAIA | Airport and Airway Improvement Act of 1982 |
| AIP | Airport Improvement Program |
| ANCA | Airport and Noise Capacity Act of 1990 |
| Bishop Responses | Unsigned 2012 FAA response to questions posed by Congressman Timothy Bishop |
| FAA | Federal Aviation Administration |
| FAA Compl. | Complaint in related action *FOEHA v. FAA*, 15 Civ. 441 (SJF) (ARL) |
| HTO | East Hampton Airport |
| Town Compl. | Amended Complaint in this action, *FOEHA v. The Town of East Hampton*, 15 Civ. 2246 (SJF) (ARL) |

## *Parties' Legal Briefs*

| | |
|---|---|
| Pls. Br. | Plaintiffs' Memorandum of Law In Support of Their Motion For a Temporary Restraining Order |
| Opp. Br. | Defendant's Opposition to Motion for Temporary Restraining Order |

### *Declarants*

| | |
|---|---|
| Ashton Dec. | Declaration of Scott E. Ashton dated April 28, 2015 |
| Brown Dec. | Declaration of Steve Brown dated April 28, 2015 |
| Carlson Dec. | Declaration of Kurt Carlson dated April 28, 2015 |
| Harris Dec. | Expert Declaration of Andrew S. Harris dated April 29, 2015 |
| Herbst Dec. | Declaration of Cynthia L. Herbst dated April 28, 2015 |
| Jungck Dec. | Declaration of Eric Jungck dated April 28, 2015 |
| Renz Dec. | Declaration of Michael Renz dated April 29, 2015 |
| Sabin Dec. | Declaration of Andrew Sabin dated April 22, 2015 |
| Shaffer Dec. | Expert Declaration of D. Kirk Shaffer dated April 29, 2015 |
| Vellios Dec. | Declaration of Chris Vellios dated April 28, 2015 |
| Zornberg Dec. | Corrected Declaration of Lisa Zornberg dated Apri 29, 2015 |
| Zuccaro Dec. | Declaration of Matthew S. Zuccaro dated April 29, 2015 |
| Norbeck Dec. | Declaration of Michael Norbeck dated May 11, 2015 |
| Ashton Supp. Dec. | Supplemental Declaration of Scott Ashton dated May 12, 2015 |
| Carlson Supp. Dec. | Supplemental Declaration of Kurt Carlson dated May 12, 2015 |
| Jungck Supp. Dec. | Supplemental Declaration of Eric Jungck dated May 12, 2015 |
| Renz Supp. Dec. | Supplemental Declaration of Michael Renz dated May 12, 2015 |
| Vellios Supp. Dec. | Supplemental Declaration of Chris Vellios dated May 12, 2015 |
| Stumpp Dec. | Expert Declaration of Peter Stumpp dated May 8, 2015 |
| Pilsk Dec. | Declaration of W. Eric Pilsk dated May 7, 2015 |
| Cantwell Dec. | Declaration of Larry Cantwell dated May 7, 2015 |

### *FAA Administrative Decisions*

| | |
|---|---|
| *Burbank* Decision | FAA, Final Decision on the Application for a Curfew by Burbank-Glendale-Pasadena Airport Authority (Oct. 30, 2009), http://www.faa.gov/airports/environmental/airport_noise/part_161/media/Burbank_10_30_09.pdf |

*LAX* Decision                              FAA Decision on 14 CFR Part 161 Study – Proposed
                                            Runway Use Restriction at LAX
                                            (Nov. 7, 2014), http://www.faa.gov/airports/environmental/
                                            airport_noise/part_161/media/Final-Determination-LAX-
                                            Part%20161-Application-20141107.pdf

*Santa Monica*                              *In re Compliance with Fed. Obligations by the City of
                                            Santa Monica, Cal.*, FAA 16-02-08 (2008), 2008 WL
                                            6895776 (May 27, 2008 Director's Determination)


*Platinum Aviation*                         *Platinum Aviation & Platinum Jet Ctr. BMI v. Bloomington-
                                            Normal Airport Auth., Ill.*, FAA 106-06-09 (2007), 2007
                                            WL 4854321 (Nov. 28, 2007 Final Decision & Order)

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Air Transport Ass'n of Am. v. Cuomo,*
520 F.2d 218 (2d Cir. 2008)...............................................................................16

*Alaska Airlines, Inc. v. Long Beach,*
951 F.2d 977 (9th Cir. 1992) .......................................................................18, 25

*Araphoe County Public Airport Authority v. FAA,*
242 F.3d 1213 (10th Cir. 2001) ........................................................................19

*Armstrong v. Exceptional Child Ctr., Inc.,*
135 S. Ct. 1378 (2015).................................................................................16-17

*Arrow Air, Inc. v. Port. Auth.,*
602 F. Supp. 314 (S.D.N.Y. 1985)....................................................................18

*Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.,*
566 F. Supp. 2d 81 (D. Conn. 2008) *aff'd,* 567 F.3d 79 (2d Cir. 2009) ..................7

*C & A Carbone, Inc. v. Town of Clarkstown,* 770 F. Supp. 848 (S.DN.Y. 1991) ..........7

*Cartoon Network LP v. CSC Holdings, Inc.,*
536 F.3d 121 (2d Cir.2008)................................................................................11

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York,*
273 F.3d 481 (2d Cir. 2001)..........................................................................11, 12

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
467 U.S. 837 (1984)......................................................................................12, 14

*Christensen v. Harris County,*
529 U.S. 576 (2000)............................................................................................11

*Christopher v. SmithKline Beecham Corp.,*
132 S. Ct. 2156 (2012)........................................................................................11

*City of Naples Airport Auth. v. F.A.A.,*
409 F.3d 431 (D.C. Cir. 2005).............................................................................9

*Clay Lacy Aviation v. Los Angeles,*
2001 WL 1941734 (C.D. Cal. July 27, 2001).....................................................18

*Fed. Crop Ins. Corp. v. Merrill*,
 332 U.S. 380 (1947)................................................................................15

*Gibbons v. Ogden*,
 22 U.S. (9 Wheat) 1 (1824)..................................................................2, 15

*Global Int'l Airways Corp. v. Port Auth.*,
 727 F.2d 246 (2d Cir. 1984)...................................................................18

*Goldberg v. Weinberger*,
 546 F.2d 477 (2d Cir.1976)....................................................................16

*Gulf & W. Corp. v. Craftique Prods., Inc.*,
 523 F. Supp. 603 (S.D.N.Y. 1981)............................................................5

*Helicopter Association International v. FAA*,
 722 F.3d 430 (D.C. Cir. 2013)................................................................22

*Lavin v. Marsh*,
 644 F.2d 1378 (9th Cir. 1981) ...............................................................16

*Murray v. Metro. Life Ins. Co.*,
 583 F.3d 173 (2d Cir. 2009)...................................................................16

*N.Y. Pub. Interest Research Grp. v. Whitman*,
 321 F.3d 316 (2d Cir. 2003)...................................................................12

*Nat'l Bus. Aviation Association v. City of Naples Airport Authority*,
 162 F. Supp. 2d 1343 (M.D. Fla. 2001).............................................22, 23

*Nat'l Helicopter Corp. of Am. v. City of New York*,
 952 F. Supp. 1011 (S.D.N.Y. 1997).........................................................3

*National Aviation v. City of Hayward*,
 418 F. Supp. 417 (N.D. Cal. 1976) .........................................................18

*National Helicopter Corp. of Am. v. City of New York*,
 137 F.3d 81 (2d Cir. 1998)....................................................3, 18, 19, 25

*Natural Res. Def. Council, Inc. v. U.S. Consumer Prod. Safety Comm'n*,
 597 F. Supp. 2d 370 (S.D.N.Y. 2009).....................................................11

