UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
FRIENDS OF THE EAST HAMPTON
AIRPORT, INC.; ANALAR CORPORATION;
ASSOCIATED AIRCRAFT GROUP, INC.;
ELEVENTH STREET AVIATION, LLC;
HELICOPTER ASSOCIATION
INTERNATIONAL, INC.; HELIFLITE
SHARES, LLC; LIBERTY HELICOPTERS,
INC.; SOUND AIRCRAFT SERVICES,
INC.; and NATIONAL BUSINESS                    MEMORANDUM & ORDER
AVIATION ASSOCIATION, INC.,                    15-CV-2246(JS)(ARL)

                    Plaintiffs,

          -against-

THE TOWN OF EAST HAMPTON,

                    Defendant.
----------------------------------X
APPEARANCES
For Plaintiffs:     Matthew Gage Coogan, Esq.
                    Jonathan Daniel Lamberti, Esq.
                    Michael Dayton Longyear, Esq.
                    Lisa R. Zornberg, Esq.
                    Lankler Siffert & Wohl LLP
                    500 Fifth Avenue, 34th Floor
                    New York, NY 10110

For Defendant:      Peter Kirsch, Esq.
                    William E. Pilsk, Esq.
                    Kaplan Kirsch & Rockwell
                    1675 Broadway, Suite 2300
                    Denver, CO 80202

                    Eric Bregman, Esq.
                    Farrell Fritz PC
                    50 Station Road
                    Water Mill, NY 11976

SEYBERT, District Judge:

          Plaintiffs, a group of airport users and aviation

companies that frequently use the East Hampton Airport, bring this

action against the Town of East Hampton, seeking declaratory and injunctive relief enjoining enforcement of Sections 75-38 and 75-39 of the Town of East Hampton Code, recently adopted town laws that impose access restrictions to the East Hampton Airport (the "Town Laws"). Plaintiffs argue that the Town Laws are invalid because: (1) they are preempted by federal statutes governing aviation and therefore violate the Supremacy Clause of the United States Constitution, U.S. CONST. art. VI, cl. 2; and (2) they constitute an unlawful restraint on interstate commerce in violation of the Commerce Clause of the United States Constitution, U.S. CONST. art. I, § 8, cl. 3.

Presently before the Court are: (1) Plaintiffs' motion for a preliminary injunction enjoining enforcement of the Town Laws pending resolution of this action and a related action against the Federal Aviation Administration ("FAA"), <u>Friends of the East Hampton Airport, Inc., et al. v. F.A.A., et al.</u>, No. 15-CV-0441 (E.D.N.Y.) (the "FAA Action"), (Docket Entry 19); and (2) Plaintiffs' letter motion to consolidate this action and the FAA Action for all purposes pursuant to Federal Rule of Civil Procedure 42, (Docket Entry 14). For the following reasons, Plaintiffs' motion for a preliminary injunction is GRANTED IN PART and DENIED IN PART, and the Court RESERVES JUDGMENT on Plaintiffs' motion to consolidate pending the filing of the FAA's response to the Complaint in the FAA Action.

I.   <u>The Parties</u>

Plaintiffs represent a wide spectrum of airport users and aviation companies that frequently use the East Hampton Airport (the "Airport").  Plaintiff Friends of the East Hampton Airport, Inc. ("FOEHA") is a nonprofit corporation that "represents the interests of those who seek to keep the Airport open to all types, kinds, and classes of aircraft activities and flying services." (Compl. ¶ 12.)   Plaintiffs Analar Corporation ("Analar"), Associated Aircraft Group, Inc. ("AAG"), HeliFlite Shares LLC ("HeliFlite"), and Liberty Helicopters, Inc. ("Liberty") are air carriers that are federally authorized to provide helicopter charter services to clients throughout the East Coast.  (Compl. ¶¶ 13-14, 17-18.)  In addition to providing charter services, AAG and HeliFlite manage "fractional aircraft ownership program[s]," which involve selling partial ownership or leasehold interests of a helicopter to private individuals who wish to operate their own helicopter using AAG and HeliFlite as managers.  (Compl. ¶¶ 14, 17.)  Plaintiff Eleventh Street Aviation LLC ("Eleventh Street") is an air carrier that is federally authorized to operate aircraft

_____

[1] The following facts are drawn from the Complaint in this action and the parties' affidavits and evidence submitted in connection with Plaintiffs' motion for a preliminary injunction.  Any factual disputes will be noted.

for private use. (Compl. ¶ 15.) Plaintiff Helicopter Association International, Inc. ("HAI") is a Delaware "trade association that represents and serves the interests of helicopter operators around the world." (Compl. ¶ 16.) According to the Complaint, HAI's "members include one or more providers of helicopter services" at the Airport. (Compl. ¶ 16.) Plaintiff Sound Aircraft Services, Inc. ("Sound") is a fixed-base operator at the Airport. (Compl. ¶ 19.) Sound leases property at the Airport from the Town of East Hampton and provides fuel and other on-site services to aircraft and passengers that use the Airport. (Compl. ¶ 19.)

Defendant the Town of East Hampton (the "Town") is the easternmost town on Long Island, New York, situated approximately 100 miles east of New York City. It is a popular seaside resort community during the summer. The Town owns and operates the Airport, a public-use airport located in the Town.

## II. The Town Laws

For years, Town residents have opposed development of the Airport and have complained about aircraft noise. (See Cantwell Decl., Docket Entry 38-1, ¶¶ 8-10.) In recent years, the complaints have escalated due to a marked increase in helicopter operations at the Airport, many of which are private charter flights taken by individuals traveling from New York City to the

East End of Long Island.[2]  (See Cantwell Decl. ¶ 11; MacNiven Decl., Docket Entry 38-4; Saltoun Decl., Docket Entry 38-5.)  To alleviate this perceived noise problem, on April 16, 2015, the Town adopted Sections 75-38 and 75-39 of the Town of East Hampton Code, local laws imposing three access restrictions to the Airport. See Town of E. Hampton Res. 2015-411, 2015-412, 2015-413, to be codified at TOWN OF E. HAMPTON CODE §§ 75-38, 75-39.[3]  The access restrictions are as follows: (1) a mandatory curfew prohibiting all aircraft from using the Airport between 11:00 p.m. and 7:00 a.m. (the "Mandatory Curfew"); (2) an extended curfew prohibiting "Noisy Aircraft" from using the Airport from 8:00 p.m. to 9:00 a.m. (the "Extended Curfew"); and (3) a weekly limit prohibiting "Noisy Aircraft" from using the Airport[4] more than two times per week during the "Season"--i.e., the months of May, June, July,

_____

[2] According to the Town, helicopter traffic increased by fifty percent last year.  (See Cantwell Decl. ¶ 11.)  On the busiest day last year, July 25, 2014, there were 353 operations at the Airport.  (See Cantwell Decl. ¶ 11.)  Forty-four operations occurred between 2:00 p.m. and 3:00 p.m. that day.  (See Cantwell Decl. ¶ 11.)  The first operation occurred at 3:04 a.m.; the last operation occurred at 11:08 p.m.  (See Cantwell Decl. ¶ 11.)

[3] The full text of the Resolutions adopting the Town Laws may be found at http://easthamptontown.iqm2.com/citizens/Default.aspx.

[4] The Town Laws define "Use of the Airport" in relevant part as "either one arrival (landing) at, or one departure (takeoff) from, the Airport."  TOWN OF E. HAMPTON CODE § 75-38(A)(6).

