

| | | |
|---|---|---|
| U.S. Department of Transportation | Office of Regional Administrator Eastern Region | 1 Aviation Plaza Jamaica, NY 11434-4809 |

**Federal Aviation Administration**

February 2, 2022

Mr. Peter Van Scoyoc
Supervisor, Town of East Hampton
159 Pantigo Road
East Hampton, NY 11937

SUBJECT: East Hampton Airport, East Hampton, New York

Dear Mr. Van Scoyoc:

The Federal Aviation Administration (FAA) has articulated on several occasions over the last year, actions that need to be completed to change the status of East Hampton Airport to a private facility.  During our meeting on Tuesday, January 25th,  the FAA agreed to provide you with a list of actions and issues triggered by East Hampton's submission of Form 7480—Deactivation of an Airport (Aeronautical Study Number (ASN) 2022-AEA-313-NRA), and Form 7480—Activation of an Airport (ANS 2022-AEA-415-NRA). We have also received the Town's February 1 Notice regarding the closing of the airport.

When FAA processes your request to deactivate East Hampton Airport (HTO or the airport), the following things will happen:
- all public instrument procedures will become unavailable;
- the existing Letter of Agreement with New York TRACON will terminate;
- all FAA-operated navigational, weather, and communication aids will be disabled; and
- Class D airspace will not be applicable.

When activating the private-use airport:
- The FAA will conduct an airspace analysis.  It must consider the effect of the proposed airport on the safe and efficient use of airspace by aircraft and the safety of persons and property on the ground by considering the effect of the proposed airport on existing or

   contemplated traffic patterns, its effect on the existing airspace structure, and the effects that existing or proposed manmade or natural objects would have on the airport proposal.
     - While the "new" airport will open on the same site, with the same facilities as the airport being deactivated, FAA has not analyzed this airspace in many years. The analysis must be completed using the most current criteria in effect, and FAA cannot predict what issues, if any, may arise with either Visual Flight Rule (VFR) or Instrument Flight Rule operations;
- Private airports cannot use publically funded procedures. Special Use procedures would have to be developed if the Town wants to replace the canceled public use instrument flight procedures. In order to do this, the Town would be required to pay for the development of those procedures, either by hiring a competent third party to design the new procedures or by entering into a reimbursable agreement with FAA for procedure development. Please be advised that there are qualified third party providers that can develop the special use procedures. (See attached)
     - Procedures at a private-use airport must be special use procedures. FAA will investigate whether the public use procedures can be replicated as special use procedures. The special use procedures would need to meet current criteria, and, if replicating the public use procedures, may require amendment. In that case, the procedures would be considered new procedures. If the path of the new procedure is altered in any way, a detailed environmental analysis will be required.
- The navigational, weather, and communications aids must be reestablished. The Town would have to make provisions for similar capabilities. The Town could procure the equipment but would have to enter into a reimbursable agreement with FAA to install, certify, and maintain that equipment.

The airport would have to establish a Letter of Agreement detailing how it plans to operate with the New York TRACON under a Prior Permission Required (PPR) construct. The Letter of Agreement must recognize that New York TRACON cannot discern who has permission to access the airfield and who does not. The access permissions would have to be managed by the Town through its airport management. New York TRACON cannot conduct verification calls. FAA is also concerned about the methods the airport will use to deny permission to land under PPR. If inbound aircraft are sent around because they have been denied permission to land, it could cause an unsafe situation within New York TRACON airspace. The FAA needs details on how the airport will enforce the PPR to ensure the integrity of the National Air Traffic System.

During our meeting, the Town also indicated that it wanted to operate a non-federal air traffic control tower at the "new" airport. To operate an air traffic control tower, FAA must certify the controllers and delegate airspace to the tower. The FAA is unsure whether it could spend appropriated funds to certify controllers at a private-use airport. Additionally, even if the Town was willing to pay the costs of certification, FAA is unsure whether such an arrangement would violate federal appropriations law. We are researching these novel issues.

At the meeting, we emphasized that the deactivation of the airport has genuine consequences. Once an airport is deactivated, it cannot be reopened with the same facilities and procedures simply by reactivating it.  While this may not be intuitively obvious, we explained our regulatory structure and need to maintain safety protocols; and how this impacts the ability to reopen quickly.  We explained the concrete actions that are taken upon deactivation; actions that, once taken, cannot simply be reversed.  FAA will not know whether such changes may be required until we conduct the airspace analysis.  If procedure changes are required, the special procedures may not be available at the start of the summer season, which would mean that the airfield is operated as a VFR only facility.  It would also mean that there would be operational impacts during instrument meteorological conditions.  We noted that this might not be the outcome you seek or desire and, if so, suggested that you reconsider the deactivation strategy; in that regard, we mentioned several other options and are happy to continue to discuss those with you.  In summary, once the airport is deactivated, it could not immediately return to its prior operating status.  While FAA will endeavor to expedite its processes, you should be aware that, it may take approximately two (2) years to restore the current capability to the airport if it is deactivated depending on any potential environmental analyses.

During our meeting, FAA pointed out that the issue of whether the Federal exclusive rights, revenue use, and civil rights obligations are extinguished by closing the airport and opening a new airport using the same location and same facilities is unsettled.  The Town indicated that it understood the risks and wanted to proceed.  In prior meetings, we offered the Town the opportunity to share the details of its legal theory with us as we consider this issue, for instance, providing statutory or case law support, but to date, you have not elected to do so.

Finally, the Town agreed to provide FAA with a list of the facilities and functions that it wants for its "new" airport. We received the Town's list on January 26.  We are currently preparing an itemized cost for each item on that list.

The issues described above represent the FAA's initial analysis of the steps it would take to deactivating an airport and then re-activating an airport on the same site.  Additional issues may arise as we work through the deactivating and re-activating with the Town.

As always, FAA is available to work with the Town on these and any other implications of the Town's decision.  Please feel free to contact my office with any questions you may have regarding these issues.

Sincerely,

MARIE T KENNINGTON-GARDINER

Digitally signed by MARIE T KENNINGTON-GARDINER
Date: 2022.02.02 17:44:22 -05'00'

Marie Kennington-Gardiner
Regional Administrator

Case 2:15-cv-02246-JS-ARL   Document 94-2   Filed 05/16/22   Page 4 of 4 PageID #: 1523