*Ratzlaf v. United States*,
 510 U.S. 135 (1994)...............................................................................14

*San Francisco v. FAA*,
 942 F.2d 1391 (9th Cir. 1991) ................................................................25

vi

*Santa Monica Airport Association v. Santa Monica*,
    481 F. Supp. 927 (C.D. Cal.), *aff'd* 659 F.2d 100 (9th Cir. 1979)..............................18, 21, 26

*Schuster v. Comm'r of Internal Revenue*,
    312 F.2d 311 (9th Cir. 1962) ...............................................................................................16

*Se. Queens Concerned Neighbors, Inc. v. F.A.A.*,
    229 F.3d 387 (2d Cir. 2000).................................................................................................21

*SeaAir, NY v. City of New York*,
    250 F.3d 183 (2d Cir. 2001).................................................................................................19

*Ticor Title Ins. Co. v. Cohen*,
    173 F.3d 63 (2d Cir. 1999)...................................................................................................4

*Tom Doherty Associates, Inc. v. Saban Entm't, Inc.*,
    60 F.3d 27 (2d Cir. 1995) ....................................................................................................5

*United States v. Simpson*,
    No. 10-CR-0836, 2011 WL 7428808 (E.D.N.Y. Sept. 8, 2011)............................................16

*Yakubova v. Chertoff*,
    No. 06 Civ. 3203 (ERK) (RLM), 2006 WL 6589892 (E.D.N.Y. Nov. 2, 2006)....................15

**Preliminary Statement**

There is no basis to dispute that the Restrictions enacted by the Town directly conflict with ANCA – the nation's uniform, mandatory noise policy.  Indeed, the Town does not even attempt to contend that its Restrictions comport with ANCA.

There is likewise no basis to dispute that ANCA expressly preempts the ability of local airport proprietors to impose the type of restrictions the Town has imposed here and to proceed in the manner the Town has proceeded.  Indeed, in 2011, the Town's counsel, the law firm Kaplan Kirsch & Rockwell LLP ("Kaplan Kirsch"), repeatedly advised the Town, without qualification, that the Town had to comply with ANCA before imposing *any* access restrictions. Similarly, in that same year, Kaplan Kirsch informed the court in another proceeding (on behalf of another airport client) that ANCA's preemptive effect is so clear, and has so eliminated a proprietor's unilateral rights to impose access restrictions, that to argue "that ANCA somehow did not alter the scope of the proprietor's exception … is *facially preposterous*."  Brief by Palm Beach County, *Trump v. Palm Beach County,* 2011 WL 100068524 (Fl. Cir. Ct. Mar. 4, 2011) ("*Trump*") (emphasis added).

Nothing has happened since 2011 to render it any less facially preposterous to suggest that the Town need not comply with ANCA.  There has been no change in ANCA's unambiguous terms, no change to the FAA's regulations implementing ANCA, and no court decisions limiting ANCA's scope or preemptive effect whatsoever.

Not surprisingly, then, the only "support" that the Town is able to muster in defense of its actions is a single sentence in an unsigned writing that someone at the FAA appears to have written in response to a series of questions posed by then-Congressman Tim Bishop  (the "Bishop Sentence").   The Town thus invites this Court to ignore the plain language of ANCA,

the FAA's regulations implementing ANCA, and indeed the Town's own prior interpretation of ANCA in favor of a passing comment in the Bishop Sentence that the 2005 Settlement Agreement means the Town need not comply with ANCA after December 31, 2014.

The Town's invitation – which is nothing more than an invitation to commit legal error – should be swiftly rejected. The Bishop Sentence is wrong factually and legally, and it is entitled to no weight. It offers a misguided, unsupported interpretation of a settlement agreement that did not even mention ANCA. Moreover, and even more significantly, it is not the product of FAA rule-making or formal adjudication. As a result, under well-established law, the Bishop Sentence is entitled to no judicial deference.

Supreme Court precedent likewise makes clear that the Town cannot attempt to capitalize on the mistaken position taken in the Bishop Sentence. There is no "reasonable reliance" exception to the Supremacy Clause. When Congress intends to displace local law – as it did in ANCA – local law gives way. *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 21 (1824). To permit the Restrictions to proceed would be to hold that a misinformed government official has the power to up-end federal law, repeal Congressional mandates, and authorize local laws to override federal ones. Supreme Court and Second Circuit authority is squarely to the contrary.

The interim injunctive relief Plaintiffs seek is warranted and urgently needed. Plaintiffs have demonstrated by overwhelming evidence that they will be irreparably harmed once the Restrictions take effect. Plaintiffs have demonstrated substantial likelihood of success on the merits. The FAA's support for an injunction shows, at the very least, that the FAA appreciates the national significance of the legal issues and the unprecedented nature of the Restrictions post-ANCA. The balance of interests thus weighs strongly in favor of preserving the same *status quo* that has existed at East Hampton Airport for the last 79 years until the merits are decided.

A. **Plaintiffs Will Be Irreparably Harmed by the Restrictions**

In their initial declarations, Plaintiffs presented overwhelming evidence that access to East Hampton Airport is critical to their revenue and operations, and that they will be immediately and irreparably harmed by the Restrictions. Irreparable harm is the most important factor in granting a TRO.

The Town's claim that Plaintiff helicopter operators' injuries are too "speculative" to support a TRO defies logic. By the Town's own public statements, the Restrictions were designed to eliminate 75% of helicopter operations at HTO. That is their purpose. (Complaint ¶ 71; Cantwell Dec., Ex. 1 at 21.) Indeed, the Town's so-called "traffic diversion study" specifically identified Plaintiffs HeliFlite, AAG, Analar, and Liberty as likely to be most affected by the Restrictions. (Stumpp Dec., Ex. 2 at 19.) In *National Helicopter Corp. of Am. v. City of New York*, then-Judge Sotomayor found preliminary injunctive relief to be "undoubtedly" warranted in similar circumstances:

> The City's suggestion that plaintiff's anticipated losses are too speculative to support a claim for injunctive relief is unavailing. *As a matter of logic*, it cannot be speculative for plaintiff to predict significant business losses resulting from the enforcement of a resolution which, on its face, mandates a . . . 47% reduction in operations at the Heliport by eliminating certain services and by restricting hours of operation. The [restrictions] . . . can be expected to have their intended effect, *and undoubtedly will cause National significant and irreparable injury* in its future operations at the Heliport. The relevant case law reinforces this finding.

952 F. Supp. 1011, 1019 (S.D.N.Y. 1997) (emphasis added) (citing cases), *aff'd in part, rev'd in part on other grounds*, 137 F.3d 81 (2d Cir. 1998).

Here, the need for injunctive relief is stronger than it was in *National Helicopter* because the Restrictions will reduce Plaintiff helicopter operators' use of the Airport by far more than 47%. *See* Carlson Dec. ¶ 21 (80–90% reduction); Ashton Dec. ¶ 23 (more than 90% reduction); Vellios Dec. ¶ 15 (effectively shut down charter service); Renz Dec. ¶ 20 (65% reduction).

The Town also errs in contending that Plaintiffs would not be harmed if denied a TRO because May is a slow month. Opp. Br. at 24-25. Because the stakes for Plaintiffs' survival are too high to leave this and other erroneous claims unanswered, Plaintiffs have respectfully filed supplemental reply declarations detailing how they are *already* being harmed by the uncertainty cast by the Restrictions' pendency, and how their losses will severely worsen as soon as the Restrictions take effect. Plaintiffs' customers have already delayed booking travel until it is established whether they will be able to fly on Plaintiffs' aircraft or be denied that opportunity because of the Restrictions. *See* Carlson Supp. Dec. ¶ 20; Renz Supp. Dec. ¶ 4. Some of these customers have directly cited the Restrictions in declining to make purchase. And those delays have *already* caused a decrease in Plaintiffs' revenue. *See* Renz Supp. Dec. ¶ 4 (loss of $200,000 due to customers not purchasing pre-paid flight time); Ashton Dec. ¶ 8 (over $270,000 in harm).