August, and September[5] (the "One-Trip Limit").  See Town of E. Hampton Code § 75-38(B)-(C).  "Noisy Aircraft" is defined as "any airplane or rotorcraft for which there is a published Effective Perceived Noise in Decibels (EPNdb) approach (AP) level of 91.0 or greater." Town of E. Hampton Code § 75-38(A)(4)(a).

Violations of the Town Laws are deemed criminal offenses punishable by a sliding scale of monetary fines for the first three violations--$1,000;  $4,000;  and  $10,000,  respectively--and prohibition from the Airport for a period of up to two years for a fourth violation.  See Town of E. Hampton Code § 75-39(B).  Under the  Town  Laws,  the  Town  may  also  seek  court  injunctions, restraining orders, and monetary fines against any person or entity with an ownership interest in a violating aircraft.  See Town of E. Hampton Code § 75-39(E).

Plaintiffs  seek  a  preliminary  injunction  enjoining enforcement of the Town Laws on the ground that they violate, and are therefore preempted by: (1) the Airport and Airway Improvement Act of 1982 ("AAIA"), 49 U.S.C. § 47101, et seq., which governs the process through which airport proprietors can obtain federal funding for the planning and development of public-use airports;

---

[5] The original version of the Town Laws did not include a definition for the term "Season."  However, the Town Board later adopted a definition at a Town Board meeting on May 7, 2015. See Town of E. Hampton Res. 2015-569.

and (2) the Airport Noise and Capacity Act of 1990 ("ANCA"), 49 U.S.C. § 47521, et seq., which governs the manner in which individual airports may adopt noise and access restrictions on certain types of aircraft. Some of the Plaintiffs claim that they will be irreparably harmed by the Town Laws because compliance will cause incalculable damages and severe economic losses that "threaten[s] [their] continued existence." (Pls.' Br., Docket Entry 32, at 8.) The Town responds, inter alia, that neither federal statute preempts the Town Laws and that the adoption and enforcement of the Town Laws constitutes a valid exercise of its proprietary rights in the Airport.

III. Relevant Airport History

The last twenty-four years of the Airport's history are marked by several key events, disputes, and agreements. From 1983 to 2001, the Town received several federal grants for airport development under the Airport Improvement Program ("AIP"). (Compl. ¶ 60.) The AIP, which was authorized by Congress when it enacted the AAIA, is the nation's current federal grant program for airport development. Under the AIP, the Secretary of Transportation, through the Federal Aviation Administration ("FAA"), provides monetary grants to public agencies and airport proprietors for the planning and development of public-use airports.

Under the AAIA, the Secretary may approve a grant application only if the airport proprietor agrees to certain written assurances regarding airport operations, which are set forth in Section 47107(a) of the AAIA. <u>See</u> 49 U.S.C. § 47107(a). The Secretary is responsible for ensuring compliance with these assurances, <u>see</u> 49 U.S.C. § 47107(g), and is authorized to approve grant applications only if the airport proprietor's assurances are "satisfactory to the Secretary," 49 U.S.C. § 47107(a). Accordingly, the Secretary, through the FAA, has promulgated a more thorough set of standardized grant assurances with which a recipient of AIP funding must comply (the "Grant Assurances"). (<u>See</u> Compl. Ex. A.)

"Upon acceptance of an AIP grant, the grant assurances become a binding contractual obligation between the airport sponsor and the Federal government." <u>Pac. Coast Flyers, Inc. v. Cnty. of San Diego</u>, FAA Docket No. 16-04-08, 2005 WL 1900515, at *11 (July 25, 2005). Under the terms of the Grant Assurances, each Grant Assurance remains in full effect for twenty years from the date the airport proprietor accepts federal funds, with the exception of Grant Assurances 23 and 25, which remain in effect as long as the airport operates as an airport. (Compl. Ex. A at 36[6].)

---

[6] Page numbers of the exhibits to the Complaint in this action referenced herein refer to the page numbers generated by the Electronic Case Filing system.

The Town last accepted an AIP grant in 2001 in the amount of $1,410,000 for rehabilitation of the Airport's terminal apron. (Compl. ¶ 61.) Shortly thereafter, the Committee to Stop Airport Expansion (the "Committee"), an unincorporated association of residents living near the Airport, commenced several legal proceedings in an attempt to halt development of the Airport. In 2003, the Committee sued the FAA and the Department of Transportation in this District, challenging the legality of AIP grants to the Town dating back to 1994 (the "Committee Action"). See Comm. to Stop Airport Expansion, et al. v. Dep't of Transp., et al., No. 03-CV-2634. In short, the Committee alleged that the Airport's prior AIP grants were improper because the FAA approved them in the absence of a current airport layout plan, which the AAIA requires before the FAA may award an AIP grant. (See Comm. Action Compl. ¶¶ 89-96 (citing 49 U.S.C. § 47107(a)(16) ("The Secretary of Transportation may approve a project grant application under [the AAIA] only if the Secretary receives written assurances, satisfactory to the Secretary, that . . . the airport owner or operator will maintain a current layout plan of the airport . . . .").) According to the Committee, the Airport's 2001 layout plan, which the FAA approved, was not current because several projects undertaken at the Airport since 1989 were not reflected in the 2001 layout plan. (See Comm. Action Compl. ¶¶ 93-94.) The Committee Action sought to vacate the 2001 layout plan

and to enjoin the award of any additional AIP grants so long as the Town lacked a current and valid airport layout plan. (See Comm. Action Compl. ¶¶ 52, 57-88.)

In 2005, the Committee and the United States Government executed a settlement agreement resolving the Committee Action, as well as other actions the Committee commenced in other forums (the "2005 Settlement Agreement"). (Pilsk Decl., Docket Entry 38-6, Ex. 3.) Under Paragraph 7 of the 2005 Settlement Agreement, the FAA agreed that, with respect to the Airport, Grant Assurance 22(a) (and three other grant assurances not relevant to this case) "[would] not be enforced [by the FAA] beyond December 31, 2014." (Pilsk Decl. Ex. 3 ¶ 7.) Grant Assurance 22(a), entitled "Economic Nondiscrimination," states: "[The airport sponsor] will make the airport available as an airport for public use on reasonable terms and without unjust discrimination to all types, kinds and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport." (Compl. Ex. A at 45.)

The 2005 Settlement Agreement further provided that, aside from the four referenced Grant Assurances, "[a]ll other grant assurances with respect to any grant awarded to East Hampton Airport . . . shall be enforced in full." (Pilsk Decl. Ex. 3 ¶ 7.) Finally, the 2005 Settlement Agreement provided that if the Town was awarded any additional AIP grants after the effective date of

the 2005 Settlement Agreement (April 29, 2005), then all Grant Assurances "shall be enforced in full" in connection with that new funding. (Pilsk Decl. Ex. 3 ¶ 7.)

The Town was not a party to the 2005 Settlement Agreement. Additionally, although this Court so-ordered the parties' stipulation dismissing the Committee Action, the Court did not so-order the 2005 Settlement Agreement, nor did the stipulation of dismissal incorporate by reference the terms of the 2005 Settlement Agreement. (See Comm. Action, Docket Entry 38.)

In December 2011, then-U.S. Representative Timothy Bishop ("Bishop") submitted a list of questions to the FAA probing the legal effect of the Town's Grant Assurances on its ability to enact noise and access regulations at the Airport. (Pilsk Decl. Ex. 2.) The FAA responded in an unsigned writing in 2012 (the "Bishop Responses"). (Pilsk Decl. Ex. 1.) The Bishop Responses stated that due to the 2005 Settlement Agreement, the FAA would not, as of December 31, 2014, "initiate or commence an administrative grant enforcement proceeding in response to a complaint from aircraft operators . . . or seek specific performance of Grant Assurances 22a, 22h, and 29," unless and until the FAA awarded a new AIP grant to the Town. (Pilsk Decl. Ex. 1 at 1.)