The denial of a TRO will bring severe harm immediately. As Plaintiffs' supplemental declarations set out in detail, the denial of a TRO – even for the next few weeks of May – will cause Plaintiffs to suffer significant losses that are not all quantifiable and that include projected revenue losses exceeding $1 million, loss of client bookings for the entire summer season, loss of new clients, loss of existing clients, loss of the opportunity to hire qualified seasonal employees, loss of business brand, and loss market share to the sea plane companies and purported "quiet helicopter" companies that have been actively advertising and competing for Plaintiffs' business ever since the Restrictions were enacted. *See* Carlson Supp. Dec. ¶ 8; Vellios Supp. Dec. ¶ 3. Courts in this Circuit repeatedly have held interim injunctive relief to be warranted in such circumstances. *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (irreparable harm demonstrated because "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate

amount of business in years to come"); *Tom Doherty Associates, Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995); *Gulf & W. Corp. v. Craftique Prods., Inc.*, 523 F. Supp. 603, 607 (S.D.N.Y. 1981).

The Town's argument that Plaintiffs can avoid this harm simply by replacing their fleets with "compliant" aircraft not subject to the Town's "Noisy Aircraft" definition, *see* Opp. Br. at 25, is untrue and reflects an utter lack of understanding of how aircraft are bought and sold and regulated for use by the federal government. Replacing aircraft is not like trading in a car at a local dealership for a newer model; it is an expensive and time-consuming process that could take years for a single aircraft. *See* Carlson Supp. Dec. ¶ 5; Renz Supp. Dec. ¶¶ 8-9; Jungck Supp. Dec. ¶4 (3 to 5 years to replace Falcon 7x jet)). Charter operators also must satisfy multiple federal regulatory requirements before any new aircraft can be used in their charter services, a process that itself takes between six months and a year. (Carlson Supp. Dec. ¶ 5.) Aside from timing impediments, purchasing fleets of "compliant" helicopters would not be possible for the many other reasons detailed in Plaintiffs' supplemental declarations, including:

- Many Plaintiffs do not have the ability to sell the aircraft they operate because those aircraft are owned by clients through fractional ownership and managed aircraft programs. (Carlson Supp. Dec. ¶ 4; Renz Supp. Dec. ¶ 8.)

- Plaintiff AAG cannot replace its fleet because, as a subsidiary of Sikorsky, it exclusively flies Sikorsky helicopters, and the only Sikorsky helicopter that is not a "Noisy Aircraft," the Sikorsky S-61, is wholly unsuitable for charter service. (Ashton Supp. Dec. ¶¶ 2-7.)

- Aircraft cost tens of millions of dollars (requiring significant investment) and take lead time to order. It would not be rational for Plaintiffs to make these kind of investments in an environment in which the Town has said it plans to consider additional access restrictions, such as the outright helicopter ban that was proposed and tabled for future consideration. (Carlson Supp. Dec. ¶¶ 5-6; Renz Supp. Dec. ¶¶ 8-9; Jungck Supp. Dec. ¶¶ 4-5.)

- Even if Plaintiffs switch from operating twin-engine helicopters (regarded as the safest type of helicopter and operated by two pilots) to the single-engine

helicopter model that the Town has not deemed "Noisy," many clients would refuse to use Plaintiffs' services on safety grounds. (Carlson Supp. Dec. ¶¶ 12-13; Renz Supp. Dec. ¶¶ 10-11.)

Significantly, the Town enacted the Restrictions to take effect "immediately," without providing aircraft operators any grace period for implementation. This further underscores that the Town's intent has never been to permit aircraft operators to adjust to the Restrictions so they can continue to access the Airport, but rather to ban helicopters and jets from the Airport at all costs. Moreover, even if it were possible for Plaintiffs to replace their fleets, many of Plaintiffs' businesses could not survive the time it would take to do so while the Restrictions are in effect. (*See* Renz Supp. Dec. ¶ 8; Ashton Supp. Dec. ¶ 9.)

The Town's further suggestion that Plaintiffs can avoid irreparable harm by diverting their operations to other airports, *see* Opp. Br. at 25, is similarly misguided. In Plaintiff Sound's case, such diversion *exacerbates* the harm to Sound's business. (*See* Herbst Dec. ¶ 15.) Moreover, the Town's so-called traffic diversion study – published by the Town just one day before the Town adopted the Restrictions – was based upon data from *other* airports, because in the Town's rush to enact the Restrictions there was insufficient time to gather data specific to East Hampton Airport. (*See* Stumpp Dec., Ex. 2 at 1, stating: "The estimates of traffic diversion in this report rely primarily on published information and experience at *other* [non-New York] noise-impacted general aviation airports, and *they may be revised substantially* as more information becomes available." (emphasis added).) In contrast to Mr. Stumpp's speculation, Plaintiffs have specified in detail, based on their *actual* operational history and customer base, why diversion to other regional airport will be highly problematic and will not prevent the Plaintiffs' losses. (*See* Ashton Dec. ¶¶ 30–34; Carlson Dec. ¶¶ 28–29; Renz Dec. ¶¶ 27–28; Vellios Dec. ¶¶ 23–25; Jungck Dec. ¶ 19.)

The Town also suggests – while simultaneously and expressly reserving its rights to argue

to the contrary at a later time –that Plaintiffs could at least in theory expect to be made whole by the Town for the tens of millions in damages they will suffer as a result of the Restrictions.  Opp. Br. at 22-23.  It is undisputed, however, that money damages are unavailable on Plaintiffs' preemption claim.  Moreover, we have been unable to locate any case, pursued under any legal theory, that awarded money damages to aircraft operators based upon a local government's imposition of unlawful airport access restrictions.  And while the Town suggests that damages theoretically may be available against the Town for a Commerce Clause claim brought pursuant to 42 U.S.C. § 1983, the Town makes clear that it is not conceding the point and indeed reserves its right to contend that money damages are in fact unavailable.

The doctrines involving suits against local and state governments are complex and often require extensive litigation.  Moreover, courts are often reluctant to award money damages against governmental entities based upon constitutional claims.  In the only case we found where a transportation operator successfully brought a § 1983 Commerce Clause claim, the court, after five years of litigation, nevertheless awarded the plaintiff nominal damages of only one dollar. *See Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 566 F. Supp. 2d 81, 106 (D. Conn. 2008) *aff'd*, 567 F.3d 79 (2d Cir. 2009).  Indeed, even in the very case that the Town cites for the proposition that damages theoretically could be available in a § 1983 Commerce Clause claim – *C & A Carbone, Inc. v. Town of Clarkstown* – the court issued an injunction.  770 F. Supp. 848, 854 (S.D.N.Y. 1991).  In short, Plaintiffs' showing of irreparable harm is not merely adequate; it is overwhelming.

## B.  **The Restrictions are Preempted by ANCA**

The Restrictions' direct conflict with ANCA likewise could not be more stark.   ANCA expressly prohibits airport proprietors from imposing any restrictions on Stage 2, Stage 3 or

Stage 4 aircraft unless ANCA's rigorous requirements have first been met. The Restrictions impose airport access limitations on Stage 2, Stage 3, and Stage 4 aircraft in violation of ANCA's requirements.[1] There is no dispute that the Town did not even try to comply with ANCA.