In addition, although the 2005 Settlement Agreement made no mention of ANCA, the Bishop Responses stated that "[t]he FAA's

agreement not to enforce also mean[t] that unless the town wishe[d] to remain eligible to receive future grants of Federal funding, it [was] not required to comply with [ANCA] . . . in proposing new airport noise and access restrictions." (Pilsk Decl. Ex. 1 at 1.)

Congress passed ANCA in 1990, directing the Secretary to "establish[ ] by regulation a national aviation noise policy" that (1) "considers . . . the phaseout and nonaddition of stage 2 aircraft," 49 U.S.C. § 47523(a), and (2) "establish[es] by regulation a national program for reviewing airport noise and access restrictions on the operation of stage 2 and stage 3 aircraft," 49 U.S.C. § 47524(a).[7] Under Section 47524(b) of ANCA, an "airport noise or access restriction" may not "include restriction on the operation of stage 2 aircraft" unless and until the airport operator publishes the proposed restriction and other information for public comment at least 180 days before the effective date of the proposed restriction. 49 U.S.C. § 47524(b). Under Section 47524(c), a restriction affecting a Stage 3 aircraft is effective only if it "has been agreed to by the airport proprietor and all aircraft operators" or has been "approved by the Secretary." 49 U.S.C. § 47524(c). Under ANCA, the only consequences for failing to comply with Section 47524 are that the

---

[7] The FAA has classified aircraft into "Stages," according to how much noise they produce, from "Stage 1" being the noisiest to "Stage 4" being the quietest. See 14 C.F.R. § 36.1(f).

airport "may not (1) receive money [under the AAIA]; or (2) impose a passenger facility charge under [49 U.S.C. § 40117]." 49 U.S.C. § 47526.

On January 29, 2015, Plaintiffs FOEHA, Analar, HAI, HeliFlite, and Liberty filed the FAA Action, principally alleging that the FAA exceeded its statutory authority and violated its statutory obligations when it agreed in the 2005 Settlement Agreement not to enforce Grant Assurance 22(a). See Friends of the E. Hampton Airport, Inc., et al. v. F.A.A., et al., No. 15-CV-0441 (E.D.N.Y.). The FAA Action seeks declaratory and injunctive relief that: (1) the FAA is statutorily obligated to ensure that the Town complies with Grant Assurance 22(a) until September 2021, i.e., twenty years from the date the Town last accepted an AIP grant; (2) neither the 2005 Settlement Agreement nor the FAA's interpretation of the 2005 Settlement Agreement in the Bishop Responses can restrain the FAA from carrying out its statutorily imposed duties under the AAIA to enforce the Grant Assurances; and (3) the Bishop Responses' one-sentence statement about ANCA, i.e., that the Town purportedly need not comply with ANCA, is contrary to law. (FAA Action Compl. ¶¶ 82-114, Prayer for Relief.)[8]

_____

[8] The Committee has filed a motion to intervene in the FAA Action, which was fully briefed on June 12, 2015. This motion will be the subject of a future, separate order.

By the time the FAA Action was filed, the Town already began its efforts to enact noise regulations at the Airport. According to the Town, prior to receiving the Bishop Responses, it felt constrained by its understanding that Grant Assurance 22(a) limited its ability to enact noise and access restrictions until 2021. (See Def.'s Opp. Br., Docket Entry 38, at 4; Zornberg Decl., Docket Entry 36, Ex. A.)  However, after receiving the FAA's statement in the Bishop Responses that it would not enforce Grant Assurance 22(a) beyond 2014, the Town began exploring ways to alleviate the perceived noise problem at the Airport.  Over the course of 2014 and early 2015, the Town reviewed old flight data, collected new data, commissioned new noise studies, and hired consultants to assist the Town.  (See Cantwell Decl., Ex. 1.)

On February 27, 2015, Town representatives met with senior FAA officials to discuss proposed access restrictions. (Cantwell Decl. ¶ 21.)  They briefed the FAA on the range of noise controls the Town was considering and expressed that the Town was relying on the statements in the Bishop Responses that the FAA would not enforce Grant Assurance 22(a) beyond 2014 and that the Town need not comply with ANCA.  (Cantwell Decl. ¶ 22.)  On April 16, 2015, following a public hearing, but apparently without the approval of the FAA, the Town adopted the Town Laws.

IV.  <u>Plaintiffs' Claims and Procedural History</u>

Plaintiffs then commenced this action on April 21, 2015. As noted, Plaintiffs claim that the Town Laws are preempted by ANCA and the AAIA and constitute an unlawful restraint on interstate commerce in violation of the Commerce Clause.  On April 27, 2015, Plaintiffs filed a letter motion to consolidate this action with the FAA Action for all purposes pursuant to Federal Rule of Civil Procedure 42.  (Docket Entry 14.)

On April 29, 2015, Plaintiffs filed a motion for a temporary restraining order enjoining enforcement of the Town Laws pending resolution of this action and the FAA Action.  (Docket Entry 19.)  On May 18, 2015, the Court held a hearing on Plaintiffs' motion for a temporary restraining order, during which the Court and the parties agreed that the Court should construe Plaintiffs' motion as one for a preliminary injunction.  (<u>See</u> Docket Entry 51.)  The Town agreed to delay enforcement of the Town Laws until today, June 26, 2015, so that the Court would have sufficient time to consider the matter.

Plaintiffs' motion for a preliminary injunction relies solely on their preemption claims.  They specifically contend that the Town Laws are preempted by ANCA because the Town did not comply with ANCA's procedural requirements for adopting noise and access restrictions affecting Stage 2 and Stage 3 aircrafts.  (<u>See</u> Compl. ¶¶ 72-74.)  With respect to the AAIA, Plaintiffs contend that the

Town Laws are preempted by Section 47107 of the AAIA because the laws violate three of the Town's Grant Assurances: (1) Grant Assurances 19(a), entitled "Operation and Maintenance," which states that the airport "shall be operated at all times in a safe and serviceable condition and in accordance with the minimum standards as may be required or prescribed by applicable Federal, state and local agencies for maintenance and operation," (Compl. Ex. A. at 44-45); (2) Grant Assurance 22(a), which, as noted above, requires the airport sponsor to "make the airport available as an airport for public use on reasonable terms," (Compl. Ex. A. at 45); and (3) Grant Assurance 23, entitled "Exclusive Rights," which prohibits the airport sponsor from permitting any "exclusive right for the use of the airport by any person," (Compl. Ex. A at 47.)

<u>DISCUSSION</u>

The Court will first address Plaintiffs' motion for a preliminary injunction before turning to their motion to consolidate.

I.  <u>Plaintiffs' Motion for a Preliminary Injunction</u>

A.  <u>Legal Standard</u>

Generally, "[t]o obtain a preliminary injunction, the moving party must demonstrate '(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping

decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction." Red Earth LLC v. United States, 657 F.3d 138, 143 (2d Cir. 2011) (quoting Metro. Taxicab Bd. of Trade v. City of N.Y., 615 F.3d 152, 156 (2d Cir. 2010)). However, where, as in this case, "'the moving party seeks a preliminary injunction that will affect government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard.'" Metro. Taxicab Bd., 615 F.3d at 156 (quoting Cnty. of Nassau v. Leavitt, 524 F.3d 408, 414 (2d Cir. 2008)).