Equally clear is that the Town's *sole* basis for trying to justify its disregard of ANCA is the Bishop Sentence. The Town claims that the Bishop Sentence clarified "an uncertain legal environment" and "removed" ANCA's "serious impediment to the Town's ability to adopt local airport restrictions." Opp. Br. at 4. No part of that claim is correct.

As an initial matter, far from the Town being "uncertain" about its legal obligations under ANCA prior to the Bishop Sentence, the Town fully understood its legal obligation to comply with ANCA before imposing any access restrictions. In 2011, Town counsel advised the Town repeatedly, in crystal clear terms that:

- *The Town cannot restrict operations by the current generation of aircraft (known as stage 3 or 4 aircraft) without FAA approval*. If the Town wanted to restrict only the older generation of aircraft or any helicopters (known as stage 1 or 2 aircraft) it could do so without FAA approval but it would first have to satisfy [ANCA's] the exhaustive Part 161 study requirements." (Zornberg Dec., Ex. A at 2) (emphasis added);

- [**Question**:] So long as the Town is federally obligated, can it impose a curfew or restriction in aircraft or helicopters? [**Answer**:] No. . . . *If an airport is federally obligated, before its proprietor can restrict the use of the airport, it must comply both the grant assurances and with [ANCA's] Part 161 requirements. Id.*[2]

- [**Question**:] Once the Town is *no longer* federally obligated, can the Town automatically impose a mandatory curfew or similar restriction on aircraft using the airport? [**Answer**:] No. The East Hampton Airport must be accessible to the public. Over the course of the last half century, courts have consistently

---

[1] Stage 4 aircraft qualify as Stage 3 aircraft for purposes of ANCA's protections. *See* Airport Compliance Manual, FAA Order 5190.6b ¶ 13.4.

[2] Town counsel did state that it is not clear whether ANCA applies *only* to federally obligated airports, but advised that this made no difference in the Town's case because the Town *was* federally obligated and would remain so until 2021. Zornberg Dec., Ex. B, 21, 27.

concluded that the U.S. Constitution imposes significant limitations on the ability of an airport owner to restrict access to its airport. *Since [ANCA's] Part 161 requirements were imposed in 1990, no airport has successfully imposed a new use restriction outside the Part 161 process. Id.*(emphasis added)

- Many airports have use restrictions (e.g.: curfews, noise limits). [However,] *with only one exception, every one of these restrictions was enacted before ANCA became law in 1990.* Since 1990, very, very few airports have even *tried* to adopt use restrictions. Only one airport has completed the process needed for FAA approval to restrict current generation of aircraft (Burbank, CA). They were unsuccessful. *Id.;* Ex. B at 22 (emphasis in original).[3]

Moreover, that legal advice was undoubtedly rendered because it is indisputable that ANCA preempts the unilateral ability of proprietors to impose any access or noise restrictions on Stage 2, Stage 3 and Stage 4 aircraft. Indeed, in a 2011 case in which Donald Trump sued Palm Beach County (in an effort to force the Palm Beach airport to restrict Stage 3 aircraft), Kaplan Kirsch successfully defended the County on the ground that ANCA plainly preempted the County from imposing any such restrictions, telling the court:

- Despite all of [Trump's] argument about the historic powers of airport proprietors, *there is no dispute that an airport's power to adopt curfews and other flight restrictions was limited by [ANCA], which further preempted proprietary powers* to restriction operations by the newer generation Stage 3 aircraft. . . . [U]nder current law all the county can do is propose suggested measures to the FAA, but the FAA retains the discretion to approve or disapprove those proposals."

- Having admitted that ANCA deprives the County of the unilateral authority to adopt operational restrictions, [Trump] make[s] the contrary argument that ANCA somehow did not alter the scope of the proprietor's excpetion. *This is facially preposterous. Prior to ANCA, airport proprietors had the legal authority unilaterally to adopt certain access restrictions without prior FAA approval. . . . After ANCA, airports lost this authority and must obtain express FAA approval.*

- [I]n ANCA, Congress explicitly requires airports to submit <u>all</u> proposals to impose restrictions on Stage 3 aircraft to the FAA for approval. . . . The cases

---

[3] The "exception" referred to in this quotation is Naples Municipal Airport, which restricted Stage 2 fixed wing aircraft only *after* fully complying with ANCA. *See City of Naples Airport Auth. v. F.A.A.*, 409 F.3d 431, 433 (D.C. Cir. 2005). In another case, the FAA subsequently rejected a Part 161 study that sought to impose a mandatory curfew at LAX – even though it the proposed curfew would only prohibit a specific departure pattern and not operations generally, and even though the airport estimated that only 65 flights per year would be affected. *See LAX Decision.*

cited by [Trump] . . . do not undermine this point, *nor could they overrule the express Congressional language of ANCA*.

*Trump*, 2011 WL 10068524 , at 3-4 (emphasis added).

ANCA has not changed since Kaplan Kirsch provided this analysis in 2011. The statute is the same. The Part 161 regulations are the same. The case law is the same. Indeed, the Town's opposition papers do not cite any judicial decision issued between 2011 and now that altered ANCA's scope and preemptive effect. There is no such case.

Yet, the Town now claims, based solely on the Bishop Sentence, that:

(i)     the Bishop Sentence announced the FAA's "interpretation of ANCA" and should deferred to by this Court;

(ii)    ANCA no longer applies to all airports, or even to all federally obligated airports, but applies only to those few airports that wish to be eligible for federal funding; and

(iii)   the Town "reasonably relied" on the Bishop Sentence in imposing the Restrictions, suggesting that the Restrictions should thus be allowed to proceed even if they violate federal law.

Opp. Br. at 10. As demonstrated below, each of those arguments is meritless.

### 1.    The Bishop Sentence did not "announce" the FAA's "interpretation of ANCA," and is not entitled to judicial deference.

The Town grossly overstates the significance of the Bishop Responses – an unsigned document, without even a cover letter, that offered a misguided interpretation of what the 2005 Settlement Agreement meant. That document did not purport to be the FAA's interpretive guidance on ANCA. The Bishop Responses' one and only sentence addressing ANCA – the Bishop Sentence – is framed as an interpretation *of the 2005 Settlement Agreement*, not of ANCA generally: "*The FAA's agreement [in the 2005 Settlement Agreement] not to enforce also means that* unless the town wishes to remain eligible to receive future grants of Federal Funding, it is not required to comply with the requirements under [ANCA] . . . in proposing new airport noise

and access restrictions." FAA Compl., Ex. C at 1 (emphasis added).

Try as it might, the Town cannot transform this limited (and erroneous) sentence, interpreting the 2005 Settlement Agreement, into an official "announcement" by the FAA of its interpretation of ANCA. The Bishop Sentence can be disregarded on the simple basis that its author misconstrued the 2005 Settlement Agreement as relating to ANCA, when in fact it did not.

Moreover, and even more importantly, because the Bishop Sentence was not the product of FAA rule-making or formal adjudication, it is entitled to no judicial deference. In that regard, it bears emphasis that Bishop Sentence is just one sentence that did not discuss ANCA's terms, language, context or purpose, and that is entirely devoid of analysis. As a result, under well-established law, the Bishop Sentence is deserving of no weight. *See Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166-67 (2012) (affording no deference "when there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question" ); *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (*Chevron*-style deference afforded only to agency interpretations "arrived at after . . . a formal adjudication or notice-and-comment rulemaking"); *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 129 (2d Cir.2008) (agency interpretation not entitled to deference where it failed to account for statute's language); *Natural Res. Def. Council, Inc. v. U.S. Consumer Prod. Safety Comm'n*, 597 F. Supp. 2d 370, 392 (S.D.N.Y. 2009) (no deference afforded agency opinion letter that failed to address "vast majority of the relevant language of the statute and all of the relevant statutory context, [was] not well reasoned, and reache[d] a result that undermines the purpose of the" federal statute).[4]

---

[4] That the Bishop Sentence is contained in a response that may have been sent to a congressman does not alter this analysis. *See Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d

**2. The contention that ANCA applies only to airports wishing to remain eligible for federal funding is refuted by ANCA's unambiguous terms and Congress's intent.**

The Town likewise errs in contending that the Bishop Sentence means that ANCA applies only to airports wishing to remain eligible for federal grant funding. Opp. Br. at 14-15. Simply put, the Town's proposed construction of ANCA contravenes the statute's express terms, wrongly confuses ANCA's application with its penalty provisions, and would lead to absurd results.