Additionally, in this Circuit, a more exacting standard-one which requires the movant to demonstrate a "clear" or "substantial" likelihood of success on the merits--applies in two situations. See Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 n.4 (2d Cir. 2010) (collecting cases). First, "[a] heightened 'substantial likelihood' standard" applies where the requested injunction: "(1) would provide the plaintiff with 'all the relief that is sought' and (2) could not be undone by a judgment favorable to defendants on the merits at trial." Mastrovincenzo v. City of N.Y., 435 F.3d 78, 90 (2d Cir. 2006) (quoting Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34-35 (2d Cir. 1995)). Second, a "mandatory" injunction, that is, one that "alter[s] the

status quo by commanding some positive act," as opposed to a "prohibitory" injunction, which "seeks only to maintain the status quo pending a trial on the merits," "should issue 'only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" Tom Doherty Assocs., 435 F.3d at 34 (quoting Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985)).

Citing Sussman v. Crawford, 488 F.3d 136 (2d Cir. 2007), the Town urges the Court to apply the heightened likelihood of success standard here. (Def.'s Opp. Br. at 6.) In Sussman, the plaintiffs sought to compel the United States Military Academy at West Point to allow a demonstration during a graduation ceremony. 488 F.3d at 137. In this case, however, the requested injunction would prohibit, rather than compel government action, because the injunction would only enjoin enforcement of the Town Laws. See Mastrovincenzo, 435 F.3d at 90 ("On its face, the injunction clearly prohibits, rather than compels, government action by enjoining the future enforcement of § 20-453 against plaintiffs."); Davis v. Shah, No. 12-CV-6134, 2012 WL 1574944, at *5 (W.D.N.Y. May 3, 2012) ("[T]he Court views the injunction being sought as prohibitory, rather than mandatory, since it merely seeks to restore and maintain the relationship that existed between the parties prior to the enactment of the challenged statute.").

Additionally, in contrast to Sussman, where an injunction would have permitted the plaintiffs to hold a large protest, thus rendering the dispute moot after entry of an injunction, the requested injunction here would not create a "particularly drastic or irreversible change in the status quo." Mastrovincenzo, 435 F.3d at 90. Instead, an injunction would simply restore and maintain the situation that existed prior to adoption of the Town Laws. The ultimate question of whether the Town may impose access restrictions to the Airport could still be resolved on the merits in the Town's favor. See id. (holding that an injunction did not "effect[ ] a particularly drastic or irreversible change in the status quo" because "the ultimate question of whether New York City [could] impose . . . licensing requirements on vendors of clothing painted with graffiti remain[ed] ripe for resolution on the merits, and the injunction did not irreversibly affect the rights of the parties"). Accordingly, since the requested injunction is prohibitory and would merely preserve the status quo, Plaintiffs are not required to meet the more exacting likelihood of success standard.

B.    Private Enforcement of the AAIA and ANCA

Before addressing the requirements for a preliminary injunction, the Court first considers whether Plaintiffs may proceed against the Town based on the Town's alleged violations of ANCA and the AAIA. As noted, Section 47524 of ANCA imposes certain

procedural requirements before an airport proprietor can adopt an "airport noise or access restriction" affecting Stage 2 and Stage 3 aircrafts. 49 U.S.C. § 47524(b), (c). Under Section 47107(a) of the AAIA, the Secretary of Transportation, through the FAA, is authorized to award airport improvement grants, but only if the airport proprietor provides the Secretary with Grant Assurances regarding airport operations. 49 U.S.C. § 47107(a). There is no dispute that the Town did not comply with ANCA's procedural requirements before adopting the Town Laws even though they affect operations of Stage 2 and Stage 3 aircrafts, and Plaintiffs argue that the Town Laws violate Grant Assurances 19(a), 22(a), and 23. The Supremacy Clause of the United States Constitution provides that federal statutes preempt contrary state and local laws. See Nat'l Helicopter Corp. of Am. v. City of N.Y., 137 F.3d 81, 88 (2d Cir. 1998) ("National Helicopter II") ("The Supremacy Clause of the United States Constitution invalidates state and local laws that 'interfere with or are contrary to, the laws of congress.'" (quoting Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 317, 101 S. Ct. 1124, 1130, 67 L. Ed. 2d 258 (1981)). Accordingly, Plaintiffs seek to enforce the Supremacy Clause by striking down the Town Laws and giving effect to ANCA's procedural requirements and the Town's Grant Assurances under the AAIA.

The Town urges the Court to deny Plaintiffs' request for an injunction on the ground that neither ANCA nor the AAIA creates

a private right of action. (Def.'s Br., Docket Entry 38 at 11-12.) That ANCA and the AAIA do not create private rights of action is beyond dispute. Courts have uniformly held that private parties have no right to sue in federal court to enforce the provisions of ANCA or the AAIA. See, e.g., McCasland v. City of Castroville, 514 F. App'x 446, 448 (5th Cir. 2013) ("As several circuit courts have held, and as Plaintiffs appear to concede, 49 U.S.C. § 47107 and its predecessor statute do not create a private right of action for parties aggrieved by alleged discrimination."); W. Air Lines, Inc. v. Port Auth. of N.Y. & N.J., 817 F.2d 222, 225 & n.4 (2d Cir. 1987) (holding that 49 U.S.C. § 2210(a), the previous codification of Section 47107(a), did not create an private right of action); Northwest Airlines, Inc. v. Kent, Mich., 955 F.2d 1054, 1058-59 (6th Cir. 1992) (same); L-3 Commc'ns Integrated Sys., L.P. v. City of Greenville, No. 11-CV-2294, 2012 WL 3941766, at *2 (N.D. Tex. Sept. 5, 2012) ("The AAIA regulations do not provide for a private right of action and therefore cannot serve as an independent basis for jurisdiction."); Horta, LLC v. City of San Jose, No. 02-CV-4086, 2008 WL 4067441, at *4 (N.D. Cal. Aug. 28, 2008) (suggesting that "Congress did not intend to create a private right of action for ANCA violations" because "ANCA contains its own enforcement mechanism, to be administered by the Secretary of Transportation"); Airborne Tactical Advantage Co., LLC v. Peninsula Airport Comm'n, No. 05-CV-0166, 2006 WL 753016, at *1

(E.D. Va. Mar. 21, 2006) ("Courts interpreting § 47107 have uniformly held that airport users have no right to bring an action in federal court claiming a recipient airport's violation of the § 47107 grant assurances . . . ."); Tutor v. City of Hailey, No. 02-CV-0475, 2004 WL 344437, at *8 (D. Idaho Jan. 20, 2004) ("[N]o implied private right of action exists under ANCA."); E. Hampton Airport Prop. Owners Ass'n, Inc. v. Town Bd. of Town of E. Hampton, 72 F. Supp. 2d 139, 147 (E.D.N.Y. 1999) ("Section 47107 [of the AAIA] does not give rise to a private right of action."). Plaintiffs do not dispute this long line of precedent. Thus, ANCA requires certain procedural hurdles prior to the enactment of noise and access restrictions on Stage 2 and Stage 3 aircrafts, and the AAIA requires the recipient of airport improvement funds to comply with the AAIA's Grant Assurances, but neither statute permits Plaintiffs to sue to enforce compliance in federal court.

Plaintiffs therefore seek to sue directly under the Supremacy Clause. However, the Supremacy Clause also does not supply a private right of action. As the Supreme Court recently clarified in Armstrong v. Exceptional Child Center, Inc., 135 S. Ct. 1378, 1383, 191 L. Ed. 2d 471 (2015), the Supremacy Clause merely "creates a rule of decision . . . . It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." Thus, the Supremacy Clause "is not

the 'source of any federal rights,' and certainly does not create a cause of action." Id. (quoting Golden State Transit Corp. v. Los Angeles, 493 U.S. 103, 107, 110 S. Ct. 444, 449, 107 L. Ed. 2d 420 (1989)).