It is a fundamental principle of statutory construction that courts must disregard interpretations that conflict with a statute's plain terms:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). *See also N.Y. Pub. Interest Research Grp. v. Whitman*, 321 F.3d 316, 324 (2d Cir. 2003) ("We will not defer to an agency's interpretation that contravenes Congress' unambiguously expressed intent."). Such is the case here.

ANCA's terms and purpose could not be clearer. ANCA established a "national aviation policy" that preempts local authority and allows proprietors to restrict Stage 2 and Stage 3 aircraft "only if" they first comply with ANCA's mandatory notice, analysis and approval requirements. 49 U.S.C. §§ 47523-24. Congress adopted ANCA to put to an end the uncoordinated imposition of restrictions by local authorities, which was harming the national air transportation system. *Id.* § 47521.

Moreover, Congress provided a broad array of means to address ANCA violations by

---

481, 489 (2d Cir. 2001) *adhered to on reconsideration*, 451 F.3d 77 (2d Cir. 2006) (no deference warranted to EPA interpretation of the Clean Water Act where, even though the interpretation was articulated in reports to Congress over two decades, (1) the EPA did not follow formal rulemaking procedures in taking its position, and (2) the ordinary meaning of the statute was unambiguous).

airport proprietors. Thus, ANCA expressly states that the federal government may "seek and obtain legal remedies . . . including injunctive relief," 49 U.S.C. § 47533(3), which means that the FAA can seek to enjoin the imposition or enforcement of access restrictions that violate ANCA. *Id.; see also* 14 C.F.R. § 161.503. In addition, the statute further provides that airports imposing restrictions in violation of ANCA are prohibited from receiving federal grant funding. 49 U.S.C. § 47526(1), and from imposing passenger facility charges, § 47526(2).

Nothing in those various penalty provisions remotely limits ANCA's application to airports that decide they want to be eligible for federal funding. There is no textual or logical support for such an interpretation. Indeed, such a construction would gut the entire statute.

It is inconceivable that Congress established a <u>national</u>, <u>mandatory</u> policy in ANCA, using the broadest and plainest language imaginable, but nevertheless intended ANCA to apply only to airports (i) that are designated by the FAA as being eligible for federal funding, and (ii) that elect to remain eligible for federal funding. Such a litmus test would render ANCA's requirements <u>neither</u> national <u>nor</u> mandatory. It is nonsensical.

Of the approximately 19,000 airports in the United States, only approximately 3,300 have even been designated by the FAA as eligible for federal funding. *See* Shaffer Dec. ¶ 16. The Town's proposed interpretation of ANCA would shrink the statute's application even further – <u>by leaving it up to the airport</u> to unilaterally decide whether to comply with ANCA or forego federal funds. In ANCA, Congress gave airports no such choice. To the contrary, the statute applies to all airports, and contains no carve-out of any kind based on airport type. ANCA imposes constraints on airports that attach whether airports want federal grant money or not.[5]

---

[5] The Town's contention that "[n]o one can seriously argue" that the Restrictions' mandatory curfews are "*per se* preempted" (Opp. Br. 7) gets it wrong. A correct statement is that no one can argue, as a matter of law, that ANCA preempts any mandatory curfew from being imposed on Stage 2, Stage 3, or Stage 4 aircraft unless and until the proprietor first complies with ANCA.

Because ANCA's terms are unambiguous, no further inquiry is needed. *Chevron*, 467 U.S. at 842-43. there is no need for this Court to consult the legislative history, and indeed courts are instructed not to do so in these circumstances. *See, e.g.*, *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994) (discussing that even if there are "contrary indications in the statute's legislative history" courts "do not resort to legislative history to cloud a statutory text that is clear").

In any event, and purely for the sake of fully responding to the Town's opposition papers (Opp. Br. 14), we note that Congressman Oberstar in fact never suggested that ANCA's scope was limited to the narrow and self-selecting set of airports. Congressman Oberstar instead recognized ANCA's national and mandatory reach, stating: "Restrictions on stage 3 aircraft proposed after October 1, 1990, *must* either be agreed to by the airport and air carrier or be approved by DOT." 136 Cong. Rec. E3693-04 (1990) (emphasis added). Moreover, when the Senate considered aviation noise legislation, Senator Wendell Ford – the Senate sponsor of ANCA – explained that aircraft noise and airport capacity issues had become a national problem:

> The lack of leadership from the Federal Government has created conflict between the airlines, the airport operators and the communities they serve. Airports are now telling the airlines what kind of aircraft they can fly as a method of regulating noise. Some airports have enforced restrictions on the type of aircraft, the number of operations and the time of day for operations. . . . The patchwork quilt of local noise restrictions is the major impediment to increasing airport and airway capacity.

101 Cong. Rec. S13619. According to the Senator, "the solution" was to create "a National Noise Policy." *Id.* Congress agreed when it adopted ANCA, finding that "a noise policy must be carried out at the national level" and that "community noise concerns have led to uncoordinated and inconsistent restrictions on aviation that could impede the national air transportation system." 49 U.S.C. § 47521(2)-(3).

At bottom, the Town's contention that it may choose between compliance and federal funding is baseless. To so construe ANCA would contravene both its letter and purpose, and would create the very "patchwork quilt of local noise restrictions" that Congress sought to end by enacting with ANCA.[6]

### 3. Whether the Town relied on the Bishop Sentence is irrelevant because the Restrictions are expressly preempted by ANCA and violate the Supremacy Clause.

The Town likewise cannot avoid the impact of ANCA by claiming that it reasonably relied on the Bishop Sentence in enacting the Restrictions. Opp. Br. at 14.

There is no "reasonable reliance" exception to the Supremacy Clause. *See* Const. art. VI. Cl. 2. The Town does not point to any doctrine or case law or statute to support its assertions otherwise. Nor could it. When Congress intends to displace local law, local law gives way. *See Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 21 (1824).