Nevertheless, this is not to say that federal courts lack equitable jurisdiction to enjoin the implementation of preempted state legislation: "[F]ederal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law." Id. at 1384; see also id. ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity . . . ."); Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96 n.14, 103 S. Ct. 2890, 2899 n.14, 77 L. Ed. 2d 490 (1983) ("A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve."). Accordingly, Plaintiffs may be able to invoke this Court's equity jurisdiction to enjoin the allegedly preempted Town Laws regardless of whether ANCA, the AAIA, or the Supremacy Clause creates a private right of action. See Armstrong, 135 S. Ct. at 1391 (Sotomayor, J., dissenting) ("[The Court has] thus long entertained suits in which a party seeks prospective equitable

protection from an injurious and preempted state law without regard to whether the federal statute at issue itself provided a right to bring an action." (collecting cases)).

But, as Armstrong counsels, even "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." 135 S. Ct. at 1385 (holding that private Medicaid providers could not sue to enforce Section 30(A) of the Medicaid Act because Congress "implicitly preclude[d] private enforcement of § 30(A)"); see also Seminole Tribe of Florida v. Florida, 517 U.S. 44, 74, 116 S. Ct. 1114, 1132, 134 L. Ed. 2d 252 (1996) ("Where Congress has created a remedial scheme for the enforcement of a particular federal right, we have, in suits against federal officers, refused to supplement that scheme with one created by the judiciary.").

Here, in this Court's view, Congress intended to foreclose equitable enforcement of the AAIA's Grant Assurances. A fair reading of the AAIA indicates that Congress intended to place authority for the enforcement of the AAIA's Grant Assurances exclusively in the hands of the Secretary of Transportation through a comprehensive administrative enforcement scheme. For starters, Section 47107(a) authorizes the Secretary to approve a grant application "if the Secretary receives written assurances, satisfactory to the Secretary." 49 U.S.C. § 47107(a) (emphasis added). If the FAA awards a grant, the Grant Assurances then

"become a binding contractual obligation between the airport sponsor and the Federal government." Pac. Coast Flyers, Inc., 2005 WL 1900515, at *11. The Secretary is then responsible for ensuring compliance with the Grant Assurances. See 49 U.S.C. § 47107(g). And to ensure compliance, Congress mandated that the Secretary "prescribe requirements for sponsors that the Secretary considers necessary." 49 U.S.C. § 47107(g) (emphasis added). Additionally, Section 47122 states that the Secretary "may take action the Secretary considers necessary to carry out [the AAIA], including conducting investigations and public hearings, prescribing regulations and procedures, and issuing orders." 49 U.S.C. § 47122(a). Based on all of these elements of the AAIA, which place the responsibility of Grant Assurance compliance squarely with the Secretary, the Court finds that Congress at least implicitly precluded federal courts from exercising equity jurisdiction to enforce the AAIA's Grant Assurances.

The Court's holding today does not leave an airport user without adequate recourse, however. The FAA's enforcement regulations permit a party "directly and substantially affected" by an airport sponsor's alleged noncompliance with a Grant Assurance to file a formal complaint with the FAA. 14 C.F.R. § 16.23(a). If the pleadings demonstrate a "reasonable basis for further investigation," the FAA investigates the allegations, after which the Director of the Office of Airport Safety and

Standards issues an "initial determination." 14 C.F.R. §§ 16.29(a), 16.31(a). If the Director dismisses the complaint, the interested party can file an administrative appeal to the Associate Administrator for Airports, who examines the existing record and issues a final decision without a hearing. 14 C.F.R. §§ 16.31(c), 16.33(a)(1). This final decision is then appealable, but only to a federal court of appeals. 49 U.S.C. § 46110(a); 14 C.F.R. § 16.247(a).

The FAA's administrative grant enforcement procedure is not insignificant. Indeed, "[c]ourts interpreting § 47107 have uniformly held that airport users have no right to bring an action in federal court claiming a recipient airport's violation of the § 47107 grant assurances until that claim has been raised with the FAA." Airborne, 2006 WL 753016, at *1 (collecting cases); see also Nw. Airlines, Inc. v. Cnty. of Kent, Mich., 955 F.2d 1054, 1059 (6th Cir. 1992) (holding that "all claims against the defendants under the AAIA were properly dismissed for failure to exhaust administrative remedies").

However, the Court recognizes that this case is complicated by the fact that the FAA agreed in the 2005 Settlement Agreement not to enforce Grant Assurance 22(a). (Pilsk Decl. Ex. 3 at 5.) On its face, this agreement appears to violate the Secretary's statutorily mandated duty to ensure compliance with the AAIA. The FAA's own decisions and determinations support this

conclusion.  See Platinum Aviation & Platinum Jet Ctr. BMI v.
Bloomington-Normal Airport Auth., FAA Docket No. 16-06-09, 2007 WL
4854321, at *15 (Nov. 28, 2007) ("[The] FAA can neither bargain
away the rights of access to public-use taxiways and movement areas
nor waive the grant assurances of the Respondent.  [The] FAA is
required to enforce the federal statutes to protect the federal
interest in the Airport.  The Part 16 process ensures respondents
comply with their agreements with the federal government to protect
and serve the public interest."); In re Compliance with Fed.
Obligations by the City of Santa Monica, Cal., FAA Docket 16-02-
08, 2008 WL 6895776, at *26 (May 27, 2008) ("The FAA may not by
agreement waive its statutory enforcement jurisdiction over future
cases.").  Thus, the Court is sorely tempted to issue a ruling
that the FAA is statutorily obligated to enforce the Town's Grant
Assurances notwithstanding its agreement not to enforce in the
2005 Settlement Agreement.  However, the Court will not rule on
the scope of the FAA's duties without first providing the FAA an
opportunity to be heard.  Currently, the FAA's response to the
Complaint in the FAA Action is due on July 8, 2015.  After the FAA
responds, the Court may order additional briefing and/or schedule
a hearing to address this issue.  In the meantime, Plaintiffs may,
if they wish, file a complaint with the FAA regarding the Town's
alleged failure to comply with its Grant Assurances.

Finally, the Court will entertain Plaintiffs' preemption claim with respect to ANCA.  With respect to ANCA, Plaintiffs simply seek a declaration and injunctive relief that ANCA expressly preempts any noise or access restriction on a Stage 2 or Stage 3 aircraft unless the airport proprietor follows ANCA's procedural requirements.  This claim does not raise the same jurisdictional concerns as Plaintiffs' AAIA claims.  There is nothing in the text or structure of ANCA indicating that Congress intended to preclude a federal court sitting in equity from entertaining Plaintiffs' preemption challenge, nor is there an administrative enforcement proceeding that would permit Plaintiffs to pursue their claim. The Court will now turn to the requirements of Plaintiffs' motion for a preliminary injunction.

C.   Irreparable Harm

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'"  Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (quoting Rodriguez v. DeBuono, 175 F.3d 227, 233-34 (2d Cir. 1999)).  Accordingly, "'the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.'"  Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (quoting Freedom Holdings, Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005)).  To meet the

irreparable harm requirement, Plaintiffs "'must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.'" Faiveley, 559 F.3d at 118 (quoting Grand River, 481 F.3d at 66). "'Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances.'" Id. (quoting Moore v. Consol. Edison Co. of N.Y., 409 F.3d 506, 510 (2d Cir. 2005)).