What a local government believes about its transgressions of federal law – reasonable or otherwise – is irrelevant to the effect of the violation. As the Supreme Court has explained, this does not reflect "callous outlook"; it is merely a reflection of the fundamental principle that federal law, as written by Congress, controls. *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 385 (1947). *See also Lavin v. Marsh*, 644 F.2d 1378, 1383 (9th Cir. 1981) ("Persons dealing with the government are charged with knowing government statutes and regulations, and they assume the risk that government agents may exceed their authority and provide misinformation."); *Schuster v. Comm'r of Internal Revenue*, 312 F.2d 311, 317 (9th Cir. 1962) ("Congress's legislative authority should not be readily subordinated to the action of a wayward or unknowledgeable

---

[6] Any interpretation of ANCA as applying only to a small subset of airports must also be rejected as conflicting with the FAA's regulations, which unambiguously provide that ANCA's requirements apply "to all airports imposing noise or access restrictions." 14 C.F.R. § 161.3(c). *See Yakubova v. Chertoff*, No. 06 Civ. 3203 (ERK) (RLM), 2006 WL 6589892, at *3 (E.D.N.Y. Nov. 2, 2006) (declining to accept agency interpretation in litigation that was "contrary to its own regulations").

administrative official.").[7]

In any event, the Town cannot contend that it reasonably relied on Bishop Sentence in enacting the Restrictions. Quite to the contrary, the Town hurried to enact the Restrictions *after* the Bishop Sentence had already been legally challenged in the *FAA Action*. That does not reflect reasonable reliance; it reflects opportunism.[8]

The Town's remaining efforts to avoid ANCA's preemptive effect are unavailing. The contention that Plaintiffs lack standing to seek relief under the Supremacy Clause (Opp. Br. 11-12) is meritless. As the Second Circuit explained in *Air Transport Ass'n of Am. v. Cuomo*, 520 F.2d 218 (2d Cir. 2008), a plaintiff can pursue a preemption challenge through the Supremacy Clause regardless of whether it has a private right of action under the federal statute at issue. *Id.* at 221 ("A claim under the Supremacy Clause that a federal law preempts a state regulation is distinct from a claim for enforcement of that federal law . . . [and] simply asserts that a federal statute has taken away local authority to regulate a certain activity.").

Moreover, the Supreme Court's decision in March 2015 in *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1385 (2015), if anything, further supports Plaintiffs' right to pursue equitable relief based on ANCA's clear terms. That decision – in which a 5-4 majority

---

[7] The Town concedes, as it must, that it has no basis to assert estoppel against the FAA based on the Bishop Sentence. Opp. Br. at 10 n.2. *See United States v. Simpson*, No. 10-CR-0836, 2011 WL 7428808, at *6 (E.D.N.Y. Sept. 8, 2011) (principles of estoppel are inapplicable absent "a showing of 'affirmative misconduct' by the government"), *report and recommendation adopted*, 2012 WL 628497 (E.D.N.Y. Feb. 27, 2012); *Goldberg v. Weinberger*, 546 F.2d 477, 481 (2d Cir.1976) ("The government could scarcely function if it were bound by its employees' unauthorized representations.").

[8] Nor does the FAA's purported silence at a meeting in February 2015 have any import. Opp. Br. 10. The Town requested the meeting while the *FAA Action* was pending, knowing that the FAA would be constrained by active litigation from making statements. Similarly, the Town's citation to a February 2012 email between Town counsel (Peter Kirsch, Esq.) and an FAA official (Pilsk Dec., Ex. 1) does nothing to bolster the Town's legally uncognizable reliance claim. It does, however, raise other concerns. To the extent the Town is suggesting that its counsel's conversations with an FAA attorney should bear on the preemption issue – and they should not – it raises the issue of counsel's ability to continue to represent the Town. *See* N.Y. Rules of Professional Conduct, Rule 3.7; *Murray v. Metro. Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009).

held that Congress, in enacting Section 30(a) of the Medicaid Act, intended to preclude private citizens from asserting Supremacy Clause claims – relied heavily on the Medicaid Act's complexity and the "judicially unadministrable" nature of Section 30(a)'s text. *Id.* As both the majority and dissent in *Armstrong* recognized, federal courts dating back to the beginning of the Republic have permitted plaintiffs to pursue preemption challenges through the Supremacy Clause *unless* Congress intended to preclude such review, which the majority found to be the case for Section 30(a) of the Medicaid Act. *Id.* at 1385-86 (majority opinion), 1390-91 (Sotomayor, J., dissenting).

Here, by contrast, there is no basis in the text or structure of ANCA to support a conclusion that Congress intended to preclude preemption challenges by private plaintiffs. Indeed, the sweeping purpose of ANCA compels the contrary conclusion. Moreover, unlike the statute at issue in *Armstrong*, ANCA is anything but incapable of judicial administration. Its notice and consent provisions are simple, straightforward, and abundantly clear.[9]

Finally, as the Town's own counsel has previously had occasion to observe, what airport proprietors were able to do prior to the enactment of ANCA is simply irrelevant to this post-ANCA world. Indeed, the best answer to the Town's emphasis on the historic powers of airport proprietors is provided by its counsel's own words in *Trump v. Palm Beach County*:

> Despite all of Plaintiffs' argument about the historic powers of airport proprietors, there is no dispute than an airport's power to adopt curfews and other flight restrictions was limited by [ANCA]… The County lacks any authority as a matter of law to unilaterally impose the restrictions on aircraft operations Plaintiffs seek. The cases cited by Plaintiffs . . . do not undermine this point, nor could they overrule the express Congressional language of ANCA.

*Trump*, 2011 WL 10068524, at 4 (emphasis added).

---

[9] The same holds true for the AAIA. Like ANCA, the AAIA is clearly written with plain directives, and there is no basis to suggest that Congress intended to preclude plaintiffs from pursuing preemption claims through the Supremacy Clause.

The cases the Town now cites as purported authority for why the Restrictions should be allowed to proceed are precisely the same cases that its counsel previously dismissed as irrelevant – and with good reason.

In *Trump,* Kaplan Kirsch correctly distinguished *Santa Monica Airport Association v. Santa Monica*, 481 F. Supp. 927 (C.D. Cal.), *aff'd* 659 F.2d 100 (9th Cir. 1979), because it was decided "many years before ANCA was enacted." 2011 WL 10068524, at 4.[10]

Similarly, as to *National Helicopter Corp. of Am. v. City of New York*, 137 F.3d 81 (2d Cir. 1998), upon which the Town relies heavily in its brief, Kaplan Kirsch previously and correctly dismissed its relevance by observing that *National Helicopter* "simply does not address ANCA and thus is not authority for how ANCA affected proprietary powers." *Id.*

*National Helicopter* is further distinguishable because it involved a local heliport that was not federally obligated or nationally important. East Hampton Airport, by contrast, is a general aviation airport that was built with federal money, remains federally obligated until September 2021, and has been designated by the FAA as important to the national system of air transportation.[11]

Another case on which the Town now relies – but that counsel previously argued to be non-applicable – is *SeaAir, NY v. City of New York*, 250 F.3d 183 (2d Cir. 2001). And, in fact,

---

[10] The same can be said of *Global Int'l Airways Corp. v. Port Auth.*, 727 F.2d 246 (2d Cir. 1984), *Arrow Air, Inc. v. Port. Auth.*, 602 F. Supp. 314 (S.D.N.Y. 1985), and *National Aviation v. City of Hayward*, 418 F. Supp. 417 (N.D. Cal. 1976), all of which the Town cites in its opposition papers. Similarly, even though the decisions in *Alaska Airlines, Inc. v. Long Beach*, 951 F.2d 977 (9th Cir. 1992) (Long Beach Airport) and *Clay Lacy Aviation v. Los Angeles*, 2001 WL 1941734 (C.D. Cal. July 27, 2001) (Van Nuys Airport), post-date ANCA's effective date, the limited restrictions at issue had been in place prior to ANCA's enactment in 1990, and thus appear to have been "grand-fathered" under ANCA. *See* 49 U.S.C. § 47524(d).

[11] The FAA has also distinguished *National Helicopter* in discussing ANCA's requirements. *See Burbank Decision* at 14. *See* Pls. Br. at 25 n.10 (providing details on *Burbank* Decision).

*SeaAir* did not address ANCA, but rather "turned on the court's conclusion that the local tourist flights were not interstate commerce and thus beyond the preemptive scope of federal law." *Trump*, 2011 WL 10068524, at 4; *SeaAir*, 250 F.3d at 186-87.

At bottom, no case remotely supports the Town's attempt to evade ANCA.