"A 'substantial loss of business,' particularly where there is a threat of bankruptcy, constitutes irreparable injury sufficient to satisfy this standard." Nat'l Helicopter Corp. of Am. v. City of N.Y., 952 F. Supp. 1011, 1018 (S.D.N.Y. 1997) ("National Helicopter I") (quoting Doran v. Salem Inn, Inc., 422 U.S. 922, 932, 95 S. Ct. 2561, 2568, 45 L. Ed. 2d 648 (1975)), aff'd in part, rev'd in part, Nat'l Helicopter II, 137 F.3d 81 (2d Cir. 1998). "Major disruption of a business can be as harmful as its termination and thereby constitute irreparable injury." Petereit v. S.B. Thomas, Inc., 63 F.3d 1169, 1186 (2d Cir. 1995) (remanding with instructions that the plaintiffs "may show that the lost profits . . . are of such magnitude as to threaten the viability of their businesses"). Additionally, "[t]he threat that a business will suffer a significant loss of 'good will'--a matter

not easily quantified--is particularly suited to a claim for injunctive relief." Nat'l Helicopter I, 952 F. Supp. at 1018.

Plaintiffs argue that they will suffer irreparable harm absent an injunction because the Town Laws will: (1) "cause severe economic harm" that will "threaten the continued existence of some Plaintiffs"; and (2) "cause incalculable and irreversible damage to Plaintiffs' goodwill, relationships, market share, and reputation." (Pls.' Br. at 8-11.) Plaintiffs have submitted various affidavits from executives and high-ranking employees to support these allegations. (See Renz Decl., Docket Entry 22; Jungck Decl., Docket Entry 23; Vellios Decl., Docket Entry 24; Herbst Decl., Docket Entry 25; Carlson Decl., Docket Entry 28; Ashton Decl., Docket Entry 29.) A review of these affidavits demonstrates that at least some Plaintiffs have demonstrated irreparable harm absent an injunction.

The majority of the aircrafts that many of the Plaintiffs use for their charter services to the Airport are subject to the Town Laws' Noisy Aircraft definition. (Renz Decl. ¶ 20 (six of Analar's seven helicopters); Ashton Decl. ¶ 15 (all ten of AAG's helicopters); Carlson Decl. ¶ 18 (HeliFlite's entire fleet); Vellios Decl. ¶ 11 (all eleven of Liberty's helicopters). Thus, it cannot be seriously argued that the Town Laws, particularly their One-Trip Limit, will not cause substantial business losses that might threaten Plaintiffs' existence. For example, according

to Analar's president, Michael Renz, flights to and from the Airport account for fifty-five percent of Analar's revenue, and over seventy percent of its passengers fly to and from the Airport. (Renz Decl. ¶¶ 9, 11.) He estimates that sixty-five percent of Analar's flights will be prohibited under the Town Laws. (Renz. Decl. ¶ 20.)

Moreover, as noted, in addition to providing charter services, AAG and HeliFlite manage "fractional aircraft ownership programs," which involve selling partial ownership or leasehold interests of a helicopter to private individuals who wish to operate their own helicopter using AAG and HeliFlite as managers. (Compl. ¶¶ 14, 17.) According to AAG's president, its prospective fractional owners have delayed purchasing shares and some of its existing fractional owners have delayed renewing their shares pending the outcome of this matter. (Ashton Decl. ¶ 28.) In this Court's view, this would result not only result in lost revenue, but also damage to AAG's reputation and good will with its present and prospective clients. HeliFlite likely faces the same predicament. (Carlson Decl. ¶¶ 26-27.) Similarly, three of Analar's seven helicopters are owned by third-party individuals with personal travel needs to and from the Airport, some of who have advised Analar that they will sell their helicopters if the Town Laws go into effect. (Renz Decl. ¶¶ 21, 24.) This undoubtedly would constitute a major business disruption because Analar would

not only lose its management business, but also the use of those helicopters for other customers. Additionally, some Plaintiffs believe that they will have to reduce their fleets and terminate many of their employees, including highly-skilled pilots. (See Renz Decl. ¶¶ 17, 25; Vellios Decl. ¶ 20; Ashton Decl. ¶ 24.) In a highly-specialized industry, the loss of operating equipment and pilots could be difficult to replace.

In sum, the Town Laws undoubtedly will impose on some of the Plaintiffs substantial business losses, major operational disruptions, and losses of good will that could be difficult to quantify. Plaintiffs have therefore demonstrated irreparable harm absent an injunction.[9]

---

[9] Additionally, the Court notes that money damages may not be available to at least one Plaintiff, Liberty, which is a New York corporation. Money damages are unavailable for its preemption claims. As previously noted, the AAIA, ANCA, and the Supremacy Clause do not create private causes of action. (See supra pp. 20-22.) Nor is a claim available for violations of the AAIA or ANCA under 42 U.S.C. § 1983. See Scott Aviation, Inc. v. DuPage Airport Auth., 393 F. Supp. 2d 638, 647 (N.D. Ill. 2005) (holding that a plaintiff may not base a Section 1983 claim upon a violation of the AAIA); Tutor, 2004 WL 344437, at *10 n.4 (same, but for ANCA). And although Plaintiffs' Commerce Clause claim might support a money damages award under 42 U.S.C. § 1983, see Dennis v. Higgins, 498 U.S. 439, 111 S. Ct. 865, 112 L. Ed. 2d 969 (1991) (recognizing that Commerce Clause claims are actionable under 42 U.S.C. § 1983), these damages clearly would be limited to those incurred in connection with an unconstitutional restraint on interstate commerce, see Town of Southold v. Town of E. Hampton, 477 F.3d 38, 47 (2d Cir. 2007) (stating that the "[D]ormant Commerce Clause . . . limits the power of local governments to enact laws affecting interstate commerce"). Thus, being a New York corporation, Liberty likely

D.  <u>Likelihood of Success on the Merits</u>

Having found irreparable harm absent an injunction, the Court now turns to the merits of this case. As noted, the Supremacy Clause provides that federal statutes preempt contrary state and local laws. <u>See</u> <u>Nat'l Helicopter II</u>, 137 F.3d at 88 ("The Supremacy Clause of the United States Constitution invalidates state and local laws that 'interfere with or are contrary to, the laws of congress.'" (quoting <u>Chicago & N.W. Transp. Co.</u>, 450 U.S. at 317, 101 S. Ct. at 1130). Plaintiffs contend that the Town Laws are invalid because ANCA "expressly preempts local proprietors from imposing any noise or access restrictions on any aircraft classified by the FAA as a 'Stage 2' or 'Stage 3' aircraft unless the proprietor has first complied with ANCA's stringent requirements." (Pls.' Br. at 14 (emphasis omitted).) Alternatively, Plaintiffs argue that the laws are preempted because they unreasonable, arbitrary, and discriminatory. (Pls. Br. at 21-25.)

The Town responds that ANCA does not expressly preempt local noise regulations. Rather, the Town reads ANCA to provide airport proprietors with a choice: comply with ANCA's requirements or lose eligibility for federal airport improvement grants. (Def.'s Br. at 14-15.) As long as an airport proprietor's noise

_____

would not be entitled to money damages under the Commerce Clause.

regulation is reasonable, non-arbitrary, and non-discriminatory, the Town contends, such regulation constitutes a valid exercise of the airport proprietor's proprietary rights in the airport. (Def.'s Br. at 14-15.)

As discussed below, the Court agrees with the Town that ANCA does not expressly preempt all airport proprietors from adopting access restrictions before complying with ANCA's procedural requirements. However, for the reasons explained below, the Court also finds that on the record before it, Plaintiffs have demonstrated that the One-Trip Limit is not reasonable.