## C.  <u>The Restrictions are Preempted by the AAIA</u>

The Town likewise has failed to offer any meaningful response to Plaintiffs' showing that the Restrictions additionally violate the Supremacy Clause because they transgress the Town's statutorily mandated grant assurances under the AAIA, including: Grant Assurance 19.a (requiring the Airport to be maintained through an adequately funded and administered maintenance program); Grant Assurance 22.a (requiring the Airport to be accessible to all types of aircraft and aeronautical activities on reasonable terms, without unjust discrimination); and Grant Assurance 23 (prohibiting anti-competitive restrictions that grant exclusive rights to some aircraft operators at the expense of others). *See* Pls. Br. at 18-21. And violation by the Town of any of these assurances triggers preemption under the Supremacy clause. *Araphoe County Public Airport Authority v. FAA*, 242 F.3d 1213 (10th Cir. 2001).[12]

Of those three grant assurances, only Grant Assurance 22.a was at issue in the 2005 Settlement Agreement; there is no dispute that Grant Assurances 19.a and 23 remain in full force and effect. Yet, the Town neither denies nor responds to Plaintiff's showing that the Restrictions violate Grant Assurances 19.a and 23. *See* Compl. ¶¶ 85-86 Shaffer Dec. ¶ 29; Sabin Dec. ¶¶ 10-12; Ashton Dec. ¶¶26-27, 35; Brown Dec. ¶ 19. Nor is that silence surprising because the Town conceded only two weeks ago in a pending administrative proceeding before the FAA that it never prepared or implemented a formal pavement maintenance program after it received

---

[12] The Town (Opp. Br. 11) either overlooked or disregarded that *Araphoe* discussed preemption principles at length and held that the proprietor's ban on scheduled passenger service was "preempted by statute and the Supremacy Clause." 242 F.3d at 1224.

federal funding in 2001 for a pavement project.  *See FOEHA v. Town of East Hampton,* FAA Docket No. 16-15-02, Respondent's Motion to Dismiss (conceding that there are "legitimate questions" regarding the Town's compliance with certain grant assurances and offering to enter into Corrective Action Plan with FAA to address noncompliance).  That concession by the Town clearly demonstrates that the Town has not lived up to its maintenance obligations under the AAIA, and that the Restrictions violate Grant Assurance 19.a because they will further strip the Airport of revenue needed for maintenance.

The Town likewise offers no response or denial that the Restrictions violate Grant Assurance 23 by giving charter aircraft not on the "Noisy Aircraft" list exclusive right to use the airport for 13 hours each day and to make more than one trip per week from May to September.

As to Grant Assurance 22.a, the Town erroneously argues that, because the AAIA does not define the duration of the mandatory grant assurances, the FAA was free to enter the 2005 Settlement Agreement by releasing the Town from its predetermined 20-year obligation a full seven years early.[13]  Opp. Br. at 13.  As the Town elects to ignore, however, the FAA itself has rejected that argument in *Santa Monica* and *Platinum Aviation* – cases in which the FAA clearly and powerfully stated that, as a matter of law and in light of its mandatory enforcement responsibilities under the AAIA, the FAA *lacks authority* to settle litigation by waiving either a proprietor's grant assurances or the FAA's enforcement jurisdiction.  *See* Pls. Br. at 20-21.[14]

_____

[13] The FAA has consistently viewed Grant Assurance 22.a as being effective and mandatory for at least 20 years.  Thus, when the Town accepted federal funding in 2001, it did so subject to agreement to comply with Grant Assurance 22.a for 20 years, until September 2021.

[14] The FAA's statements in *Santa Monica* and *Platinum Aviation* (unlike the Bishop Sentence) are afforded deference because those were considered FAA opinions rendered in an adjudicative setting that thoroughly examined the language content and purpose of the AAIA.  *See* Pls. Br. 20; *Se. Queens Concerned Neighbors, Inc. v. F.A.A.*, 229 F.3d 387, 390 (2d Cir. 2000) (giving *Chevron* deference to FAA decisions in formal adjudications).

The Town's argument likewise disregards that the AAIA explicitly prohibits the FAA from even *modifying* a grant assurance requirement unless public notice and opportunity for comment have first been provided, *see* 49 U.S.C. § 47107(h), which was not done before the FAA entered the 2005 Settlement Agreement. Nor does the Town's argument address the FAA's comprehensive internal procedures (FAA Order 5190.6B, Chapter 22) providing that the FAA *cannot* release a proprietor from any grant assurance unless doing so: (i) is authorized by law (Order 5190.6B §§ 22.4, 22.28); (ii) is supported by the proprietor's written application documenting the proposed reasons for release (*id.* §§ 22.14, 22.22, 22.23); and (iii) will "*protect, advance, or benefit the public interest in civil aviation*" (*id.* § 22.4, emphasis added). None of those requirements was met before the FAA entered the 2005 Settlement Agreement. The Town never applied to the FAA for release from Grant Assurance 22.a, and the FAA's agreement in the settlement agreement to stop enforcing Grant Assurance 22.a after December 31, 2014 most definitely did not protect or advance the public interest in civil aviation.

### D. The Restrictions Are Unreasonable, Arbitrary, and Discriminatory

Finally, the Town does not – because it cannot – offer any supportable basis for rejecting Plaintiffs' contention that the Restrictions cannot survive the "rigorous" requirement that they be reasonable, non-arbitrary, and non-discriminatory. *See* Pls. Br. at 21-25.

The Town's argument that it was reasonable and permissible to rely on telephonic and web-based complaint data to justify the restrictions is wholly without support. The FAA has squarely rejected the notion that complaint data alone can justify airport access restrictions, and no court has sanctioned access restrictions based primarily on complaint. *See* Pls. Br. at 23.

*Helicopter Association International v. FAA*, 722 F.3d 430 (D.C. Cir. 2013) ("*HAI*"), and *Nat'l Bus. Aviation Association v. City of Naples Airport Authority*, 162 F. Supp. 2d 1343 (M.D.

Fla. 2001) ("*NBAA*"), do not support the Town's position.  At issue in *HAI* was the FAA's plenary power to regulate aircraft while in flight by promulgating a rule requiring helicopters flying to eastern Long Island to fly along a certain route one mile off the north shore of the island.  *HAI*, 722 F.3d at 431-32.  In promulgating the rule, the FAA relied on, among other things, "externally generated [noise] complaints from elected officials and commercial and private residents of Long Island."  *Id.* at 435-36.  In reviewing the rule, the court applied the highly deferential "substantial evidence" standard applicable to a court's review of a federal agency's rulemaking.  *Id.* at 435. Under that standard, the court held that, in fulfilling its statutory obligations as a rulemaking agency, the FAA was entitled to take noise complaints from members of the public into account in promulgating its rule.  *Id.* at 436.  *HAI* has nothing to do with a local proprietor's power to impose access restrictions on Stage 2, Stage 3, and Stage 4 aircraft, which is subject to the "rigorous" review applicable to airport proprietors, *see* Pls. Br. at 22, and *HAI* certainly does not stand for the proposition that the Town may restrict access to a public-use airport on the basis of residential complaint data alone.

 *NBAA* also is inapposite.  In that case, the Naples airport authority enacted a mandatory prohibition on Stage 2 aircraft *after complying with ANCA*.  *See NBAA*, 162 F. Supp. 2d at 1346. The court held that, unlike here, the defendant had complied with ANCA's notice-and-comment requirements for Stage 2 access restrictions, including by conducting a DNL-based noise study "in conformity with the procedural requirements of 49 U.S.C. § 47524(b), Part 150 and Part 161."  *Id.* at 1353.  In light of that, the court held, the airport proprietor was entitled to take residents' noise complaints into account in enacting its Stage 2 aircraft restriction.  *See id*.  *NBAA* does not support the proposition that noise complaints alone can justify an airport access restriction in the absence of an appropriate noise study.