### 1. Whether ANCA Preempts the Town Laws

Under the Airline Deregulation Act ("ADA"), Congress has expressly preempted state and local regulations "related to a price, route or service of an air carrier." 49 U.S.C. § 41713(b)(1)). However, Congress also expressly stated that the ADA's preemptive effect does not apply to regulations passed by state and local authorities in the course of "carrying out [their] proprietary powers and rights." 49 U.S.C. § 41713(b)(3). "Under this 'cooperative scheme,' Congress has consciously delegated to state and municipal proprietors the authority to adopt rational regulations with respect to the permissible level of noise created by aircraft using their airports in order to protect the local

population." <u>Nat'l Helicopter II</u>, 137 F.3d at 88 (collecting cases and legislative history).

Thus, "federal courts have recognized federal preemption over the regulation of aircraft and airspace, subject to a complementary though more 'limited role for local airport proprietors in regulating noise levels at their airports.'" <u>Id.</u> (quoting <u>City and County of San Francisco v. F.A.A.</u>, 942 F.2d 1391, 1394 (9th Cir. 1991)). Known as the "proprietor exception," it permits a local municipality, acting in its proprietary capacity, as opposed to its police power, to adopt "'reasonable, nonarbitrary and non-discriminatory' regulations of noise and other environmental concerns at the local level." <u>Id.</u> (quoting <u>British Airways Bd. v. Port Auth. of N.Y.</u>, 558 F.2d 75, 84 (2d Cir. 1977)); <u>see also</u> <u>Glob. Int'l Airways Corp. v. Port Auth. of N.Y. & N.J.</u>, 727 F.2d 246, 248 (2d Cir. 1984) ("[S]tates and localities retain power in their capacity as airport proprietors to establish requirements as to the level of permissible noise created by aircraft using their airports."). The rationale for the proprietor exception is that since airport proprietors are liable for compensable takings from excessive aircraft noise, <u>British Airways</u>, 558 F.2d at 83 (citing <u>Griggs v. Allegheny Cnty.</u>, 369 U.S. 84, 82 S. Ct. 531, 7 L. Ed. 2d 585 (1962)), fairness dictates that they should have the power to limit their liability by restricting access to their airports, <u>see</u> <u>id.</u> ("The right of the

proprietor to limit his liability by restricting the use of his airport has been thought a corollary of this principle.").

Plaintiffs do not dispute the existence of the proprietor's exception. Rather, they contend that when Congress enacted ANCA in 1990, it "displac[ed] local proprietors' authority to unilaterally impose restrictions." (Pls.' Br. at 15.) The Court disagrees. Plaintiffs are correct that ANCA directed the Secretary of Transportation to "establish[ ] by regulation a national program for reviewing airport noise and access restrictions on the operation of stage 2 and stage 3 aircraft." 49 U.S.C. § 47524(a). However, under Section 47526 of ANCA, entitled, "Limitations for noncomplying airport noise and access restrictions," the only consequences for failing to comply with ANCA's review program are that the "airport may not--(1) receive money under [the AAIA]; or (2) impose a passenger facility charge under [49 U.S.C. § 40117]." 49 U.S.C. § 47524. This provision raises an obvious question. If Congress intended to preempt all airport proprietors from enacting noise regulations without first complying with ANCA, why would it also include an enforcement provision mandating the loss of eligibility for federal funding and the ability to impose passenger facility charges? The logical answer is that Congress intended to use grant and passenger facility charge restrictions to encourage, but not require, compliance with ANCA. Indeed, in National Helicopter II, the

36

Second Circuit affirmed a decision rendered by then-District Judge
Sonia Sotomayor in which she applied the proprietor exception to
uphold various noise regulations imposed by the City of New York
on Manhattan's East 34th Street Heliport notwithstanding the fact
that the plaintiff in that case presented the same ANCA-preemption
argument that Plaintiffs assert here.  See Nat'l Helicopter II,
137 F.3d at 88; Nat'l Helicopter I, 952 F. Supp. at 1023.
Accordingly, in line with National Helicopter II, this Court holds
that ANCA did not displace the proprietor exception.[10]

        2.    Whether the Town Laws Are Reasonable, Non-
              Arbitrary, and Non-Discriminatory

        Even though ANCA does not expressly preempt the Town
Laws, to be constitutional under the proprietor exception, the
laws still must be reasonable, non-arbitrary, and non-
discriminatory.  Nat'l Helicopter II, 137 F.3d at 88 ("[T]he
proprietor exception allows municipalities to promulgate
'reasonable, nonarbitrary and non-discriminatory' regulations of
noise and other environmental concerns at the local level."

---

[10] The Court does note that the Airport is federally obligated
since it accepted federal funds in 2001, and ANCA expressly
states that it "does not affect . . . the authority of the
Secretary of Transportation to seek and obtain legal remedies
the Secretary considers appropriate, including injunctive
relief."  49 U.S.C. § 47533.  The Court offers no opinion on
whether or not the FAA has authority to enjoin the Town Laws on
the basis that the Airport is still federally obligated and
therefore would need to comply with ANCA's procedural
requirements.

(quoting British Airways, 558 F.2d at 84)).  Regulations of noise "must avoid even the appearance of irrational or arbitrary action." Id. at 89.

For ease of reference, the Town Laws impose the following three access restrictions: (1) the Mandatory Curfew, which prohibits all aircraft from using the Airport between 11:00 p.m. and 7:00 a.m.; (2) the Extended Curfew, prohibiting "Noisy Aircraft" from using the Airport from 8:00 p.m. to 9:00 a.m.; and (3) the One-Trip Limit, a weekly limit prohibiting Noisy Aircraft from using the Airport more than two times per week during the months of May, June, July, August, and September.  See TOWN OF E. HAMPTON CODE § 75-38(B)-(C).

Plaintiffs argue that the Town Laws are unreasonable, arbitrary, and discriminatory on three grounds: (1) "the Town justified [the Town Laws] with deeply flawed data that are noncompliant with federal regulations," (Pls.' Br. at 22-23); (2) "The Town's 'Noisy Aircraft' standard is unreasonable because it is so extreme and excessive" and "is also arbitrary and discriminatory," (Pls.' Br. at 23-24); and (3) the Town Laws "are unreasonable and conflict with federal law because they create potential safety problems," (Pls.' Br. at 24-25).  The Court will first address Plaintiffs' arguments regarding safety and the Town's data since both arguments are applicable to all three access restrictions.

With respect to safety, Plaintiffs contend that the Town Laws' curfews are unsafe because they impose financial and injunctive penalty provisions that could influence pilot decisions in an unsafe manner and also divert air traffic to nearby airports that are unable to handle an increased demand. (Pls.' Br. at 24-25.) However, on the record before the Court, there is no evidence that the mandatory curfews would force any pilot to operate his or her aircraft in an unsafe manner. Plaintiffs' argument is purely speculative. Plaintiffs also cite to an FAA decision in which the FAA found that a mandatory curfew imposing financial penalties and injunctions was unsafe, and therefore unreasonable, because it "'reache[d] into the cockpits of individual aircraft and interact[ed] with safety parameters affecting critical . . . decisions' by pilots." (Pls.' Br. at 24 (quoting FAA Decision on 14 CFR Part 161 Study – Proposed Runway Use Restriction at LAX (Nov. 7, 2014) (alterations and ellipsis in original)).[11] However, in this case, the Town Laws include an exception for operational or medical emergencies. See TOWN OF E.

---

[11] The FAA's LAX decision is available at:
http://www.faa.gov/airports/environmental/airport_noise/part_161
/media/Final-Determination-LAX-Part%20161-Application-
20141107.pdf.