The Town's contention that it "did not rely on complaint data alone," Opp. Br. at 18, because it "conducted several noise studies over the past decade," *id.*, is misleading. Examined closely, the Town's actions over the last decade confirm that, in enacting the Restrictions this year, it relied primarily on noise complaint data after numerous previous studies were found not to support legislative action because they showed residential areas surrounding the Airport to be well under the federally accepted noise exposure level of DNL 65. *See* Pls. Br. at 23; Harris Dec. ¶¶ 27-28.[15] Indeed, the Town's own "Staff Report" – proffered by Town Supervisor Larry Cantwell as an "accurate[] summar[y]" of "the information reviewed by the Town Board and relevant deliberations leading to the enactment of the Local Laws," Cantwell Dec. ¶ 14 – confirms that the Town's pre-2012 studies did not show a noise problem and that, in 2012, the Town therefore "adopted a Resolution to obtain better data to support meaningful noise control measures," Cantwell Dec., Ex. 1 at 4. The noise complaints are the allegedly "better data" referenced. It is on those complaints alone that the Town must rely to support the Restrictions because none of the Town's other, legitimate studies has demonstrated a noise problem.[16]

---

[15] The Town's argument that the 65 dB threshold stated in Part 150 is not "binding in all cases," Opp'n Mem. at 15-16, misses the point. There is no question that the FAA, in Part 150, has expressed a policy view that DNL levels below 65 dB are compatible with residential land use. That the FAA may approve certain actions taken by local authorities where DNL levels surrounding an airport are below 65 dB in particular circumstances is irrelevant here because the Town has never submitted its Restriction for FAA review and offers no reasoned basis that it should be exempted from the default presumption that a DNL level 65 is compatible with residential land use.

[16] The Town's statement in its brief that "many thousands of East End residents made complaints," Opp. Br. at 18, is also incorrect. All of the 23,954 hotline complaints relied upon by the Town came from 633 households – a tiny fraction of the total households in the relevant geographic area. *See* Pls. Br. at 22; Harris Dec. ¶¶ 35-38. The Town also does not dispute that the majority of the complaints were generated by a handful of households in the area. *See id.* The Town released a redacted version of the complaint database days before voting on the Restrictions. *See* http://www.htoplanning.com (Excel spreadsheet dated April 10, 2015 titled "PLANE NOISE COMPLAINTS DATA names and addresses redacted"). Plaintiffs have not have a chance to analyze the data in great detail. However, even a cursory review of the spreadsheet reveals a number of abnormalities, including multiple entries in which the content of a complainant's description of the noise event is identical to another entry and many instances in which complaints were made at the exact same second.

The Town's further contention that it "did not 'solicit' complaints," Opp. Br. at 17, is coy at best since it cannot seriously be disputed that complaints were in fact actively solicited – even if not directly by the Town. Throughout the year leading up to the Town's enactment of the Restrictions, advertisements appeared in local newspapers urging residents to "LOG YOUR COMPLAINTS!" (Norbeck Dec., Exs. A-D.) The advertisements referenced the impending restrictions as a foregone conclusion that needed to be supported by complaint data:

> The Town Board plans to reduce noise by imposing meaningful curfews, limiting hours and banning the noisiest aircraft. These plans must be supported by noise complaint data . . . . [P]ledge to call the hotline, even if only once a day. To end the noise we need to *make* some noise!

(Norbeck Dec., Ex. A-D (emphasis in original).) Those advertisements plainly show that noise complaints were solicited. Whether the Town itself paid for them is irrelevant. As explained in Plaintiffs' Opening Memorandum, the distribution of the complaints shows that the majority of them were made by a handful of highly vocal residents. *See* Pls. Br. at 22-23.

The Town's effort to justify its use of EPNdB as a basis on which to designate certain aircraft as "Noisy," *see* Opp. Br. at 18-20, is likewise unsupported. EPNdB levels are not published for all aircraft. Contrary to the Town's statement that EPNdB levels are published for "all aircraft types" except those "which the FAA does not rate because they are considered too quiet to regulate for noise purposes," Opp. Br. at 19, some aircraft are not EPNdB-rated because the FAA rates them under an alternative metric called SEL (Sound Exposure Level). *See* 14 C.F.R. § J36.101(d). These aircraft are not necessarily quieter than EPNdB-rated aircraft, and in some cases are far louder. Ashton Supp. Dec. ¶¶ 2-7.[17] Those aircraft are not EPNdB-rated or SEL-rated at all. Under the Restrictions' definition of "Noisy Aircraft," any aircraft that is not

---

[17] *Compare* 14 C.F.R. § J36.1 (providing "alternative noise certification requirements . . . for helicopters . . . having maximum certificated takeoff weight of not more than 7,000 pounds) *with* Pt. 36, App. H (providing certification requirements for helicopters).

rated – no matter how noisy – may continue to use the Airport while Plaintiffs' EPNdB-certified aircraft may not. Under the relevant case law, such "unreasoned discrimination" is not permitted. *See National Helicopter*, 137 F.3d at 91; *see also San Francisco v. FAA*, 942 F.2d 1391, 1398 (9th Cir. 1991). We are aware of no comparable access restrictions that use EPNdB as a basis for discriminating between aircraft, and the Town has identified none.[18]

Finally, the Town asserts that no "substantial" safety issues exist because the concerns raised by the FAA in response to similar proposed mandatory restrictions are "speculative fears about possible responses to the Local Laws by future pilots." Opp. Br. at 21. The Town's position is untenable. First, the fact that the Town needed to qualify its argument by saying no "substantial" safety issues are raised speaks volumes. Even the Town is unwilling to say, without qualification, that the mandatory curfews are safe. Moreover, because the Town has not conducted the robust study of the Restrictions that is required of it, and because the FAA experts have not yet had the opportunity to examine the Restrictions, there is no basis to conclude that the Restrictions are safe. In examining other airports' proposed mandatory curfews, the FAA has detailed serious safety concerns and approved such curfews only in rare circumstances following extensive safety analyses. *See* Pls. Br. at 24-25. Here, no such analysis has been done.[19]

---

[18] As noted in the Harris Declaration, the Town's "Staff Report" references two restrictions at San Jose International Airport ("SJC") and Sacramento Executive Airport ("SAC") that use EPNdB as a basis. Those restrictions do not support the Town's position here because they were grandfathered under ANCA (among other reasons). In its opposition, unlike in the "Staff Report," the Town does not point to either restriction in support of its own.

[19] The cases cited by the Town on this point are inapposite. *Alaska Airlines* involved a claim about disproportionate fines and raised no safety issues. *See* 951 F.2d at 985. *Santa Monica Airport Association v. Santa Monica*, 481 F. Supp. 927, 941(C.D. Cal. 1979), *aff'd*, 659 F.2d 100 (9th Cir. 1981), involved claims about pilots taking actions that are solely within their control to avoid a regulation. By contrast, the Restrictions (like those at issue in the *LAX* Decision) raise safety issues caused by factors outside aircraft operators' control. *See* Pls. Br. at 25 n.10 (providing details on LAX Decision).

## **CONCLUSION**

The Court should enjoin the restrictions until it adjudicates the merits of Plaintiffs' action and the FAA Action.

Dated:  New York, New York
        May 12, 2015

LANKLER SIFFERT & WOHL LLP

By: _Lisa Zornberg_____
    Lisa Zornberg (lzornberg@lswlaw.com)
    Matthew Coogan (mcoogan@lswlaw.com)
    Jonathan Lamberti (jlamberti@lswlaw.com)
    *Attorneys for Plaintiffs*