HAMPTON CODE § 75-38(E).[12]  In this regard, the Court notes that the FAA has been aware that the Town intended to impose curfews at the Airport since at least the end of February this year.  If at any time the FAA believed that the curfews were unsafe, it could, and still can, attempt to regulate the Town Laws based on safety concerns.

Plaintiffs also argue that the Town Laws are unconstitutional because the Town justified the Town Laws based on flawed data not compliant with federal regulations.  Specifically, Plaintiffs contend that the FAA has established a single metric-- yearly day-night noise exposure level expressed in decibels ("DNL")--and "requires its use by all airports to justify any efforts to reduce airport noise by restricting aircraft access." (Pls.' Br. at 22.)  Plaintiffs are correct that the FAA has established the DNL metric with respect to submissions under ANCA

---

[12] Specifically, Section 75-38 states:

> The restrictions of this section 75-38 shall not apply to any aircraft operational emergency, any medical emergency operation, whether by public or private aircraft, or to any operation by a government-owned aircraft, including, without limitation, police, emergency services, and military operations. In the case of an aircraft emergency or medical emergency operation, the operator shall submit a sworn statement to the Airport Manager within 24 hours of such operation attesting to the nature of the emergency and reason for the operation.

TOWN OF E. HAMPTON CODE § 75-38(E)

and the Airport Noise and Safety Act of 1979 ("ANSA"), 49 U.S.C. § 47502, et seq. See, e.g., Aircraft Owners & Pilots Ass'n v. City of Pompano Beach, FAA Docket 16-04-01, 2005 WL 3722717, at *28 (Dec. 15, 2005). However, here, the question is whether the Town acted appropriately under the proprietor exception, not ANCA or ANSA. In adopting the Town Laws, the Town considered formal complaints submitted through the Airport's formal complaint log, which yielded over 23,000 complaints. The Court recognizes that a large portion of these complaints came from a small number of households, but it cannot be argued that the Town lacked data to support a finding of a noise problem at the Airport, particularly given the large increase in helicopter traffic in recent years. Indeed, courts have affirmed the FAA's use of complaint data "as empirical data of a noise problem." Helicopter Ass'n Int'l, Inc. v. F.A.A., 722 F.3d 430, 436 (D.C. Cir. 2013).

Having found no evidence that the Town Laws are unsafe and that Plaintiffs have failed to demonstrate that the Town lacked sufficient noise data, the Court turns to the Mandatory Curfew. Aside from its argument that the Town relied on flawed data, Plaintiffs do not specifically argue that the Mandatory Curfew is unreasonable, arbitrary, or discriminatory. Accordingly, the Court will not preliminarily enjoin the Mandatory Curfew, a decision which is in line with precedent in this Circuit. See Nat'l Helicopter II, 137 F.3d at 89 (affirming district court's

41

decision to uphold weekday and weekend curfews because "[t]he protection of the local residential community from undesirable heliport noise during sleeping hours is primarily a matter of local concern and for that reason falls within the proprietor exception").

The Court now turns to the access restrictions applicable to "Noisy Aircraft." Plaintiffs first argue that the definition of "Noisy Aircraft" is "unreasonable because it is so extreme and excessive." (Pls.' Br. at 23.) In support of this argument, Plaintiffs submit expert declarations and other affidavits alleging that the Noisy Aircraft definition includes certain aircraft that a generally viewed as quiet. (See Shaffer Decl., Docket Entry 20, ¶ 36; Jungck Decl. ¶ 5; Brown Decl., Docket Entry 27, ¶ 22.) The Court disagrees with Plaintiffs. As noted, Noisy Aircraft is defined as "any airplane or rotorcraft for which there is a published Effective Perceived Noise in Decibels (EPNdb) approach (AP) level of 91.0 or greater." TOWN OF E. HAMPTON CODE § 75-38A(4)(a). The 91 EPNdb threshold appears to be a valid indicator of noise as it affects individuals. As the FAA has explained:

> EPNL is a single number measure of the noise of an individual airplane flyover that approximates laboratory annoyance responses. . . . The EPNL computation process effectively yields a time integrated annoyance level.

See FAA, Advisory Circular 36-4C, Noise Standards: Aircraft Type and Airworthiness Certification ¶ 192(a).[13]  Even if not all aircrafts are EPNdb certified, as Plaintiffs claim, this does not render the Noisy Aircraft definition arbitrary or discriminatory. For starters, Plaintiffs do not identify how many aircraft are not EPNDb certified.  Additionally, the Noisy Aircraft definition is based on noise, as opposed to restrictions based on weight or size, which courts have found to constitute unreasoned discrimination because they do not regulate based on noise.  See, e.g., Nat'l Helicopter II, 137 F.3d at 91 ("In this case, the City placed restrictions on certain aircraft because of their size--not the noise they make--despite evidence that larger helicopters are not necessarily noisier than smaller ones.  A regulation purporting to reduce noise cannot bar an aircraft on any other basis.").  Thus, Plaintiffs have not demonstrated that the 91 EPNdb threshold for Noisy Aircraft is arbitrary or discriminatory, at least at this stage of the litigation.  The Court therefore will not preliminarily enjoin the Extended Curfew that applies to Noisy Aircraft, for the same reasons stated with respect to the Mandatory Curfew.

---

[13] The Advisory Circular is available at:
http://www.faa.gov/documentLibrary/media/Advisory_Circular/AC36-4C.pdf.

However, the Court will preliminarily enjoin the One-Trip Limit as applied to Noisy Aircraft.  This measure is drastic, considering the effect it poses on some of Plaintiffs' businesses, and there is no indication that a less restrictive measure would not also satisfactorily alleviate the Airport's noise problem. Accordingly, on the record before it, the Court will preliminarily enjoin the One-Trip Limit as not reasonable.  In making this ruling, the Court has considered the fact that the Town's complaint data originated from a small percentage of the Town's residents.

E.    Balance of Hardships

"The balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided."  Goldman, Sachs & Co. v. N. Carolina Mun. Power Agency No. One, No. 13-CV-1319, 2013 WL 6409348, at *8 (S.D.N.Y. Dec. 9, 2013) (internal quotation marks and citation omitted).  Here, the balance of hardships tips in the Town's favor with respect to the Mandatory Curfew and Extended Curfew, as the Town's desire to protect its residents during sleeping hours clearly outweighs the inconvenience Plaintiffs may experience by having to minimize their flight schedules.  However, with respect to the One-Trip Limit, the balance tips in Plaintiffs' favor in light of the fact that the One-Trip Limit will have a drastic impact on their businesses, and there is no indication in the Town's papers that a less restrictive measure would not also

satisfactorily alleviate the Town's noise problem. Accordingly, Plaintiffs' motion for a preliminary injunction is GRANTED IN PART and DENIED IN PART. It is GRANTED with respect to the Town Laws' One-Trip Limit and is DENIED with respect to the Mandatory Curfew and Extended Curfew.

## II. Motion to Consolidate

Plaintiffs also seek to consolidate this action and the FAA Action for all purposes. The Court, in its discretion, RESERVES JUDGMENT on this motion pending the filing of the FAA's response to the Complaint in the FAA Action.

### CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction enjoining enforcement of the Town Laws (Docket Entry 19) is GRANTED IN PART and DENIED IN PART. It is GRANTED with respect to the One-Trip Limit and is DENIED with respect to the Mandatory Curfew and Extended Curfew. The Court RESERVES JUDGMENT with respect to Plaintiffs' motion to consolidate (Docket Entry 14) pending the filing of the FAA's response to the Complaint in the FAA Action.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     June   26  , 2015
           Central Islip, NY